**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

LEAGUE OF WOMEN VOTERS, et al.,

Plaintiffs,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY, et al.,

Defendants.

Civil Action No. 1:26-cv-3602

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER, STAY UNDER 5 U.S.C. § 705, AND/OR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ iii

INTRODUCTION ........ 1

BACKGROUND ........ 4

I. The Trump Administration's efforts to seize the states' authority to run elections and determine who gets to vote ........ 4

II. Defendants' Voter Data Policy and Voter Data Transmission Policy ........ 6

III. Defendants' implementation of the Voter Data Policy and Voter Data Transmission Policy in California, Washington, and other states ........ 9

IV. Defendants' lists of "likely noncitizen voters" are demonstrably unreliable ........ 11

LEGAL STANDARD ........ 15

ARGUMENT ........ 15

I. Plaintiffs are likely to succeed on the merits ........ 15

A. The Voter Data Transmission Policy is final agency action reviewable under the APA ........ 16

B. The Voter Data Transmission Policy is contrary to law and exceeds Defendants' authority (Count I) ........ 18

C. The Voter Data Policy violates the Privacy Act's notice-and-comment requirements for new or revised systems of records (Count III) ........ 21

D. The Voter Data Transmission Policy violates the Privacy Act's substantive restrictions on disclosure (Count II) ........ 23

II. The Voter Data Transmission Policy irreparably harms Plaintiffs ........ 28

III. The balance of equities and public interest favor preliminary relief ........ 38

CONCLUSION ........ 43

# TABLE OF AUTHORITIES*

## Cases

*AFL-CIO v. Dep't of Lab.*,
778 F. Supp. 3d 56 (D.D.C. 2025) .......... 21

*Ala. Ass'n of Realtors v. HHS*,
594 U.S. 758 (2021) .......... 20

*Benisek v. Lamone*,
585 U.S. 155 (2018) .......... 40

*Bennett v. Spear*,
520 U.S. 154 (1997) .......... 16

*Buckley v. Am. Const. L. Found., Inc.*,
525 U.S. 182 (1999) .......... 26

*C.G.B. v. Wolf*,
464 F. Supp. 3d 174 (D.D.C. 2020) .......... 39

* *Cal. Nurses Ass'n v. Mullin*,
No. 26-cv-10680-AMO, 2026 WL 3166149 (N.D. Cal. Oct. 21, 2026) .......... 12, 40

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006) .......... 15

* *Citizens for Resp. & Ethics in Washington v. OMB*,
791 F. Supp. 3d 29 (D.D.C. July 21, 2025) .......... 35, 36, 37

*Colo. Mont. Wyo. State Area Conf. of the NAACP v. Smith*,
180 F.4th 1266 (10th Cir. 2026) .......... 33

* *Common Cause v. DOJ*,
No. 26-cv-1352 (SLS), 2026 WL 3033772 (D.D.C. Oct. 9, 2026) .......... *passim*

*Council for Opportunity in Educ. v. U.S. Dep't of Educ.*,
No. 25-cv-03491 (TSC), 2026 WL 120984 (D.D.C. Jan. 16, 2026) .......... 33

*Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*,
77 F.4th 679 (D.C. Cir. 2023) .......... 38

*Ctr. for Taxpayer Rts. v. Internal Revenue Serv.*,
190 F.4th 990 (D.C. Cir. 2026) .......... 29, 33

---

* Authorities marked with an asterisk are those on which counsel chiefly relies.

*DHS v. LWV*,
609 U.S. ----, 2026 WL 2879700 (2026) ... 21

*District of Columbia v. USDA*,
444 F. Supp. 3d 1 (D.D.C. 2020) ... 15

*Drs. for Am. v. OPM*,
793 F. Supp. 3d 112 (D.D.C. 2025) ... 18, 35

*DSCC v. Trump*, --- F. Supp. 3d ----, No. 26-cv-01114 (CJN),
2026 WL 2681471 (D.D.C. Sept. 13, 2026) ... 35

*Dunn v. Blumstein*,
405 U.S. 330 (1972) ... 39

*Elev8 Balt., Inc. v. Corp. for Nat'l & Cmty. Serv.*,
804 F. Supp. 3d 524 (D. Md. 2025) ... 17

*Eu v. San Francisco Cnty. Democratic Cent. Comm.*,
489 U.S. 214 (1989) ... 26

*FAA v. Cooper*,
566 U.S. 284 (2012) ... 24

*FEC v. Cruz*,
596 U.S. 289 (2022) ... 18

*Friends of Animals v. Jewell*,
824 F.3d 1033 (D.C. Cir. 2016) ... 38

*Hall v. Johnson*,
599 F. Supp. 2d 1 (D.D.C. 2009) ... 15

*Ill. State Bd. of Elections v. Socialist Workers Party*,
440 U.S. 173 (1979) ... 39

* *League of United Latin Am. Citizens v. EOP*,
818 F. Supp. 3d 34 (D.D.C. 2026), *judgment entered*,
No. 25-cv-0946 (CKK), 2026 WL 880056 (D.D.C. Mar. 31, 2026),
*aff'd*, No. 25-5476, 2026 WL 1991571 (D.C. Cir. July 2, 2026) ... 2, 4, 17, 20, 21

* *League of United Latin Am. Citizens* v. *EOP*,
780 F. Supp. 3d 135 (D.D.C. 2025) ... 29, 32, 33

*League of Women Voters of Mass. v. Trump*,
No. 26-cv-11549-IT, 2026 WL 2539946 (D. Mass. Aug. 27, 2026) ... 33

*League of Women Voters of N.C. v. North Carolina*,
769 F.3d 224 (4th Cir. 2014) .......................................................................................... 3

* *League of Women Voters of United States v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) .......................................................................................*passim*

*League of Women Voters v. U.S. Dep't of Homeland Sec.*,
835 F. Supp. 3d 79 (D.D.C. 2026) ................................................................................... 31

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024).......................................................................................................... 18

*Maydak v. United States*,
363 F.3d 512 (D.C. Cir. 2004) .......................................................................................... 27

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*,
595 U.S. 109 (2022)..................................................................................................... 18, 20

*Nken v. Holder*,
556 U.S. 418 (2009).......................................................................................................... 38

*Open Cmtys. All. v. Carson*,
286 F. Supp. 3d 148 (D.D.C. 2017) .................................................................................. 39

*Purcell v. Gonzalez*,
549 U.S. 1 (2006)............................................................................................... 3, 33, 34, 40

*Roudebush v. Hartke*,
405 U.S. 15 (1972)....................................................................................................... 20, 39

*Rutan v. Republican Party of Ill.*,
497 U.S. 62 (1990)............................................................................................................ 26

*Shawnee Tribe v. Mnuchin*,
984 F.3d 94 (D.C. Cir. 2021) ............................................................................................ 39

*Sw. Airlines Co. v. Dep't of Transp.*,
832 F.3d 270 (D.C. Cir. 2016) .......................................................................................... 17

*U.S. Sugar Corp. v. EPA*,
113 F.4th 984 (D.C. Cir. 2024) .......................................................................................... 18

*United States v. California*,
921 F.3d 865 (9th Cir. 2019), *cert. denied*, 590 U.S. 1015 (2020).................................. 21

* *United States v. California*, --- F.4th ----,
2026 WL 3212945 (9th Cir. Oct. 26, 2026)................................................. 10, 19, 20, 34

* *United States v. California*,
No. 26-cv-12025, Dkt. No. 149 (C.D. Cal. Oct. 28, 2026)....................................... *passim*

*United States v. Henderson*,
No. 26-cv-00166, 2026 WL 3181405 (D. Utah Oct. 23, 2026).................................. 5, 18

*United States v. Ramirez*,
No. 5:25-cr-00264, 2026 WL 3223483 (C.D. Cal. Oct. 27, 2026).................................... 7

* *United States v. Weber*,
816 F. Supp. 3d 1168 (C.D. Cal. 2026)........................................................... 2, 22, 26, 40

*Urb. Sustainability Dirs. Network v. U.S. Dep't of Agric.*,
No. 25-cv-1775 (BAH), 2026 WL 1877821 (D.D.C. June 30, 2026)............................. 33

*Venetian Casino Resort v. EEOC*,
530 F.3d 925 (D.C. Cir. 2008)........................................................................... 17

*Waterkeeper All. v. EPA*,
853 F.3d 527 (D.C. Cir. 2017)........................................................................... 38

*West Virginia v. EPA*,
597 U.S. 697 (2022)........................................................................................ 20

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008).......................................................................................... 28

**Statutes**

5 U.S.C. § 552a....................................................................................... *passim*

5 U.S.C. § 705.............................................................................................. 15

5 U.S.C. § 706(2)........................................................................... 18, 21, 23, 24

8 U.S.C. § 1373............................................................................................ 21

18 U.S.C. § 611............................................................................. 10, 19, 26, 39

Pub. L. No. 93-579, § 2(b), (b)(4), 88 Stat. 1896 (1974)........................................... 21

Wash. Rev. Code § 29A.08.820(1)........................................................................ 35

Wash. Rev. Code § 29A.08.840(3)(c)..................................................................... 32

**Regulations**

Exec. Order No. 14248, 90 Fed. Reg. 14005 (Mar. 28, 2025)........................................ 5

**Other Authorities**

County of Los Angeles, *Statement from Dean Logan Regarding U.S. Department of Justice Correspondence* (Oct. 14, 2026), https://perma.cc/J7VD-TPEG ........................ 10

Elaine Kamarck, *Why do so few noncitizens try to vote?*, Brookings (July 23, 2026), https://perma.cc/8NMX-JBVA ........................ 40

*Express*, Black's Law Dictionary, (12th ed. 2024) ........................ 26

First Assistant U.S. Attorney Bill Essayli (@USAttyEssayli), X (Oct. 19, 2026 at 7:21 pm), https://perma.cc/BE94-5AQF ........................ 1, 8

First Assistant U.S. Attorney Bill Essayli (@USAttyEssayli), X (Oct. 23, 2026 at 8:49 pm), https://perma.cc/TPJ9-WYAF ........................ 10

How to Challenge a Voter Registration & Washington State Voter Registration Challenge Form, Washington Secretary of State, https://perma.cc/H7Y4-LJZS ........................ 35

Julia Ainsley et al., *DOJ Weighs Election Litigation Against More States*, NBC News (Oct. 21, 2026), https://perma.cc/7CBD-PK8V ........................ 11, 28

Karina Tsui, Maria Aguillar Prieto & Isa Mudannayake, *Justice Department orders California counties to set aside ballots from suspected noncitizens*, CNN (Oct. 24, 2026), https://tinyurl.com/84ys5u3j ........................ 14

Kaylie Martinez-Ochoa, Eileen O'Connor & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (Oct. 26, 2026), https://perma.cc/3A3A-F7LF ........................ 5

Kristina Cooke & Peter Eisler, *White House Pushes for Speedy Review of Voter Rolls in Hunt for Noncitizen Voters*, Reuters (Sep. 24, 2026), https://perma.cc/D347-SKR8 ........................ 7

Laurel Rosenhall & Shawn Hubler, *Justice Dept. Demands That California Counties Help Identify Noncitizen Voters*, N.Y. Times (Oct. 23, 2026), https://perma.cc/82W7-PXMP ........................ 10, 13, 14, 42

Letter for Charles Neil Floyd, Acting United States Attorney, and Pete Serrano, First Assistant United States Attorney, from Steve Hobbs, Washington Sec. of State (Oct. 28, 2026), https://perma.cc/G4T5-XLFE ........................ 13

Letter for Dean C. Logan, Los Angeles County Registrar-Recorder/County Clerk, from R. Trent McCotter, Acting Deputy Attorney General (Oct. 13, 2026), *available at* https://perma.cc/Q2T79ZQW ........................ 9, 19, 29

Letter for Hon. Steve Hobbs, Washington Sec. of State, from Charles Neil Floyd, Acting United States Attorney, and Pete Serrano, First Assistant United States Attorney (Oct. 26, 2026), *available at* https://perma.cc/K3WY-ET8G .......................... 8, 19, 28, 29

Letter for Peter M. Bollinger, Assistant County Counsel, Los Angeles County Counsel's Office, from Trent McCotter, Acting Deputy Attorney General, U.S. Department of Justice (Oct. 16, 2026) ........................................................................................ 11

Letter for Shirley N. Weber, California Secretary of State, from R. Trent McCotter, Acting Deputy Attorney General (Oct. 13, 2026), *available at* https://perma.cc/TVU7-KDJY ............................................................................ 8, 9, 19, 29

Letter from Sen. Alex Padilla & Sen. Dem. Leader Chuck Schumer to Sec. Markwayne Mullin & Joseph B. Edlow, Dir. USCIS, (Sep. 13, 2026), https://perma.cc/MK8U-JP2X ........................................................................................................... 6

Miles Parks & Jude Joffe-Block, *Some on DOJ's 20,000 'Likely' Noncitizen List in California Appear to Be U.S.-Born*, NPR (Oct. 20, 2026), https://perma.cc/RBQ7-35T4 .............................................................................................................. 13, 42

Nick Corasaniti, *From 16,000 to 185 to Zero: Trump's Claims of Illegal Voting in Nevada Fizzle*, N.Y. Times (Sep. 24, 2026), https://perma.cc/G7F5-X6SK ................ 6, 41

Nick Corasaniti, *Homeland Security Made a Big Claim About Noncitizen Voting. Now It Can't Prove It.*, N.Y. Times (Aug. 20, 2026), https://perma.cc/2999-VP26 ...................... 6

Peter Elkind et al., *Inside Trump's Failed Hunt for Noncitizen Voters*, ProPublica (Aug. 14, 2026), https://perma.cc/6VZG-UKY8. ................................................................ 12, 41

Press Release, DOJ, *Federal data shows hundreds of non-citizens registered to vote in Washington*, (Oct. 26, 2026), *available at* https://www.justice.gov/usao-edwa/pr/federal-data-shows-hundreds-non-citizens-registered-vote-washington ............ 29

Press Release, Washington Sec. of State, *Statement about Washington's safe and secure elections,* (Oct. 26, 2026), https://tinyurl.com/y8ynf3bt .................................................. 35

Ryan Sabalow & Jeanne Kuang, *What Local Election Officials Found in Trump's New Claims About California Voters*, CalMatters (Oct. 27, 2026) https://perma.cc/E9R7-8LFK ......................................................................................... 42

SSA, *Social Security Corrects Tens of Millions of Files in the Social Security Number Database Improving the Integrity of Vital Records* (Oct. 20, 2026), https://perma.cc/PBT8-SXYT ........................................................................................ 12

U.S. Dep't of Homeland Sec., Privacy Policy Directive 047-01-007, *Handbook for Safeguarding Sensitive PII* 14 (Dec. 4, 2017), https://perma.cc/KE5K-SBG7 ................ 25

U.S. Dep't of Homeland Security, *Dozens of Illegal Aliens Arrested in Nationwide Voter Fraud Crackdown*, (Oct. 28, 2026), https://perma.cc/SCC9-953Q .................................. 41

USCIS, First Interim Response to ICE FOIA Case Number 2026-ICLI-00100 (Oct. 1, 2026), *available at* https://perma.cc/Q6VE-W9UC........................................................... 7

## INTRODUCTION

With midterm voting well underway, Defendants Department of Homeland Security and Department of Justice have deployed an illegal policy trying to dictate who gets to vote. Under this policy, Defendants are creating unreliable federal lists of "likely noncitizen voters" and threatening to prosecute state election officials if they refuse to investigate the identified voters and stop counting their ballots—despite admitting the lists are inaccurate and likely to misidentify eligible voters as "noncitizens." The policy works like this:[1]




This motion seeks emergency relief to halt the final component of this overarching policy: Defendants' transmission of data about registered voters who they claim are "likely noncitizens"

[1] First Assistant U.S. Attorney Bill Essayli (@USAttyEssayli), X (Oct. 19, 2026 at 7:21 pm), https://perma.cc/BE94-5AQF.

to states and localities, for the purpose of states and localities taking special action with respect to those voters: investigating the identified voters, segregating the identified voters' ballots, and/or refusing to tabulate the identified voters' ballots until their citizenship status can be determined (the "Voter Data Transmission Policy").

"Never before in American history has the federal government, on the eve of an election, sought to coerce a state and local government to abandon their own Constitutional elections procedures and bend to the will of the Executive Branch." Order Denying TRO at 2, *United States v. California*, No. 26-cv-12025 (C.D. Cal. Oct. 28, 2026), Dkt. No. 149 ("*California* TRO Denial"). Defendants' unprecedented Voter Data Transmission Policy threatens millions of Americans' fundamental voting and privacy rights and risks throwing our nation into electoral chaos. To prevent this result, this Court should temporarily restrain and then stay and preliminarily enjoin the Policy.

Plaintiffs—voting and privacy rights organizations with members nationwide—meet each requirement for preliminary relief. They are likely to succeed on their claims that the Voter Data Transmission Policy exceeds Defendants' statutory authority and affirmatively violates the Privacy Act of 1974—a statute designed to restrict the government's disclosure of sensitive personal information, promote transparency, and protect U.S. citizens from adverse determinations based on flawed federal data. Courts in this District and across the country have recently rejected similar unlawful data-disclosure initiatives by this administration. *See League of United Latin Am. Citizens ("LULAC") v. EOP*, 818 F. Supp. 3d 34, 113-15 (D.D.C. 2026), *judgment entered*, No. 25-cv-0946 (CKK), 2026 WL 880056 (D.D.C. Mar. 31, 2026) (*"LULAC II*"); *Common Cause v. DOJ*, No. 26-cv-1352 (SLS), 2026 WL 3033772, at *1 (D.D.C. Oct. 9, 2026); *United States v. Weber*, 816 F. Supp. 3d 1168, 1192-94 (C.D. Cal. 2026). Indeed, as one court emphasized just

yesterday in refusing to order California to comply with Defendants' same Voter Data Transmission Policy, "[g]iven the vagueness of [the government's] descriptions of its procedures and the unreliability of its similar claims in other states, the Court cannot conclude that [the government's] process is credible," which "calls into question [the government's] allegation that the individuals on the October List are 'highly likely to be noncitizens.'" *California* TRO Denial at 22 (cleaned up).

The resulting harms to Plaintiffs League of United Latin American Citizens ("LULAC") and Electronic Privacy Information Center ("EPIC")—with election day, canvassing, tabulation, and certification looming—are unquestionably irreparable. Once election deadlines pass, "there can be no do over and no redress." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (quoting *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014)).

To start, Defendants' Voter Data Transmission Policy, predictably, is irreparably harming voters across the country—especially LULAC's constituency in the Latino community, who are at heightened risk of being swept up in and misidentified by Defendants' illegal dragnet. Defendants' Policy is "likely caus[ing] 'voter confusion and consequent incentive to remain away from the polls' as individuals . . . wonder whether their ballots were likely to be withheld." *California* TRO Denial at 25 (quoting *Purcell v. Gonzalez*, 549 U.S. 1, 5 (2006)). Simply put, when it comes to the harms the Voter Data Transmission Policy is imposing on LULAC's members and voters across the country, "[c]onstitutional rights and our democracy are at stake." *Id.* at 26.

The Policy is also irreparably harming LULAC and EPIC themselves. LULAC's mission is to advance the voting rights of the Latino community, particularly through encouraging civic engagement and voter education. LULAC cannot effectively accomplish that mission when its

members are scared and confused about exercising their voting rights and while Defendants are hiding the truth about what exactly they are doing. And at the same time, LULAC is responding to an outcry from its members seeking assistance and guidance. Likewise, Defendants' opacity is anathema to EPIC's pursuit of oversight of government activities that impact individual privacy. LULAC and EPIC both *urgently* need the statutorily required information Defendants are withholding from the public to fulfill their organizational mandates.

"Eroded trust in our democracy is irreparable. Once a vote is segregated, lasting harm has occurred. If the Executive can discount votes and threaten an ongoing election due to unproven allegations, then our democracy is in danger." *Id.* Accordingly, Plaintiffs respectfully request the Court grant the motion and put a stop to the Voter Data Transmission Policy.[2]

## BACKGROUND

### I. The Trump Administration's efforts to seize the states' authority to run elections and determine who gets to vote

Our Constitution and federal statutes entrust the states alone with determining who is qualified to vote and with conducting federal elections. "The Constitution assigns no direct role to the President in either" the "domain[s]" of "voter qualifications" or "election procedures." *LULAC II*, 818 F. Supp. 3d at 59-61.

Nonetheless, since the early days of his second term, President Trump and his administration have engaged in a fishing expedition to identify purported unlawful voters and to compel states to purge supposedly ineligible voters from their rolls using unreliable methods and

[2] While Defendants' overarching Voter Data Policy, as defined below, is illegal across the board, Plaintiffs LULAC and EPIC now seek emergency relief as to the most imminently harmful aspect of that policy—i.e., the Voter Data Transmission component. They seek preliminary relief solely with respect to Counts I through III of the First Amended Complaint. *See* First Am. Compl. ¶¶ 188-224 (APA claims for lack of statutory authority and violations of the Privacy Act). Plaintiffs do not move for relief on their remaining claims at this time. *See id.* ¶¶ 225-65 (Paperwork Reduction Act, arbitrary-and-capricious, and constitutional claims).

citizenship data. Just two months after inauguration day, President Trump signed Executive Order 14248, "Preserving and Protecting the Integrity of American Elections," which directed the Attorney General to "prioritize enforcement of 18 U.S.C. [§§] 611 and 1015(f) and similar laws that restrict non-citizens from registering to vote or voting." Exec. Order No. 14248, § 2(e), 90 Fed. Reg. 14005, 14007 (Mar. 28, 2025). The Executive Order also directed the Attorney General and the DHS Secretary to take measures to identify—or ensure that states could identify—unqualified voters on state registration rolls. *Id.* § 2(b)(i), (e)-(f).

Soon after the Executive Order, DOJ began demanding that states produce complete statewide voter registration lists, or "SVRLs," that contain sensitive information about voters, including names, addresses, birth dates, Social Security numbers, driver's license numbers, and much more. *See* Kaylie Martinez-Ochoa, Eileen O'Connor & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (Oct. 26, 2026), https://perma.cc/3A3A-F7LF; *Common Cause*, 2026 WL 3033772, at *5. At least 18 states have agreed to provide their complete, unredacted SVRLs to DOJ. *Common Cause*, 2026 WL 3033772, at *5. However, many states refused. *Id.* DOJ followed up by suing 30 states and the District of Columbia for their failure to comply with its demands. Martinez-Ochoa, *Tracker of Justice Department Requests for Voter Information*.

DOJ has lost *every single one* of the lawsuits that has been adjudicated. *Id.* Just last week, a district court in Utah handed the administration its latest loss. *See United States v. Henderson*, No. 26-cv-00166, 2026 WL 3181405 (D. Utah Oct. 23, 2026).

Moreover, earlier this month, Judge Sooknanan vacated DOJ's "Voter List Maintenance Policy" which made "every American citizen who registers to vote . . . the subject of a voter fraud investigation . . . simply because they registered to vote." *Common Cause*, 2026 WL 3033772, at *1. The court concluded that the policy "r[a]n roughshod over longstanding laws that were

carefully crafted to protect the rights of the American people," and that DOJ's policy lacked statutory authority, was arbitrary-and-capricious in violation of the APA, and violated both the Privacy Act and the Paperwork Reduction Act. *Id.*

For its part, DHS has engaged in its own dubious efforts to identify alleged noncitizen voters. For instance, Secretary Mullin claimed that DHS had identified 15,903 noncitizens registered to vote in Nevada. *See* Nick Corasaniti, *Homeland Security Made a Big Claim About Noncitizen Voting. Now It Can't Prove It.*, N.Y. Times (Aug. 20, 2026), https://perma.cc/2999-VP26. But when DHS was pressed by Nevada officials, it admitted it had identified only 185. *Id.* And when Nevada looked into those 185 voters, it found every single one was a citizen. Nick Corasaniti, *From 16,000 to 185 to Zero: Trump's Claims of Illegal Voting in Nevada Fizzle*, N.Y. Times (Sep. 24, 2026), https://perma.cc/G7F5-X6SK. These efforts have also been shrouded in secrecy and clouded by doubt, with a whistleblower recently coming forward to provide evidence of DHS "using highly questionable data and methods to identify purported unlawful voters." Letter from Sen. Alex Padilla & Sen. Dem. Leader Chuck Schumer to Sec. Markwayne Mullin & Joseph B. Edlow, Dir. USCIS, at 1 (Sep. 13, 2026), https://perma.cc/MK8U-JP2X. According to the whistleblower disclosure, DHS employees were informed that additional data on voters were also to be added through "supplemental magic." *Id.* attach. at 3.

## II. Defendants' Voter Data Policy and Voter Data Transmission Policy

Defendants' "Voter Data Policy" is the Administration's latest, and most sweeping, salvo in its hunt for alleged voter fraud. The Voter Data Policy is a policy adopted by DHS and DOJ to collect, maintain, augment, and use available SVRLs to support the agencies' efforts to identify purportedly unlawful voters and coerce states to not count their votes. The "Voter Data Transmission Policy" is, as described below, both a component part of the Voter Data Policy and a separate action adopted collectively by DHS and DOJ. Although Plaintiffs are challenging both

the Voter Data Policy and the Voter Data Transmission Policy in their First Amended Complaint, only the latter policy is at issue in this motion.

A DOJ graphic published by Bill Essayli, the First Assistant U.S. Attorney for the Central District of California, explains the full scope of the Voter Data Policy—a "multi-agency, multi-step" process designed "to protect the integrity of federal elections and ensure only U.S. citizens vote." *See supra* Introduction at 1.[3] As the DOJ graphic explains, the Voter Data Policy contains multiple component parts. ***First***, DHS collects SVRLs—or "what appear[]" to be SVRLs, *id.*—which contain information such as "name, mailing address, date of birth or age, social security number, phone number, email, registration information, voter-history information, and more." Decl. of Nicolas Bartell, *United States v. California*, No. 26-cv-12025, ¶¶ 13, 16 (C.D. Cal. Oct. 19, 2026), Dkt. No. 22-4. DHS has collected a staggering amount of data. Per an HSI Election Integrity Investigations report, by June 1, 2026, DHS had "ingested" "50.6 million records" in a "DOJ Dataset Intake" and an additional "48.4 million records [that] were obtained by [Deputy Assistant Secretary] Heather Honey through independent sources of information." USCIS, First Interim Response to ICE FOIA Case Number 2026-ICLI-00100, at 26-ICLI-00100 057 (Oct. 1, 2026), *available at* https://perma.cc/Q6VE-W9UC. And according to Reuters, an internal government email dated September 1, 2026, indicates that DHS has obtained some version of the SVRLs of at least 47 states. *See* Kristina Cooke & Peter Eisler, *White House Pushes for Speedy Review of Voter Rolls in Hunt for Noncitizen Voters*, Reuters (Sep. 24, 2026), https://perma.cc/D347-SKR8.

***Second***, USCIS sends the data to LexisNexis's Accurint Service. Decl. #2 of Nicolas Bartell, *United States v. California*, No. 26-cv-12025, ¶ 15 (C.D. Cal. Oct. 26, 2026), Dkt. No.

---

[3] A federal district court recently held that Essayli is "unlawfully serving as a 'de facto' United States Attorney." *United States v. Ramirez*, No. 5:25-cr-00264, 2026 WL 3223483, at *10 (C.D. Cal. Oct. 27, 2026).

107-2. Accurint augments the SVRLs by adding information like name, Social Security number, date of birth, phone number, and address. *Id.*

***Third***, USCIS and HSI attempt to match the identities of individuals in the supplemented SVRLs to citizenship information they already possess, including USCIS "alien" numbers, State Department data, Social Security Administration ("SSA") data, and HSI data. *See* Decl. of Nicolas Bartell, *United States v. California*, No. 26-cv-12025, ¶¶ 16-20 (C.D. Cal. Oct. 19, 2026), Dkt. No. 22-4; *see also* Decl. of Eric McLoughlin, *United States v. California*, No. 26-cv-12025, ¶¶ 16-19 (C.D. Cal. Oct. 19, 2026), Dkt. No. 22-3. The result is a list of individuals that DHS claims are "likely noncitizens registered to vote." First Assistant U.S. Attorney Bill Essayli (@USAttyEssayli), X (Oct. 19, 2026 at 7:21 pm), https://perma.cc/BE94-5AQF.

***Fourth and finally***, DHS and DOJ deliver the purported list of unlawful voters, including sensitive identifying information, to states and localities for the purpose of demanding that those jurisdictions take specific action with respect to the identified individuals' ballots. *See id.*; *see also* Decl. of Eric McLoughlin, *United States v. California*, No. 26-cv-12025, ¶ 24 (C.D. Cal. Oct. 19, 2026), Dkt. No. 22-3. Among other things, the agencies demand that, where state or local election administrators cannot independently confirm the citizenship status of voters within the timelines that DOJ dictates, the officials investigate identified voters and segregate and refuse to tabulate those voters' vote-by-mail ballots until their citizenship status can be determined. *See, e.g.*, Letter for Shirley N. Weber, California Secretary of State, from R. Trent McCotter, Acting Deputy Attorney General at 1 (Oct. 13, 2026) ("DOJ Letter to California"), *available at* https://perma.cc/TVU7-KDJY; Letter for Hon. Steve Hobbs, Washington Sec. of State, from Charles Neil Floyd, Acting United States Attorney, and Pete Serrano, First Assistant United States Attorney, at 2 (Oct. 26, 2026) ("DOJ Letter to Washington"), *available at* https://perma.cc/K3WY-ET8G. This final component step of the Voter Data Policy is the Voter Data Transmission Policy.

### III. Defendants' implementation of the Voter Data Policy and Voter Data Transmission Policy in California, Washington, and other states

In the run-up to Election Day 2026, with voting well underway, DHS and DOJ are implementing the Voter Data Policy and Voter Data Transmission Policy in California and Washington and are preparing to implement it elsewhere.

In California, on October 13, 2026, DOJ sent letters to the Secretary of State and Los Angeles County Registrar-Recorder/County Clerk demanding that each review a list of "people the Federal Government believes are likely noncitizens who were sent a vote-by-mail ballot to participate in the November 2026 federal election" within 48 hours, and to take action to prevent ineligible voters from voting. DOJ Letter to California at 1-2; Letter for Dean C. Logan, Los Angeles County Registrar-Recorder/County Clerk, from R. Trent McCotter, Acting Deputy Attorney General at 1-2 (Oct. 13, 2026) ("DOJ Letter to L.A. County"), *available at* https://perma.cc/Q2T79ZQW. Specifically, DOJ demanded that "[f]or individuals whom you cannot independently confirm citizenship status . . . you [must] immediately instruct the appropriate elections official to segregate . . . those individuals' vote-by-mail ballots until their citizenship status can be determined." DOJ Letter to California at 1; DOJ Letter to L.A. County at 1. Where listed individuals had "not yet been sent a vote-by-mail ballot," DOJ required election officials to "take all immediate and reasonable steps to not provide a ballot to those individuals until [the federal government] confirm[s] their citizenship status." DOJ Letter to California at 1-2; DOJ Letter to L.A. County at 1-2. Finally, DOJ demanded that election officials "not verify the signature and/or tabulate" ballots for individuals on the list "until citizenship can be determined." DOJ Letter to California at 1-2; DOJ Letter to L.A. County at 1-2.

Along with the letter, DOJ and DHS sent a "password-protected thumb drive" containing the list of individuals who DOJ and DHS "believe[d] are likely noncitizens" who received a mail-in ballot. DOJ Letter to L.A. County at 1. The lists of people were generated pursuant to the Voter

Data Policy. *See* Decl. of Eric McLoughlin, *United States v. California*, No. 26-cv-12025, ¶¶ 20-24 (C.D. Cal. Oct. 19, 2026). The lists were transmitted along with "a handwritten note providing a password" and were so insecure that Los Angeles County concluded it "would conflict with established data privacy and information security protocols" to access them. County of Los Angeles, *Statement from Dean Logan Regarding U.S. Department of Justice Correspondence* (Oct. 14, 2026), https://perma.cc/J7VD-TPEG.

On October 15, 2026, after California and Los Angeles County refused to accede to DOJ's demands, DOJ filed suit. *See* Complaint, *United States v. California*, No. 26-cv-12025, ¶ 5 (C.D. Cal. Oct. 15, 2026), Dkt. No. 1. After filing suit, Defendants sent lists of voters to every other California county along with letters making similar demands to the ones it made of Los Angeles County. *See* Laurel Rosenhall & Shawn Hubler, *Justice Dept. Demands That California Counties Help Identify Noncitizen Voters*, N.Y. Times (Oct. 23, 2026), https://perma.cc/82W7-PXMP.

Meanwhile, DOJ moved for emergency relief against California and Los Angeles County in both the Central District of California and the Ninth Circuit. On October 26, 2026, the Ninth Circuit rejected the government's request for emergency relief, *see United States v. California*, --- F.4th ----, 2026 WL 3212945 (9th Cir. Oct. 26, 2026) (per curiam), and on October 28, the district court did too, *see California* TRO Denial.

DOJ has also threatened California election officials who fail to comply with criminal prosecution. For instance, on October 23, 2026, First Assistant U.S. Attorney Bill Essayli posted on X about the California litigation, claiming that "[k]nowingly processing noncitizen ballots is a federal crime under 18 U.S.C. §§ 611 and 2" and threatening that "[w]e will hold election officials accountable" and that "[n]o one is above the law." First Assistant U.S. Attorney Bill Essayli (@USAttyEssayli), X (Oct. 23, 2026 at 8:49 pm), https://perma.cc/TPJ9-WYAF. DOJ has also informed the Los Angeles County Counsel's Office that the county's refusal to comply with DOJ's

demands places both state and county officials "at risk of knowingly facilitating violations of federal criminal statutes." Letter for Peter M. Bollinger, Assistant County Counsel, Los Angeles County Counsel's Office, from Trent McCotter, Acting Deputy Attorney General, U.S. Department of Justice (Oct. 16, 2026), *available at* Ex. 3, Decl. of Rachel Evans, *United States v. California*, No. 26-cv-12025 (C.D. Cal. Oct. 20, 2026), Dkt. No. 31-2 at 13.

Defendants are implementing the Voter Data Policy and Voter Data Transmission Policy in other states as well. On October 26, 2026, DOJ sent a letter to the Washington Secretary of State, demanding that the state review a list of individuals it claimed to identify as unlawful voters, investigate the identified voters, and sequester their ballots. DOJ Letter to Washington at 2. The letter also states that DOJ "anticipate[s] imminently receiving a second list of individuals believed to be noncitizens who are registered to vote from DHS, which [DOJ] will transmit ahead of the November 2, 2026 [sic], General Election with the request that [Washington] follow the protocol" described in the letter. *Id.* And reporting indicates that Defendants may take the same action with other states, both before and after Election Day. Julia Ainsley et al., *DOJ Weighs Election Litigation Against More States*, NBC News (Oct. 21, 2026), https://perma.cc/7CBD-PK8V.

## IV. Defendants' lists of "likely noncitizen voters" are demonstrably unreliable

DHS is incapable of reliably identifying noncitizen voters based on the information in its possession—a fact that has been proven both within the agencies' implementation of the Voter Data Policy and in their other efforts. For example, DHS has used data from SSA, via its modified Systematic Alien Verification for Entitlements ("SAVE") program, to identify individuals who are supposedly ineligible to vote. But, as Judge Sooknanan recently determined, the modified SAVE system is "plagued with inaccuracies," and the government has only "limited" "ability to verify citizenship," especially "the citizenship of acquired or naturalized citizens." *Common Cause*, 2026 WL 3033772, at *1, *33 (citing a government record and declaration). Indeed, just last week, the

SSA announced that it was "in the process of correcting an additional 8.5 million records with inaccurate citizenship status"—thus conceding that millions of its citizenship records are inaccurate. SSA, *Social Security Corrects Tens of Millions of Files in the Social Security Number Database Improving the Integrity of Vital Records* (Oct. 20, 2026), https://perma.cc/PBT8-SXYT. Disregarding these known risks, DHS is continuing to use this same inaccurate SSA citizenship data to create and transmit lists of purported noncitizen voters under the Policy. *See* Decl. #2 of Nicolas S. Bartell ¶ 17, *United States v. California*, No. 2:26-cv-12025 (C.D. Cal. Oct. 26, 2026), Dkt. No. 107-2.

Similarly, a district court recently found that USCIS's process of producing its own lists of alleged noncitizens—relying on "unknown artificial intelligence tools" and "[c]ommercial databases"—creates a "high likelihood of error" and depends on "faulty data sources that sweep in U.S. Citizens." *Cal. Nurses Ass'n v. Mullin*, No. 26-cv-10680-AMO, 2026 WL 3166149, at *2, *8 (N.D. Cal. Oct. 21, 2026). Likewise, DHS has attempted to use HSI's Innovation Lab, or "iLab," to identify unlawful voters. But as one iLab staffer explained, that process would generate "an 'ungodly' number of false positives"—i.e., U.S. citizens incorrectly identified as noncitizens. Peter Elkind et al., *Inside Trump's Failed Hunt for Noncitizen Voters*, ProPublica (Aug. 14, 2026), https://perma.cc/6VZG-UKY8.

The agencies' experience with the Voter Data Policy confirms that they are unable to reliably identify alleged noncitizen voters. When Los Angeles County analyzed a sample of 200 records from the list the agencies provided, it concluded that only "42.4% of the list samples had active [voting] records," that 112 individuals did not have ballots mailed to them and had "canceled or inactive records," and that "71.2% of the list sampled had never voted in the past elections." Decl. of Aman Bhullar, *United States v. California*, No. 2:26-cv-12025, ¶ 24 (C.D. Cal. Oct. 20, 2026), Dkt. No. 32-3. Moreover, "[a]mong the records for which birthplace information was

meaningfully reported, 38.9% indicated that they were born in the United States." *Id.* Other counties have had similar experiences. *See* Rosenhall & Hubler, *Justice Dept. Demands That California Counties Help Identify Noncitizen Voters*. Indeed, USCIS has admitted to possible errors in its lists, has conceded that "there is always a risk for human error" in its process, and has identified nearly 200 "data discrepancies" in the lists it provided to California. *See* Decl. of Nicolas Bartell re: Dean Logan's Sample List, *United States v. California*, No. 2:26-cv-12025, ¶ 13 & n.1 (C.D. Cal. Oct. 26, 2026), Dkt. No. 107-1; Decl. #2 of Nicolas Bartell, *United States v. California*, No. 2:26-cv-12025, ¶ 24 n.1 (C.D. Cal. Oct. 26, 2026), Dkt. No. 107-2. Similarly, the Acting Deputy Attorney General has admitted "[t]here may be some names on" Defendants' list of 20,000 purported noncitizen California voters "who it turns out ultimately are citizens." Miles Parks & Jude Joffe-Block, *Some on DOJ's 20,000 'Likely' Noncitizen List in California Appear to Be U.S.-Born*, NPR (Oct. 20, 2026), https://perma.cc/RBQ7-35T4 (quoting Acting Deputy Attorney General Trent McCotter).

The Washington Secretary of State's response to DOJ raises similar concerns. *See* Letter for Charles Neil Floyd, Acting United States Attorney, and Pete Serrano, First Assistant United States Attorney, from Steve Hobbs, Washington Sec. of State (Oct. 28, 2026), https://perma.cc/G4T5-XLFE. According to Secretary Hobbs, "[a] preliminary investigation confirms what your letter acknowledges: This list includes United States citizens and is not reliable." *Id.* The Washington Secretary of State's preliminary analysis revealed "a significant number of people on [Defendants'] list who are not currently registered to vote or are on inactive status" and "that many of the persons on [the] list are United States citizens based on information of which Washington is aware." *Id.*

Finally, in many cases, DOJ has disclosed sensitive private information of voters to officials in jurisdictions where those voters do not even reside. For instance, "[o]f the more than 20,000 records" provided to Los Angeles County, only "7,035 have addresses located in Los Angeles County." Decl. of Aman Bhullar, *United States v. California*, No. 26-cv-12025, ¶ 25 (C.D. Cal. Oct. 20, 2026), Dkt. No. 32-3. Defendants sent other counties, like Mendocino, a list of voters "from another county." Rosenhall & Hubler, *Justice Dept. Demands That California Counties Help Identify Noncitizen Voters* (quoting the Mendocino clerk-recorder); *see also* Karina Tsui, Maria Aguillar Prieto & Isa Mudannayake, *Justice Department orders California counties to set aside ballots from suspected noncitizens*, CNN (Oct. 24, 2026), https://tinyurl.com/84ys5u3j (stating same for Modoc County).

Thus, as the district court in the *California* litigation found, the federal government's "allegations" of non-citizens on California's voter rolls "are not credible." *California* TRO Denial at 21. As the court determined, the hazards of "matching voter registration records with data from other administrative databases" are "well-documented"—especially in cases of "verifying citizens," where the government's methodology "can lead to false positives" of "citizen[s] incorrectly being identified as [] noncitizen[s]." *Id.* And the government's explanation of its methodology hardly resolved these fears; rather, it "raises significant concerns." *Id.* The government has not explained "the specific matching rules, the specific criteria for its confidence thresholds, [or] any detailed information about the third-party platform and their procedures." *Id.* "It remains unknown how Lexis Nexis performed its analysis. . . ." *Id.* at 22. The government did not explain its "enrichment process," provided "no error rates" or "validation against a reliable benchmark," and never explained how it arrived at a list of 20,000 individuals when it had initially identified "nearly 200,000 alleged noncitizens." *Id.* Even the origins of the initial statewide voter

records are unclear: HSI claims to have obtained "a voter file that *appeared to reflect*" the state's actual voter rolls. *Id.* at 5 (emphasis added). As the court held, "[g]iven the vagueness of Plaintiff's descriptions of its procedures and the unreliability of its similar claims in other states," it could not "conclude that Plaintiff's process is credible" or that, as the government claimed, the listed individuals were "highly likely to be noncitizen[s]." *Id.* at 22.

## LEGAL STANDARD

To obtain a temporary restraining order, "the moving party must show: (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the [temporary restraining order] were not granted, (3) that [such an order] would not substantially injure other interested parties, and (4) that the public interest would be furthered" by the order. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (cleaned up); *see also Hall v. Johnson*, 599 F. Supp. 2d 1, 3 n.2 (D.D.C. 2009) ("[T]he same standard applies to both temporary restraining orders and to preliminary injunctions.") (cleaned up).

Section 705 of the APA authorizes the court to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights" pending judicial review "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705. "The factors governing issuance of a preliminary injunction also govern issuance of a § 705 stay." *District of Columbia v. USDA*, 444 F. Supp. 3d 1, 15 (D.D.C. 2020) (citing cases).

## ARGUMENT

### I. Plaintiffs are likely to succeed on the merits

Defendants' Voter Data Transmission Policy is a flagrant power grab that will, unless enjoined, upend the states' authority to run elections and disenfranchise untold numbers of eligible voters across the country. Plaintiffs are likely to succeed on their claims under the APA that the

Policy exceeds Defendants' statutory authority and violates the Privacy Act's procedural safeguards and substantive restrictions on disclosure.

### A. The Voter Data Transmission Policy is final agency action reviewable under the APA

The Voter Data Policy consists of several component policies. The sole policy at issue in Plaintiffs' motion is one of those component policies, the Voter Data Transmission Policy. Defendants' Voter Data Transmission Policy constitutes "final agency action" subject to APA review because it "mark[s] the consummation of the agency's decisionmaking process" and is an action by "which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (internal citations omitted).

The facts around the Voter Data Policy are not disputed—and indeed are based on Defendants' public statements. *See supra* Introduction at 1; Background at 7-14. Under the Voter Data Transmission Policy, Defendants transmit data about registered voters that DHS claims are "likely noncitizens" to states and localities for the purpose of demanding that states and localities take special action with respect to those voters' ballots. Those demands include requiring states and localities to investigate identified voters and segregate and refuse to tabulate the identified voters' ballots until their citizenship status can be determined. Defendants have systematically applied the Voter Data Transmission Policy in multiple jurisdictions and have indicated that they will likely expand the Policy across the country.

Defendants' letters demanding that states and localities segregate and not count ballots, and Defendants' own admissions—including a DOJ graphic published by the First Assistant U.S. Attorney for the Central District of California describing the data disclosed pursuant to the Policy as "final," *see supra* Introduction at 1—show the Voter Data Transmission Policy marks the consummation of Defendants' decision-making process. "[T]he way in which the agency

subsequently treats the challenged action" is evidence of finality, *Sw. Airlines Co. v. Dep't of Transp.*, 832 F.3d 270, 275 (D.C. Cir. 2016), and here, Defendants have already begun implementation.

As for the second *Bennett* prong, "[t]he nonconsensual sharing of individuals' confidential information itself creates legal consequences, without any need for further action." *Common Cause*, 2026 WL 3033772, at *21 (citing cases). Moreover, Defendants' recent actions in California and Washington reinforce that Defendants have adopted a definitive policy in ways that have legal consequences, including disclosing voter data without notice, demanding states and localities take prescribed actions, subjecting states and localities to lawsuits for failure to comply with Defendants' demands, and subjecting voters to the possibility of not having their votes counted. *See id.* at *20 (rejecting Defendants' claims that DOJ's Voter List Maintenance Policy was unreviewable because it was made up of multiple constituent actions (citing *Elev8 Balt., Inc. v. Corp. for Nat'l & Cmty. Serv.*, 804 F. Supp. 3d 524, 557 (D. Md. 2025) (permitting an APA challenge to a set of "discrete agency actions" that "all occurred within a period of less than two weeks and reflect[ed] a final and categorical decision" by the defendant agency)); *see also LULAC II*, 818 F. Supp. 3d at 112 ("[S]haring sensitive records with others outside the agency is 'final' because it clearly represents the 'consummation' of the agency's decision-making process and is an action 'by which rights or obligations have been determined, or from which legal consequences will flow.'" (emphasis omitted)), *aff'd*, No. 25-5476, 2026 WL 1991571 (D.C. Cir. July 2, 2026); *Venetian Casino Resort v. EEOC*, 530 F.3d 925, 931 (D.C. Cir. 2008) ("Adopting a policy of permitting employees to disclose confidential information without notice is surely a 'consummation of the agency's decisionmaking process,' and 'one by which [the submitter's] rights [and the agency's] obligations have been determined.'").

### B. The Voter Data Transmission Policy is contrary to law and exceeds Defendants' authority (Count I)

Plaintiffs are likely to succeed on their claim that the Voter Data Transmission Policy is contrary to law and exceeds Defendants' lawful authority. *See* First Am. Compl. ¶¶ 188-200. An "agency . . . literally has no power to act . . . unless and until Congress authorizes it to do so by statute." *FEC v. Cruz*, 596 U.S. 289, 301 (2022) (cleaned up); *see also NFIB v. OSHA*, 595 U.S. 109, 117 (2022) ("Administrative agencies are creatures of statute" that "possess only the authority that Congress has provided."). "And if an agency acts without statutory authority, then a court must set that action aside" under the APA. *Drs. for Am. v. OPM*, 793 F. Supp. 3d 112, 143 (D.D.C. 2025); *see also Common Cause*, 2026 WL 3033772, at *22 (citing 5 U.S.C. §§ 706(2)(A), (C)). "To determine 'whether an agency has acted within its statutory authority,' [courts] use 'the traditional tools of statutory construction.'" *U.S. Sugar Corp. v. EPA*, 113 F.4th 984, 997 (D.C. Cir. 2024) (quoting *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 403 (2024)).

No statute authorizes the Voter Data Transmission Policy. As relevant to the preliminary relief sought here, neither DHS nor DOJ is authorized to distribute voter data to states and localities and demand that they change their election procedures to subject the identified voters to additional scrutiny. *See supra* Background at 6-11. Other courts have consistently reached similar conclusions in striking down the federal government's varied attempts to insert itself into the administration of elections by collecting, manipulating, and transmitting voter data. *See, e.g.*, *Common Cause*, 2026 WL 3033772, at *1, 22-26 (holding that DOJ's "Voter List Maintenance Policy"—which included "demanding voter registration lists from all states, comparing those lists against a citizenship-status database plagued with inaccuracies, and urging states to remove voters who the Division deems ineligible"—is not authorized by statute, including under the Civil Rights Act of 1960, NVRA, and HAVA); *United States v. Henderson*, No. 26-cv-166, 2026 WL 3181405, at *11 & n.50 (D. Utah Oct. 23, 2026) (dismissing DOJ lawsuit demanding that Utah produce its

unredacted SVRL, and listing other similar cases); *see also supra* Background at 4-6. This newest iteration of the government's efforts is no different and should be similarly halted as exceeding statutory authority.

Defendants have relied only on 18 U.S.C. § 611 to justify their actions. *See, e.g.*, *California* TRO Denial at 9-10; DOJ Letter to California at 1; DOJ Letter to Washington at 1; DOJ Letter to L.A. County at 1. But this statute, which makes it a criminal misdemeanor for "an alien" to vote in federal elections, does not authorize the Voter Data Transmission Policy. *California* TRO Denial at 15 ("Section 611 is a federal misdemeanor statute that sets forth criminal punishments for non-citizens who vote illegally . . . . It includes no language addressing the State administration of federal elections. And it includes no mechanism for the United States Department of Justice to intervene in an ongoing election to require a State and its officials to segregate and stop counting ballots."). Section 611 is a criminal prohibition, not a source of authority; it penalizes actions by individuals, not by state or local governments; and it does not mention dissemination of voter data or election administration in any way, shape, or form. Certainly, nothing in its text can be read to authorize DHS or DOJ to transmit voter data—including sensitive personal information of registered voters having nothing to do with citizenship status—to third parties or to states and use that data to make coercive demands.

Judge Bennett's Ninth Circuit concurrence in *California* explains why the government's reliance on Section 611 is so misguided. 2026 WL 3212945, at *10-13 (Bennett, J., concurring). As he noted, Section 611 in no way authorizes the Executive Branch to demand that California conduct additional citizenship verification for mail-in ballots of 20,000 individuals identified by DHS after collection and curation of a public voter roll. *Id.* at *10. Rather, Congress left "responsibility for voter roll maintenance, ballot mailing, and vote processing to the states" and

"did not delegate any of these roles to the Executive Department." *Id.* at *11. Yesterday, the district court in the same case reached the same conclusion. *See California* TRO Denial at 13-17.

Defendants' lack of statutory authority is all the more striking because the Voter Data Transmission Policy intrudes on the Constitution's allocation of responsibility for voter registration and list maintenance to the states. *See*, *e.g., Roudebush v. Hartke*, 405 U.S. 15, 24 (1972); *Common Cause*, 2026 WL 3033772, at *25 ("Consistent with our constitutional structure, the NVRA and HAVA place *states* at the helm of maintaining their voter rolls."). The Elections Clause vests power in *Congress* to override that default setting with respect to election procedures, but "Congress must speak clearly if it intends to delegate any part of that power to the Executive Branch." *LULAC II*, 818 F. Supp. 3d at 100 (citing *West Virginia v. EPA*, 597 U.S. 697, 723 (2022)). A clear expression from Congress is especially important here because the administration of our nation's elections is undoubtedly a question of "vast . . . political significance" that is "the particular domain of state law." *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021) (citation modified). There is no statement, however, from Congress—clear or otherwise—that authorizes Defendants' actions.

Moreover, "[n]ever before in American history has the federal government, on the eve of an election, sought to coerce a state and local government to abandon their own Constitutional elections procedures and bend to the will of the Executive Branch." *California* TRO Denial at 2. The total "'lack of historical precedent'" for Defendants' actions, "coupled with the breadth of authority that [they] now claim[], is a 'telling indication'" that their actions "extend[] beyond [their] legitimate reach." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*, 595 U.S. 109, 119 (2022) (per curiam).

Accordingly, the Voter Data Transmission Policy must be "h[e]ld unlawful and set aside" as "not in accordance with" and "in excess of statutory . . . authority." 5 U.S.C. § 706(2)(A), (C).[4]

**C. The Voter Data Policy violates the Privacy Act's notice-and-comment requirements for new or revised systems of records (Count III)**

Plaintiffs are also likely to succeed on their claim that Defendants acted "without observance of procedure required by law," 5 U.S.C. § 706(2)(D), by implementing the Voter Data Policy without regard for the Privacy Act's procedural safeguards.[5] *See* First Am. Compl. ¶¶ 216-224. "Enacted in 1974, the Privacy Act establishes 'certain safeguards for an individual against an invasion of personal privacy by requiring Federal agencies' to 'collect, maintain, use, or disseminate any record of identifiable personal information in a manner that assures that such action is for a necessary and lawful purpose.'" *Common Cause*, 2026 WL 3033772, at *3 (quoting Pub. L. No. 93-579, § 2(b), (b)(4), 88 Stat. 1896, 1896 (1974)). "The Act imposes several limits on the ability of federal agencies to collect and disseminate the personal information of American

[4] To Plaintiffs' knowledge, Defendants have not invoked 8 U.S.C. § 1373 as authority for the Voter Data Transmission Policy. Nor could they. Among other reasons, Section 1373 is not an election or voting statute that grants DHS or DOJ authority to meddle in the states' administration of elections by transmitting voter data in service of efforts to coerce states and localities to change their election procedures. Indeed, Section 1373 concerns "information regarding [ ] citizenship or immigration status," not voter information. Moreover, the Policy entails unprompted dissemination of voter data to state and local entities and officials. This unsolicited distribution is a far cry from the duty imposed on DHS by Section 1373 to respond to "inquir[ies] . . . seeking to verify or ascertain the citizenship or immigration status of any individual." 8 U.S.C. § 1373(c); *see also DHS v. LWV*, 609 U.S. ----, 2026 WL 2879700, at *5 (Sep. 25, 2026). And the data disseminated, including personal information like voter addresses, exceeds the narrow scope of information addressed by Section 1373. *See, e.g.*, *United States v. California*, 921 F.3d 865, 891-92 (9th Cir. 2019) ("'information regarding the citizenship or immigration status, lawful or unlawful, of any individual'"—as laid out in Section 1373—"is naturally understood as a reference to a person's legal classification under federal law" and does not "reach broader swaths of information," such as a person's address), *cert. denied*, 590 U.S. 1015 (2020). And, of course, nothing in Section 1373 even conceivably permits segregating ballots or refusing to tabulate votes.

[5] The APA provides a remedy for Defendants' violations of the Privacy Act. *See, e.g.*, *LULAC II*, 818 F. Supp. 3d at 110-113; *Common Cause*, 2026 WL 3033772, at *27-28; *AFL-CIO v. Dep't of Lab.*, 778 F. Supp. 3d 56, 81 (D.D.C. 2025).

citizens," including "procedural safeguards." *Id.* Defendants have ignored these safeguards when implementing the Voter Data Policy, including by transmitting sensitive private voter data to states and localities—including jurisdictions with little or no connection to the identified voters—without issuing required notices and allowing for meaningful opportunity for public feedback.

The Privacy Act requires an agency establishing or revising a system of records to publish a notice in the Federal Register containing detailed information about the system. 5 U.S.C. § 552a(e)(4). "Among other things, these notices—which are known as system of records notices, or SORNs—must include 'the categories of individuals on whom records are maintained in the system' and 'each routine use of the records contained in the system, including the categories of users and the purpose of such use[.]'" *Common Cause*, 2026 WL 3033772, at *28 (quoting 5 U.S.C. § 552a(e)(4)(B), (D)). "The Privacy Act further requires notice and 'an opportunity for interested persons to submit written data, views, or arguments to the agency' at least 30 days *before* 'any new use or intended use of the information in the system[.]'" *Id.* (quoting 5 U.S.C. § 552a(e)(11)) (emphasis added). These requirements are "'an essential component of the [Privacy] Act and an essential piece of American democracy.'" *Common Cause*, 2026 WL 3033772, at *34 (quoting *Weber*, 816 F. Supp. 3d at 1193). "Americans deserve to know the nature, scope, and routine uses of [their] records *before* they are collected by the federal government." *Id.* (emphasis added).

Defendants have flouted these safeguards. By adopting and implementing the Voter Data Policy, Defendants have established a new—or at least revised an existing—system of records subject to the Privacy Act's safeguards. *See* 5 U.S.C. § 552a(a)(4)-(5).[6] In either case, Defendants'

[6] It is indisputable that the voter records collected, maintained, used, and disseminated by Defendants as part of the Voter Data Policy, and disseminated pursuant to the Voter Data Transmission Policy, constitute "record[s]" within the meaning of the Privacy Act because they

transmission of voter data to state and local officials for the purposes of injecting themselves into election administration (under the Voter Data Transmission Policy) is a new use that triggers the Privacy Act's SORN and notice-and-comment requirements. Yet Defendants have issued no SORNs for these systems or uses. They have disclosed no new or intended uses of the voter data records. And they have created no opportunity for public comment on the use of these records.

Accordingly, the Voter Data Policy (including the Voter Data Transmission Policy) must be "h[e]ld unlawful and set aside" as "not in accordance with" and "without observance of procedure required by" the Privacy Act. 5 U.S.C. § 706(2)(A), (D).

### D. The Voter Data Transmission Policy violates the Privacy Act's substantive restrictions on disclosure (Count II)

Defendants' Voter Data Transmission Policy violates three of the Privacy Act's substantive restrictions on disclosure. Under the Policy, Defendants are disclosing, or will imminently disclose, thousands of individuals' protected voter records in bulk to states and local governments in violation of the Act's (1) general prohibition on disclosure without consent or an applicable statutory exception, *see* 5 U.S.C. § 552a(b); (2) prohibition on disclosing inaccurate records about individuals, *see id.* §§ 552a(e)(5), (6), (10); and (3) prohibition on disclosure of any record "describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity," *id.* § 552a(e)(7). For

---

are "item[s], collection[s], or grouping[s] of information about an individual that [are] maintained by [Defendants] . . . and that contain[] his name, or the identifying number, symbol, or other identifying particular assigned to the individual." 5 U.S.C. § 552a(a)(4). Together, these records constitute one or more "system[s] of records" within the meaning of the Privacy Act because they are a "group of any records under the control of [Defendants] from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual." 5 U.S.C. § 552a(a)(5).

any one of these reasons, the Court must "hold unlawful and set aside" the Policy as "not in accordance with" the Privacy Act. 5 U.S.C. § 706(2)(A).

**Violations of the Privacy Act's general ban on disclosure without consent.** The Privacy Act generally prohibits "an agency" from "disclos[ing] a record to another agency" or other entity "without the written consent of the person to whom the record pertains," subject to "certain exceptions." *FAA v. Cooper*, 566 U.S. 284, 289 n.2 (2012) (citing 5 U.S.C. § 552a(b)). Here, no statutory exception permits Defendants' non-consensual disclosures of individuals' records under the Policy. The disclosures are therefore prohibited by 5 U.S.C. § 552a(b).

Elsewhere, the government has (unsuccessfully) invoked the Act's "routine use" and law enforcement exceptions for its bulk disclosure of sensitive voter data. *See, e.g.*, *Common Cause*, 2026 WL 3033772, at *29-32. Neither exception applies here. The routine use exception cannot apply because Defendants have not issued updated SORNs and conducted notice-and-comment for the vast volumes of new voter data they are disclosing under the Policy, and the disclosures are not encompassed within any existing routine use. *See supra* Argument Section I.C. And the law enforcement exception cannot apply because there is no predicate "written request" by the "head" of a state or local law enforcement agency to Defendants "specifying the particular portion desired and the law enforcement activity for which the record is sought." 5 U.S.C. § 552a(b)(7). Rather, Defendants are unilaterally sending unprompted lists of "likely noncitizens" to certain states and trying to dictate whether and how those voters' ballots are counted. The "law enforcement exception does not encompass" this activity. *Common Cause*, 2026 WL 3033772, at *32.

**Violations of the Privacy Act's ban on disclosure of inaccurate records.** Under the Privacy Act, an agency must "maintain all records which are used by the agency in making any determination about any individual with such accuracy, relevance, timeliness, and completeness

as is reasonably necessary to assure fairness to the individual in the determination." 5 U.S.C. § 552a(e)(5). The Act defines "maintain" to include to "collect, use, or disseminate." 5 U.S.C. § 552a(a)(3). The Privacy Act also mandates that agencies "make reasonable efforts to assure that such records are accurate, complete, timely, and relevant for agency purposes" before "disseminating" them "to any person other than a[ ] [federal] agency." *Id.* § 552a(e)(6). And it tasks agencies with "establish[ing] appropriate . . . safeguards . . . to insure the security and confidentiality of records and to protect against any anticipated threats or hazards to their security or integrity which could result in substantial harm, embarrassment, inconvenience, or unfairness." *Id.* § 552a(e)(10). DHS's own *Handbook for Safeguarding Sensitive PII* emphasizes the importance of these requirements when sharing PII outside DHS. *See* U.S. Dep't of Homeland Sec., Privacy Policy Directive 047-01-007, *Handbook for Safeguarding Sensitive PII* 14 (Dec. 4, 2017), https://perma.cc/KE5K-SBG7. And "*[s]ensitive* PII (SPII) … requires special handling due to the increased risk of harm to an individual if it is compromised." *Id.* at 3 (emphasis in original).

Under the Policy, Defendants are disseminating lists of "likely noncitizen voters" to state and local election officials that Defendants admit are inaccurate and depend on unreliable federal citizenship data, and demanding that the jurisdictions subject the identified individuals to special election procedures. *See supra* Background at 9-15. As explained elsewhere, *see supra* Background at 11-15; *infra* Argument at 38-42, these lists are riddled with errors. The disclosures thus violate the Privacy Act's accuracy protections. While "the Privacy Act does not demand perfection," it "uncontroversially requires agencies to 'make reasonable efforts to assure that [] records are accurate, complete, timely, and relevant' before disclosing them outside the federal government—including to states." *Common Cause*, 2026 WL 3033772, at *33. "On this record, the Defendants have not done that." *Id.*

**Violations of the Privacy Act's ban on disclosure of First Amendment protected records.** The Policy also violates the Act's prohibition on "maintaining"—i.e., "collect[ing], us[ing], or disseminat[ing]," 5 U.S.C. § 552a(a)(3)—"record[s] describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity," 5 U.S.C. § 552a(e)(7).

Voter registration records are plainly "First Amendment protected records." *Common Cause*, 2026 WL 3033772, at *33-34 (so holding); *Weber*, 816 F. Supp. 3d at 1193 (same). Indeed, "voter registration, participation in elections, as well as party affiliation are all types of political expression protected by the First Amendment." *Id.* at *34 (quoting *Weber*, 816 F. Supp. 3d at 1193 (first citing *Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 195 (1999), and then citing *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 69 (1990))); *see also Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 224 (1989) ("Freedom of association means . . . that an individual voter has the right to associate with the political party of her choice[.]"). For the reasons explained above, Defendants' disclosures are not "expressly authorized by statute," 5 U.S.C. § 552a(e)(7), including 18 U.S.C. § 611. *See supra* Argument at 18-21. Even if they were authorized at all (and they are not), they surely are not authorized "expressly"—a word that requires the authorization to be "[c]learly and unmistakably communicated" and "stated with directness and clarity." *Express*, Black's Law Dictionary, (12th ed. 2024).

Nor are Defendants' disclosures "within the scope of an authorized law enforcement activity." 5 U.S.C. § 552a(e)(7). The "D.C. Circuit has . . . 'required greater specificity' from agencies relying on the law enforcement exception to ensure that agencies do not 'simply invoke a need to maintain records for generic investigative and informative purposes.'" *Common Cause*,

2026 WL 3033772, at *34 (quoting *Maydak v. United States*, 363 F.3d 512, 517 (D.C. Cir. 2004)) (cleaned up). First, as explained above, there is no relevant "authorized" law enforcement activity because Defendants lack the authority to implement the Voter Data Transmission Policy at all. Second, DHS is using the information for election administration purposes unrelated to law enforcement. Where an agency is not using information for law enforcement "purposes only," invocation of the law enforcement activity exception is inappropriate. *Maydak*, 363 F.3d at 517 (declining to grant summary judgment for the government where some of its uses of the records fell within the exception but it was unclear whether other uses did).[7]

[7] Moreover, under the Voter Data Policy, Defendants are obtaining certain states' entire SVRLs for the "generic investigative . . . purpose[]" of determining whether the millions of individuals on those lists are U.S. citizens eligible to vote, "without any specific reason to believe that they committed voter fraud." *Maydak*, 363 F.3d at 517. Then, after utilizing inaccurate citizenship data and unreliable matching processes, Defendants are creating and disclosing demonstrably unreliable lists of "likely noncitizens" to state and local election officials. *See supra* Background at 9-13. To be sure, "DOJ may continue to investigate violations of [federal election statutes] within the confines of its statutory authorities—including by acting on specific complaints." *Common Cause*, 2026 WL 3033772, at *34. But Defendants "cannot evade the Privacy Act's free-speech protections by attempting a dragnet investigation" of every registered voter in states they choose to target for heightened scrutiny. *Id.* "There is no doubt" that Defendants' Policy "violates the Privacy Act's prohibition on maintaining records of protected First Amendment activity." *Id.*

## II. The Voter Data Transmission Policy irreparably harms Plaintiffs

"The party seeking a preliminary injunction must make two showings to demonstrate irreparable harm": (1) "the harm must be certain and great, actual and not theoretical, and so imminent that there is a clear and present need for equitable relief to prevent irreparable harm," and (2) "the harm must be beyond remediation." *Newby*, 838 F.3d at 7-8 (cleaned up). "As a preliminary injunction requires only a likelihood of irreparable injury, Damocles's sword does not have to actually fall on [Plaintiffs] . . . before the court will issue an injunction." *Id.* at 8-9 (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).

LULAC, EPIC, and their members are all suffering severe and irreparable harm and, absent a stay and temporary restraining order, will continue to suffer irreparable harm through certification of the upcoming election, because of Defendants' Voter Data Transmission Policy in California, Washington State, and beyond. For example, as described above, in Defendants' October 26, 2026, letter to Washington transmitting an initial list of purported non-citizen voters and demanding Washington investigate and segregate the ballots of identified voters, Defendants also stated they "anticipate imminently receiving a second list of individuals believed to be noncitizens who are registered to vote from DHS, which [Defendants] will transmit ahead of the November 2, 2026 [sic], General Election with the request that [Washington] follow the protocol" described in the letter. DOJ Letter to Washington at 2. And reporting indicates that Defendants intend to take the same action with other states, both before and after Election Day. Ainsley et al., *supra* Background at 11.

### A. LULAC is suffering irreparable organizational injuries

Defendants' Voter Data Transmission Policy is irreparably harming LULAC's core operations and mission and will continue to do so through election certification. "[N]ew obstacles" that "unquestionably make it more difficult for [an organization] to accomplish [its] primary

mission . . . provide injury for purposes both of standing and irreparable harm." *Newby*, 838 F.3d at 9. "For example, [the D.C. Circuit] ha[s] held that a voter education and mobilization organization suffers irreparable harm when state law hinders its ability to register voters in the run-up to an election deadline." *Ctr. for Taxpayer Rts. v. Internal Revenue Serv.*, 190 F.4th 990, 1010-11 (D.C. Cir. 2026) (citing *Newby*, 838 F.3d at 8-9); *accord LULAC* v. *EOP*, 780 F. Supp. 3d 135, 200-02 (D.D.C. 2025) ("*LULAC I*"). As set forth in its declaration, LULAC is suffering precisely these sorts of organizational harms, in the form of burdens on LULAC's mission and its expenditure of resources because of Defendants' Voter Data Transmission Policy.

Defendants' Voter Data Transmission Policy includes DOJ demanding that election administrators investigate identified voters and, for voters whose citizenship status state or local election administrators cannot independently confirm, election officials must segregate and refuse to tabulate those voters' vote-by-mail ballots until their citizenship status can be determined.[8] This demand is imposing drastic new obstacles that are making it more difficult for LULAC to accomplish its mission.

LULAC has a substantial presence in both California and Washington. In California, LULAC has 28 local councils. Proaño Decl. ¶ 7. Altogether, LULAC has more than 40,000 members in California, making it one of the states with the most LULAC members in the nation. *Id.* These members are in cities and towns across the state. *Id.* In Los Angeles County, where Defendants have focused their efforts in California, LULAC has over 5,700 members and at least five councils. *Id.* ¶ 8. LULAC's California membership is deeply civically and politically engaged. At least 80 percent of LULAC's California members are registered to vote, at least 80 percent of

[8] *See* Press Release, DOJ, *Federal data shows hundreds of non-citizens registered to vote in Washington*, (Oct. 26, 2026), *available at* https://www.justice.gov/usao-edwa/pr/federal-data-shows-hundreds-non-citizens-registered-vote-washington; DOJ Letter to Washington at 2; DOJ Letter to California at 1; DOJ Letter to L.A. County at 1.

LULAC's members who are registered to vote did so in 2020, and at least 75 percent voted in 2022. *Id.* ¶ 9. LULAC has 8 local councils in Washington, and over 5,600 members in Washington. *Id.* ¶ 11. And like in California, LULAC's Washington membership is also very civically and politically engaged. *Id.*[9] LULAC has many members across the country who are naturalized and derived U.S. citizens. *Id.* ¶ 18. These members have files with U.S. Citizenship and Immigration Services due to their or their parent's naturalization process. *Id.*

Protecting voting rights, voter education and engagement are central to LULAC's mission. *See id.* ¶¶ 3, 27. For example, LULAC holds educational events on voting-related issues, *id.* ¶ 13; registers prospective voters, and holds voter registration drives at schools, churches, and other community events, *id.* ¶ 14; holds get-out-the-vote programs before elections to encourage its members to vote, *id.*; distributes information on how to register to vote, check voter registration status, vote by mail-in ballot, and find polling locations for voters who do not know where they should vote, *id.* ¶ 15; helps voters check their registration status, *id.*; helps voters register to vote, *id.* ¶ 16; and is now in the midst of encouraging members to vote, *id.* LULAC also runs an Election Protection Incident Report and Dashboard at https://vamosavotar.org/report, wherein it documents incidents across the country including reports of voter confusion, intimidation, misinformation, and issues that arise at polling places. *Id.* ¶ 17.

Defendants' eleventh-hour implementation of their Voter Data Transmission Policy is directly harming LULAC's mission. *See id.* ¶ 27. "The government's transmission of lists of voter data to states and counties and its demands that states and counties segregate the ballots of identified voters, including its actions in Washington and California, have sowed distrust and confusion and made it more difficult for LULAC to encourage voter confidence and accurately

[9] LULAC also has a significant presence in other jurisdictions that have been the target of the federal government's election administration efforts, including Nevada, New Jersey, and Washington, D.C. Proaño Decl. ¶ 12.

inform voters about the use of voter data and voter security." *Id.* ¶ 28. As a result, "there is a palpable fear among many Latinos, including LULAC members, about how their votes will be treated." *Id.* ¶ 29. LULAC has "heard from members concerned and confused about how their vote will be treated due to the federal government's policies. They wonder: Will my ballot be separated? Withheld? Put into a 'maybe' pile for further consideration? Thrown out? They also do not know how to remedy or 'cure' ballots that are improperly segregated." *Id.* LULAC's councils, staff, and volunteers also are concerned about the criminal repercussions of participating in efforts to help other people register or vote, even when they are doing so lawfully. *Id.* ¶ 30. Finally, the Latino voters who LULAC serves "face particular risks when government agencies rely on incomplete or inaccurate records to determine citizenship status. Common names, inconsistent identifying information, and records that fail to reflect naturalization can lead to mistaken identifications." *Id.* ¶ 31. In other words, LULAC members' fear is well-founded. *See Common Cause,* 2026 WL 3033772, at *6, *33 (concluding naturalized and derived citizens are at heightened risk of misidentification by inaccurate social security citizenship data); *League of Women Voters v. U.S. Dep't of Homeland Sec.*, 835 F. Supp. 3d 79, 101, 115 (D.D.C. 2026) (same).

The Voter Data Transmission Policy is also causing LULAC to redirect resources to counteract the Policy's harms on LULAC's members. *See* Proaño Decl. ¶¶ 33-45. Because of the Policy and its particular targeting of LULAC's Latino members, "LULAC has had to increasingly field concerns from voters who are confused or worried about the government's efforts to obtain voter registration records and segregate ballots, some of whom are wondering whether their personal information could be used to target them or whether they are still eligible to vote." *Id.* ¶ 33. Thus, LULAC has "been forced to increasingly serve as a sounding board for [its] councils and members to clear up misinformation, answer questions, and reassure people who are worried about their voter registration status." *Id.* ¶ 34. LULAC also has "had to create and publish additional

messaging to address the increased confusion." *Id.* ¶ 35. "In the past week alone, LULAC staff have spent dozens of staff hours responding to concerns about the federal government's actions, coordinating with state council leaders, consulting legal partners, and preparing additional voter education materials. That is time [LULAC] would otherwise have spent on [its] planned Election Day voter outreach and protection activities." *Id.* ¶ 36. These changes are "taking away resources from [LULAC's] regular voter engagement work." *Id.* ¶ 37. LULAC has "been forced to pivot away from registration and GOTV efforts toward education about voter eligibility and ameliorating voters' fears that they may be targeted by the federal government or that their votes may not be counted." *Id.*

These changes and burdens will only worsen if Defendants continue or expand their efforts to implement the Voter Data Transmission Policy. *See id.* ¶¶ 38-45. And they will not end on November 3. The ongoing harms to LULAC will last through tabulation and any period for "curing" segregated ballots,[10] and will continue at least until the election is certified, at which point voters will conclusively know whether their vote was counted or not. *See id.* ¶¶ 43-45.

In other words, absent relief from the Court, the Voter Data Transmission Policy is causing and will continue to cause harms to LULAC that courts in this District have concluded are irreparable in analogous situations. Allowing Defendants to continue implementing the Voter Data Transmission Policy is forcing LULAC "to update educational information that they provide to prospective voters, much of which they have translated into multiple languages." *LULAC I*, 780 F. Supp. 3d at 189. And the Policy is also requiring LULAC "to invest additional resources in training their staff and volunteers, both to understand the new requirement and to [secure] the

[10] In Washington, for example, all challenged voters—including voters whose citizenship is challenged—are entitled to a hearing at which they can prove their qualifications. *See* Wash. Rev. Code § 29A.08.840(3)(c).

sensitive personal information contained in passports and other documents listed [serving] as acceptable proof of citizenship." *Id.* "Such articulated harms to core operations and mission qualify as irreparable harm." *Urb. Sustainability Dirs. Network v. U.S. Dep't of Agric.*, No. 25-cv-1775 (BAH), 2026 WL 1877821, at *10 (D.D.C. June 30, 2026) (collecting cases).[11]

**B. LULAC's members are suffering irreparable injuries**

Defendants are also irreparably harming LULAC's members by causing voter confusion. Just as an organization can vindicate associational harms on behalf of its members for purposes of standing, an association can also vindicate associational irreparable harms when seeking preliminary relief. *See*, *e.g.*, *Council for Opportunity in Educ. v. U.S. Dep't of Educ.*, No. 25-cv-03491 (TSC), 2026 WL 120984, at *16 (D.D.C. Jan. 16, 2026) (collecting cases for proposition that "the totality of injuries identified by [an organizational plaintiff] and its members" may "demonstrate a likelihood of imminent, irreparable harm in the absence of injunctive relief"). Additionally, "voter confusion" is a well-recognized species of irreparable injury. *See*, *e.g.*, *LULAC I*, 780 F. Supp. 3d at 201; *League of Women Voters of Mass. v. Trump*, No. 26-cv-11549-IT, 2026 WL 2539946, at *3-4 (D. Mass. Aug. 27, 2026); *cf. Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006) (recognizing "voter confusion" as important consideration in election cases).

Here, LULAC's declaration clearly establishes widespread confusion among its voter members. In furtherance of the Voter Data Transmission Policy, Defendants are trying to require that state and local election administrators to investigate identified voters, segregate ballots cast by voters accused of being non-citizens, and then refuse to tabulate those ballots until at-issue

---

[11] For the same reasons, LULAC also has organizational standing to sue. *See Newby*, 838 F.3d at 9; *Ctr. for Taxpayer Rts.*, 190 F.4th at 1000-02; *Common Cause*, 2026 WL 3033772, at *9-12; *Colo. Mont. Wyo. State Area Conf. of the NAACP v. Smith*, 180 F.4th 1266, 1275-76 (10th Cir. 2026).

voters' citizenship is proven. *See supra* Background at 9-11. LULAC's members and voters across the country are confused about how this will work and how it will affect their ballots. *See* Proaño Decl*.*, ¶¶ 28-29, 33.

This confusion is unsurprising. As the California Secretary of State has explained in opposing litigation brought by Defendants seeking to force California to investigate suspected non-citizens voters and segregate ballots submitted by those voters, "segregating ballots would be a logistical and administrative nightmare," including because Defendants' list of supposed non-citizen voters "does not contain the information necessary to identify voters"; California's registrars have "no established system for segregating ballots"; and "trying to create one now risks shutting down the system the Registrar needs to run the entire election." Opp. to Mot. for Preliminary Injunction at 19, Dkt. 30.1, *United States v. California*, No. 26-7070 (9th Cir. Oct. 24, 2026). The district court in *California* explicitly adopted similar facts, *see California* TRO Denial at 22-24, concluding that Defendants are attempting to "provoke catastrophic change, upending the administration of the election" that "would likely cause 'voter confusion and consequent incentive to remain away from the polls' as individuals would wonder whether their ballots were likely to be withheld," *id.* at 25 (quoting *Purcell,* 549 U.S. at 5). Ninth Circuit Judge Sanchez likewise agreed, emphasizing that Defendants' desired course of action "would in fact spark significant prospective voter confusion about an unprecedented sequestration and citizenship-verification process." *California*, 2026 WL 3212945, at *20 (Sanchez, J., concurring).

Of course, LULAC members are similarly confused about what will happen to their vote if their mail-in ballot is segregated, how a voter whose ballot is segregated will learn of its segregation, and what the process will be for such a voter to provide proof of citizenship. *See* Proaño Decl. ¶ 29. Neither California, the county registrar in California, nor even Defendants

know the answer to those questions. Washington's Secretary of State has similarly accused Defendants of using the Voter Data Transmission Policy to "creat[e] additional uncertainty" about the state's elections.[12] Indeed, Washington's election code only permits challenges to ballots when they are made "no later than 45 days before the election." Wash. Rev. Code § 29A.08.820(1). This includes challenges based on a voter's citizenship. *See* How to Challenge a Voter Registration & Washington State Voter Registration Challenge Form, Washington Secretary of State, https://perma.cc/H7Y4-LJZS. The confusion resulting from Defendants' Voter Data Transmission Policy is a feature, not a bug. The same confusion will be endemic everywhere that Defendants impose the Policy. And with election day and then tabulation and canvassing mere days away, this confusion is unquestionably irreparable and will continue through certification without the Court's intervention.[13]

### C. LULAC and EPIC are suffering irreparable informational injuries

Defendants' refusal to publish SORNs in violation of the Privacy Act's transparency requirements is irreparably injuring LULAC and EPIC. "[A]n informational injury can be sufficient to establish irreparable harm if the information sought is time-sensitive." *Drs. for Am. v. OPM*, 766 F. Supp. 3d 39, 54 (D.D.C. 2025) (cleaned up); *see also Citizens for Resp. & Ethics in Washington ("CREW") v. OMB*, 791 F. Supp. 3d 29, 58 (D.D.C. July 21, 2025) (plaintiffs suffered irreparable injuries by being denied "information to which they are statutorily entitled" relating to "ongoing, imminent" issues of public concern). That is especially true where the information at

---

[12] Press Release, Washington Sec. of State, *Statement about Washington's safe and secure elections,* (Oct. 26, 2026), https://tinyurl.com/y8ynf3bt.

[13] For the same reasons, LULAC also has organizational standing to sue. *See DSCC v. Trump*, --- F. Supp. 3d ----, No. 26-cv-01114 (CJN), 2026 WL 2681471, at *6 (D.D.C. Sept. 13, 2026) (holding association had standing based on member's "confusion and uncertainty about whether [she] will be able to vote by mail in the upcoming elections").

issue "relates directly to the conduct of impending elections." *CREW v. DOJ*, 826 F. Supp. 3d 73, 89 (D.D.C. 2026). "As the D.C. Circuit has recognized, once an election passes, 'there can be no do over and no redress.'" *Id.* (quoting *Newby*, 838 F.3d at 9). Such is the case here.

As the *California* court found, Defendants' opacity and "[o]missions of . . . critical information prevent an evaluation of [Defendants'] procedure, including how [Defendants] reduced [their] initial claim of nearly 200,000 alleged noncitizens to 20,000 individuals." *California* TRO Denial at 22. And as a result of Defendants' violation of the Privacy Act, Defendants are denying LULAC and EPIC basic, statutorily required details about whose data is in DHS's system of records, what record sources the system is pooling from, how the system is being used and accessed, as well as "the agency procedures whereby an individual can be notified at his request if the system of records contains a record pertaining to him" and "the agency procedures whereby an individual can be notified at his request how he can gain access to any record pertaining to him contained in the system of records, and how he can contest its content." 5 U.S.C. § 552a(e)(4). Without statutorily guaranteed SORNs, LULAC, EPIC, and their members cannot fully understand how voters' personal data is being aggregated, repurposed, and pooled across the government; take steps to safeguard their privacy interests; or protect themselves against any attendant consequences to their personal lives, careers, or participation in elections. Perhaps most crucially, this lack of information impairs the ability of LULAC, EPIC, and their members to exercise their rights under the Privacy Act to submit appropriately targeted requests to access or correct their own records, *see* 5 U.S.C. § 552a(d), and requests for an accounting of how their records have been disclosed, *see id.* § 552a(c). Moreover, these informational injuries are irreparable "because 'stale information is of little value,' especially in the time-sensitive context of an election cycle," meaning LULAC's and EPIC's "interest in informing the public about these

matters will be irreparably impaired by any delay." *CREW v. DOJ*, 826 F. Supp. 3d at 89. LULAC's and EPIC's declarations crystallize their acute and immediate need for the information withheld by Defendants.

**LULAC.** Voter education is a key component of LULAC's mission. *See* Proaño Decl*.*, ¶¶ 13-15, 46. But "[b]ecause the federal government did not publish a System of Records Notice or provide an opportunity for public comment in connection with its collection and use of voter data, LULAC was not aware of" Defendants' Voter Data Transmission Policy. Proaño Decl*.*, ¶ 47. And given the dearth of public information about Defendants' Policy and because Defendants have not disclosed the information they should have provided to the public in a SORN, "LULAC cannot provide accurate information to its members about how their data is being used by the federal government and clear up their confusion." *Id.* This harm is especially acute given LULAC's focus on Latino civil rights and the heightened risks Latino voters in particular face from Defendants' Policy. *See id.* ¶¶ 3, 31-32.

**EPIC**. EPIC's mission is to secure the fundamental right to privacy in the digital age for all people through advocacy, research, and litigation. Central to EPIC's mission is oversight of government activities that impact individual privacy, free expression, and democratic values. Butler Decl., ¶ 3. "EPIC conducts numerous activities in furtherance of its mission to secure the fundamental right to privacy. EPIC routinely monitors, analyzes, and educates the public about the collection, use, retention, and transfer of personal information by federal agencies." *Id.* ¶ 4; *see also id.* ¶¶ 9-14. This includes System of Records Notices. *See id.* Defendants' actions (and inaction), therefore, "have directly hindered EPIC's mission of securing the fundamental right to privacy in the digital age for all people." *Id.* ¶ 7; *see also id.* ¶¶ 15-17. And "[b]y failing to disclose

lawfully required information, Defendants have prevented EPIC from ensuring oversight of and educating the public on government activities that impact individual privacy, free expression, and democratic values. Their actions have caused harm to EPIC." *Id.*; *see also id.* ¶¶ 18-19. Moreover, as is the case for LULAC, "EPIC's informational injuries are time-sensitive. . . . [A]gencies are currently using the unlawfully collected and transmitted data in connection with ongoing election administration efforts and appear intent on doing so in the immediate aftermath of the election. Because the government's actions are tied to the ongoing election cycle, EPIC has an immediate need for the information the agencies failed to disclose in order to fulfill its organizational mission and inform the public and its members about the privacy risks associated with the government's actions in a timely manner." *Id.* ¶ 8.[14]

Finally, the D.C. Circuit has repeatedly held that a plaintiff can seek vacatur of agency action under the APA based solely on informational injuries. *See, e.g.*, *Waterkeeper All. v. EPA*, 853 F.3d 527, 533, 537-38 (D.C. Cir. 2017) (vacating final rule based on informational injuries); *U.S. Int'l Dev. Fin. Corp.*, 77 F.4th at 686 (plaintiff's informational standing allowed it to seek APA vacatur); *Friends of Animals v. Jewell*, 824 F.3d 1033, 1040 (D.C. Cir. 2016) (plaintiff's informational standing allowed it to pursue separation of powers claim and APA vacatur).

## III. The balance of equities and public interest favor preliminary relief

"[W]hen the Government is the opposing party," the last two interim relief factors—"harm to the opposing party" and "the public interest"—"merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009). "A party's likelihood of success on the merits 'is a strong indicator that a preliminary injunction would serve the public interest' because '[t]here is generally no public interest in the

[14] For the same reasons, LULAC and EPIC also have informational standing to sue. *See Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 77 F.4th 679, 685-87 (D.C. Cir. 2023); *Common Cause*, 2026 WL 3033772, at *12-13.

perpetuation of unlawful agency action.'" *Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 102 (D.C. Cir. 2021) (alteration in original) (quoting *Newby*, 838 F.3d at 12); *see also C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (when balancing equities and considering public interest, "[i]t is well established that the Government 'cannot suffer harm from an injunction that merely ends an unlawful practice.'" (quoting *Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017))).

The blatant lawlessness of the Voter Data Transmission Policy is on its own enough to resolve these two factors in Plaintiffs' favor. As explained above, the government has no legal authority for its unlawful election interference campaign. The Constitution leaves election administration to the states, not the federal government, *see, e.g.*, *Roudebush*, 405 U.S. at 24, and Defendants have no legitimate interest in their unlawful power grab. Likewise, enjoining the Voter Data Transmission Policy would not preclude the government from later investigation and prosecution of any potential violations of 18 U.S.C. § 611.

On the other side of the ledger, the public interest cuts decisively against policies like the Voter Data Transmission Policy that make it "more difficult for groups like [LULAC] to register otherwise qualified voters." *Newby*, 838 F.3d at 12-13. Thus, the "programmatic harm" suffered by organizations like LULAC "dovetails with the public interest." *Id.* at 13. For the same reason that Defendants' actions are "confus[ing] the public"—and giving rise to LULAC's injuries—they are also "creat[ing] a disincentive for citizens who would otherwise attempt to register to vote" or vote. *Id*. That harm is severe: The right to vote is "preservative of all rights' and 'of the most fundamental significance under our constitutional structure.'" *Id.* (first quoting *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972); then quoting *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979)). Accordingly, because "there is a substantial risk that citizens will be

disenfranchised in the present federal election cycle" due to the voter confusion spawned by Defendants' unlawful policy, "the public interest . . . favors" immediate relief. *Id.*; *see also California* TRO Denial at 24-25 (describing disenfranchisement likely to result from Defendants' Policy).

More broadly, Defendants' demands "for election officials to identify and segregate ballots" would "lead[] to chaos" and "upend[] the election" by compelling states and localities "to create wholly new procedures while the election is already underway. *California* TRO Denial at 22-23. It would force jurisdictions to "diver[t] . . . resources" away from their pressing election administration responsibilities, putting their ability "to meet statutory deadlines" at risk and "jeopardiz[ing] the finalization of the election and the ability of newly elected officials to assume their responsibilities." *Id.* at 23-24. These changes would be "catastrophic." *Id.* at 25. Defendants' actions would thus undermine the "public interest in orderly elections," which is yet another reason that relief is appropriate. *Benisek v. Lamone*, 585 U.S. 155, 160 (2018) (citing *Purcell*, 549 U.S. at 4-5).

Even measured on its own terms, Defendants' Voter Data Transmission Policy is manifestly contrary to the public interest. Unlawful voting by noncitizens is vanishingly rare. *See* Elaine Kamarck, *Why do so few noncitizens try to vote?*, Brookings (July 23, 2026), https://perma.cc/8NMX-JBVA; *Weber*, 816 F. Supp. 3d at 1186, n.26 (collecting evidence). And the data and systems Defendants rely on to identify supposed noncitizen voters are incapable of reliably identifying whether a voter is a citizen or not.[15] As the court in *California* recently found,

[15] *See, e.g.*, *Common Cause*, 2026 WL 3033772, at *6, 33 (noting that "SSA has long recognized that its citizenship data contains certain inaccuracies"; that "[a] 2006 SSA audit found that 7% of the non-U.S. citizen records in SSA's database . . . misidentified U.S. citizens as noncitizens"; and that "SAVE's ability to verify citizens . . . is limited"); *Cal. Nurses Ass'n v. Mullin*, No. 26-cv-10680-AMO, 2026 WL 3166149, at *2 (N.D. Cal. Oct. 21, 2026) (finding that DHS's data lists

"[i]t is well-documented that matching voter registration records with data from other administrative databases 'presents numerous challenges,'" "such as differences in when and how information across databases is captured and common identifying information," which "can lead to false positives, such as a citizen incorrectly being identified as a noncitizen." *California* TRO Denial at 21. When, under the Voter Data Transmission Policy, Defendants send letters and threats seeking to compel states to segregate votes, their data-matching programs purport to find thousands upon thousands. But when using their full criminal investigative authorities, unrestricted by the specific factors supporting an injunction here, Defendants have identified only "dozens" of noncitizen voters around the entire country.[16]

Moreover, Defendants' matching "protocol raises significant concerns" because Defendants have not disclosed any specifics about how it works. *California* TRO Denial at 21. Those unexplained gaps include what "the specific matching rules" are, "how Lexis Nexis perform[s] its analysis," what the "'enrichment process' entail[s]," or how DHS arrived at 20,000 unlawful voters in California when it initially—and erroneously—claimed that there were ten times that number. *Id.* at 21-22. "Given the vagueness of [the government's] descriptions of its

---

are based on sources "of questionable provenance," noting that "USCIS concedes that errors will result" for incomplete data, and explaining that "[e]ven under the best conditions, there is a high likelihood of error in review because there is no federal database containing citizenship status of U.S. residents"); Elkind et al., *Inside Trump's Failed Hunt for Noncitizen Voters* (describing how HSI's process for comparing voter files with its data to identify unlawful voters produces "an 'ungodly' number of false positives"); Corasaniti, *From 16,000 to 185 to Zero: Trump's Claims of Illegal Voting in Nevada Fizzle* (explaining how DHS initially claimed to identify 15,903 unlawful voters in Nevada but were forced to downgrade their estimate to 185, and how Nevada subsequently determined that all 185 were citizens).

[16] *See, e.g.,* U.S. Dep't of Homeland Security, *Dozens of Illegal Aliens Arrested in Nationwide Voter Fraud Crackdown*, https://perma.cc/SCC9-953Q (Oct. 28, 2026) (highlighting 13 examples of noncitizen voting, including an individual who allegedly voted in 1992, plus some thirty others arrested since the administration made this an area of "focus").

procedures and the unreliability of its similar claims in other states," the lists of voters it has foisted upon states and counties simply are "not credible." *Id.* at 22.

Unsurprisingly, the lists provided to California jurisdictions have repeatedly misidentified citizens as noncitizens or contained other glaring errors.[17] Defendants hardly dispute this point, acknowledging that its lists may contain voters "who it turns out ultimately are citizens," and conceding "we're not perfect." Parks & Joffe-Block, *Some on DOJ's 20,000 'Likely' Noncitizen List in California Appear to Be U.S.-Born*. Thus, the predictable consequence of Defendants' policy is to "deprive" voters "who have met the requirements for voter registration of their fundamental right" due to the government's "unfounded allegations" of fraud. *California* TRO Denial at 25.

Under these circumstances, the risk that Defendants will erroneously disenfranchise lawful voters and destabilize the 2026 elections far outweighs any unproven benefit of the Voter Data Transmission Policy. The public interest and balance of the equities thus weigh heavily in favor of immediate relief during the election itself and the post-election tabulation and certification period.

[17] *See, e.g.*, Decl. of Aman Bhullar, *United States v. California*, No. 26-cv-12025, ¶ 24 (C.D. Cal. Oct. 20, 2026), Dkt. No. 32-3 (explaining that when Los Angeles County sampled the records sent by DOJ, it concluded that "71.2% of the list sampled had never voted in the past elections," that most of the sample did not receive ballots, and that where birthplace records were available, "38.9% indicated that [the listed individuals] were born in the United States"); Ryan Sabalow & Jeanne Kuang, *What Local Election Officials Found in Trump's New Claims About California Voters*, CalMatters (Oct. 27, 2026) https://perma.cc/E9R7-8LFK (quoting California election officials describing the lists they received as "a poorly formatted excel spreadsheet with missing and jumbled information," "not particularly legible," "not in a format that facilitates counting or reviewing," and not establishing grounds for disqualification given its "overall inaccuracy"); Rosenhall & Hubler, *Justice Dept. Demands That California Counties Help Identify Noncitizen Voters* (identifying one county that received another county's list); *California* TRO Denial at 6-7 (recognizing that "[s]ister district courts across the country have case doubt about the United States' proffered lists" and collecting citations).

## CONCLUSION

For the foregoing reasons, the Court should grant the motion and issue a temporary restraining order, a stay under section 705 of the APA, and/or a preliminary injunction.

Dated October 29, 2026

Respectfully submitted,

*/s/ Louis R. Katz*
Louis R. Katz (D.C. Bar No. 90003861)
Briana M. Clark (D.C. Bar No. 1735505)
J.P. Cooney (D.C. Bar No. 494026)
Ronald A. Fein (D.C. Bar No. 90026641)
Brian D. Netter (D.C. Bar No. 979362)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
lkatz@democracyforward.org
bclark@democracyforward.org
jpcooney@democracyforward.org
rfein@democracyforward.org
bnetter@democracyforward.org

John B. Hill (D.C. Bar No. 90044825)
Reuven Dashevsky (D.C. Bar No. 90046789)*
Haley Y. Florsheim (D.C. Bar No. 90041575)^
Nikhel S. Sus (D.C. Bar No. 1017937)
Citizens for Responsibility
and Ethics in Washington
P.O. Box 14596
Washington, DC 20044
(202) 408-5565
jhill@citizensforethics.org
rdashevsky@citizensforethics.org
hflorsheim@citizensforethics.org
nsus@citizensforethics.org

* Admitted *pro hac vice*
^ Admitted *pro hac vice*, notice of appearance forthcoming

*Counsel for Plaintiffs*