**UNITED STATES DISCTRICT COURT**
**FOR THE DISTIRCT OF COLUMBIA**

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPT. OF HOMELAND SECURITY, *et al.*,<br><br>Defendants. | Civil Action No. 26-3602 (TSC) |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER, STAY UNDER 5 U.S.C. § 705, AND/OR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS


INTRODUCTION ..... 1

BACKGROUND ..... 2

A. Factual Background ..... 2

B. *United States v. California* ..... 3

C. Procedural History ..... 4

D. Legal Standard ..... 5

ARGUMENT ..... 7

I. Plaintiffs Cannot Establish Standing. ..... 7

A. Legal Standard for Standing ..... 7

i. Plaintiffs lack a non-speculative injury-in-fact. ..... 8

ii. The Plaintiffs cannot establish associational standing. ..... 11

iii. Plaintiffs Cannot Establish Organizational Standing ..... 12

iv. Plaintiffs Cannot Establish Informational Standing ..... 15

II. Plaintiffs Have Not Demonstrated a Likelihood of Success on the Merits ..... 17

A. Plaintiffs Fail To Establish Final Agency Action Reviewable Under the APA ..... 17

B. Plaintiffs Cannot Bring APA Claims Seeking Injunctive Relif Predicated on Privacy Act Violations ..... 21

C.. Defendants' Challenged Actions Are Not Contrary to Law ..... 22

III. Plaintiffs Cannot Establish Irreparable Harm ..... 24

IV. The Balance of Equities Weighs Against Granting Plaintiffs' Request for Emergency Injunctive Relief ..... 26

V. The Proposed Injunction Is Vague, Unworkable, and Violates the Separtion of Powers ..... 28

CONCLUSION ..... 29

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Aamer v. Obama*,
742 F.3d 1023 (D.C. Cir. 2014) ........ 6

*AARP v. Trump*,
605 U.S. 91 (2025) ........ 4

*Air Transp. Ass'n of Am. v. Export-Import Bank of the U.S.*,
878 F. Supp. 2d 42 (D.D.C. 2012) ........ 25

*Am. First Legal Found. v. Greer*,
--- F.4th ---, 2025 WL 2810813 (D.C. Cir. Oct. 3, 2025) ........ 15

*Am. Library Ass'n v. FCC*,
401 F.3d 489 (D.C. Cir. 2005) ........ 11

*Anderson v. United States*,
417 U.S. 211 (1974) ........ 26

*Ariz. All. for Retired Ams. v. Mayes*,
186 F.4th 622 (9th Cir. 2026) ........ 13

*Arizona v. United States*,
567 U.S. 387 (2012) ........ 22, 24

*Bennet v. Spear*,
520 U.S. 154 (1997) ........ 18

*Biden v. Texas*,
597 U.S. 785 (2022) ........ 18

*Block v. Cmty. Nutrition Inst.*,
467 U.S. 340 (1984) ........ 21

*Bluman v. FEC*,
800 F. Supp. 2d 281 (D.D.C. 2011) ........ 22

*Boone v. Illinois Dep't of Corr.*,
Nos. 23-2630 & 23-2727 , 2024 WL 4750494 (7th Cir. Nov. 12, 2024),
*cert. denied*, 145 S. Ct. 2819 (2025); ........ 9

*Bowen v. Massachusetts*,
487 U.S. 879 (1988) .......... 21

*Brnovich v. Democratic Nat'l Comm.*,
594 U.S. 647 (2021) .......... 27

*Burroughs v. United States*,
290 U.S. 534 (1934) .......... 23

*California v. Texas*,
593 U.S. 659 (2021) .......... 12

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006) .......... 24, 25

*Chavez-Perez v. Ashcroft*,
386 F.3d 1284 (9th Cir. 2004) .......... 23

*Clapper v. Amnesty Int'l*,
568 U.S. 398 (2013) .......... 10, 11, 12, 24

*Clevinger v. Advoc. Holdings, Inc.*,
134 F.4th 1230 (D.C. Cir. 2025) .......... 6, 23

*Cobell v. Kempthorne*,
455 F.3d 301 (D.D.C 2006) .......... 19

*Common Cause v. Nuclear Regul. Comm'n*,
674 F.2d 921 (D.C. Cir. 1982) .......... 28

*Crawford v. Marion Cnty. Election Bd.*,
553 U.S. 181 (2008) .......... 25

*Ctr. for L. & Educ. v. Dep't of Educ.*,
396 F.3d 1152 (D.C. Cir. 2005) .......... 15

*Ctr. for Taxpayer Rts. v. IRS*,
No. 26-5006, __ F.4th __, 2026 U.S. App. LEXIS 27506 (D.C. Cir. Sep. 8, 2026) .......... 14

*D.A.M. v. Barr*,
474 F. Supp. 3d 45 (D.D.C. 2020) .......... 5, 6, 7, 23

*Dew v. United States*,
192 F.3d 366 (2d Cir. 1999) .......... 21

*DHS v. League of Women Voters*,
609 U.S. ---, No. 26A308, 2026 WL 2879700 (U.S. Sep. 25, 2026) .......... 26

*Doe v. Blanche*,
172 F.4th 901 (D.C. Cir. 2026) .......... 6

*Doe v. Off. of Pers. Mgmt.*,
No. 25-cv-234, 2025 WL 513268 (D.D.C. Feb. 17, 2025) .......... 24

*DSCC v. Trump*,
834 F. Supp. 3d 19 (D.D.C. 2026) .......... 24

*El Rio Santa Cruz Neighborhood Health Ctr. v. HHS*,
396 F.3d 1265 (D.C. Cir. 2005) .......... 21

*Elec. Privacy Info. Ctr. v. U.S. Dep't of Com.*, ("*EPIC*"),
928 F.3d 95 (D.C. Cir. 2019) .......... 7, 11, 16

*EPIC v. PACEI*,
878 F.3d 371 (D.C. Cir. 2017) .......... 16

*FTC v. Standard Oil Co. of Cal.*,
449 U.S. 232 (1980) .......... 20

*Fanning v. United States*,
346 F.3d 386 (3d Cir. 2003) .......... 19

*FAA v. Cooper*,
566 U.S. 284 (2012) .......... 22

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) .......... 12, 13, 14, 15

*Food & Water Watch, Inc. v. Vilsak*,
808 F.3d 905 (D.C. Cir. 2015) .......... 6, 7, 8

*Friends of the Everglades, Inc. v. Sec'y of the United States Dep't of Homeland Sec.*,
174 F.4th 822 (11th Cir. 2026) .......... 17

*Garcia v. Vilsack*,
563 F.3d 519 (D.C. Cir. 2009) .......... 21

*Glob. Health Council v. Trump*,
153 F.4th 1 (D.C. Cir. 2025) .......... 6

*Haase v. Sessions*,
835 F.2d 902 (D.C. Cir. 1987) .......... 19, 20

*Hanson v. District of Columbia*,
120 F.4th 223 (D.C. Cir. 2024), *cert. denied*, 145 S. Ct. 2778 (2025) ....................................... 5

*Harisiades v. Shaughnessy*,
342 U.S. 580 (1952)............................................................................................................ 22

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982)............................................................................................................ 15

*Hines v. Davidowitz*,
312 U.S. 52 (1941)....................................................................................................... 22, 23

*Indep. Equip. Dealers Ass'n v. EPA*,
372 F.3d 420 (D.C. Cir. 2004) ............................................................................................ 17

*Indep. Mkt. Monitor for PJM v. FERC*,
162 F.4th 1167 (D.C. Cir. 2025)........................................................................................... 14

*Indus. Energy Consumers of Am. v. FERC*,
125 F.4th 1156 (D.C. Cir. 2025)........................................................................................... 12

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)......................................................................................................... 7, 12

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990)............................................................................................... 18, 19, 20

*Mills v. District of Columbia*,
571 F.3d 1304 (D.C. Cir. 2009) ............................................................................................ 7

*Murthy v. Missouri*,
603 U.S. 43 (2024)............................................................................................................ 7, 8

*N.Y. Times Co. v. Def. Health Agency*,
Civ. A. No. 21-cv-566, 2021 WL 1614817 (D.D.C. Apr. 15, 2021) ......................................... 6

*Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*,
366 F.3d 930 (D.C. Cir. 2004) ............................................................................................ 10

*Nken v. Holder*,
556 U.S. 418 (2009)............................................................................................................ 25

*North Carolina v. Covington*,
581 U.S. 486 (2017)............................................................................................................ 28

*Norton v. S. Utah Wilderness All.*, ("*SUWA*"),
542 U.S. 55 (2004)....................................................................................................... 17, 18

*Obama v. Klayman*,
800 F.3d 559 (D.C. Cir. 2015) .......... 7

*Olu-Cole v. E.L. Haynes Pub. Charter Sch.*,
930 F.3d 519 (D.C. Cir. 2019) .......... 26

*Osborn v. Visa Inc.*,
797 F.3d 1057 (D.C. Cir. 2015) .......... 8

*People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*,
797 F.3d 1087 (D.C. Cir. 2015) .......... 15

*Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*,
489 F.3d 1279 (D.C. Cir. 2007) .......... 8

*Purcell v. Gonzalez*,
549 U.S. 1 (2006) .......... 25

*Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*,
324 F.3d 726 (D.C. Cir. 2003) .......... 17, 20

*Rimmer v. Holder*,
700 F.3d 246 (6th Cir. 2012) .......... 21

*Rodriguez v. U.S. Dep't of the Air Force*,
387 F. Supp. 3d 130 (D.D.C. 2019) .......... 19, 20

*Schmidt v. Lessard*,
414 U.S. 473 (1974) .......... 28

*Sibley v. Alexander*,
916 F. Supp. 2d 58 (D.D.C. 2013) .......... 24

*Sibley v. U.S. Supreme Ct.*,
786 F. Supp. 2d 338 (D.D.C. 2011) .......... 10

*Smiley v. Holm*,
285 U.S. 355 (1932) .......... 22

*South Carolina v. United States*,
898 F. Supp. 2d 30 (D.D.C. 2012) .......... 25

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) .......... 15

*Taylor v. Trump*,
788 F. Supp. 3d 1 (D.D.C. 2025) ........ 23

*Tex. Children's Hosp. v. Azar*,
315 F. Supp. 3d 322 (D.D.C. 2018) ........ 9

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ........ 8, 17

*Trump v. California*,
609 U.S. 1032 (2026) ........ 9, 28

*Trump* v. *CASA, Inc.*,
606 U.S. 831 (2025) ........ 27

*TVA* v. *Hill*,
437 U.S. 153 (1978) ........ 27

*U.S. Army Corp. of Eng'rs v. Hawkes Co.*,
578 U.S. 590 (2016) ........ 18

*United States v. Knight*,
490 F.3d 1268 (11th Cir. 2007) ........ 21

*United States* v. *Oakland Cannabis Buyers' Co-op.*,
532 U.S. 483 (2001) ........ 27

*United States v. Raines*,
362 U.S. 17 (1960) ........ 23

*Urb. Sustainability Dirs. Network v. Dep't of Agric.*,
2025 WL 2374528 (D.D.C. Aug. 14, 2025) ........ 6

*Virginia v. Ferriero*,
525 F. Supp. 3d 36 (D.D.C. 2021), *aff'd on other grounds,* 60 F.4th 704 (D.C. Cir. 2023) ...... 9

*Williams v. Dep't of Veterans,*
*Affs.*, 104 F.3d 670 (4th Cir. 1997) ........ 16

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ........ 5, 6

*Wis. Gas Co. v. FERC*,
758 F.2d 669 (D.C. Cir. 1985) ........ 25, 26

**Constitutional Provisions**

U.S. Const. art. I, § 4, cl. 1 ..... 22

**Statutes**

5 U.S.C. § 551 ..... 17, 18

5 U.S.C. § 552a ..... 22

5 U.S.C. § 704 ..... *passim*

5 U.S.C. § 705 ..... 5

18 U.S.C. § 611 ..... *passim*

28 U.S.C. § 533 ..... 23

**Rules**

Rule 65 ..... 28, 29

**Executive Materials**

Executive Order 14248 ..... 1

## INTRODUCTION

In an effort to manufacture a cause of action, Plaintiffs have created an imaginary "policy" that they have named "The Voter Data Transmission Policy." They attach no official copy of this supposed policy, or provide any real definition of its contours. Instead, they point to a series of law enforcement efforts by federal authorities to identify non-citizens who may have cast, or may be imminently casting, votes in the upcoming federal election in violation of an explicit federal law that prohibits such votes. These law enforcement efforts – an administration priority known to all since early 2025, *see, e.g.*, Executive Order 14248 – are administration wide efforts to ensure voting integrity. They are not discrete, final agency action subject to review under the Administrative Procedure Act.

In any event, Plaintiffs' suit fails at the inception because Plaintiffs have not demonstrated standing to bring this suit. Organizational standing fails because the functions of counseling and advising naturalized citizens about their voting rights is consistent with the organizational mission of the League of United Latin American Citizens ("LULAC"). EPIC similarly lacks injury as an organization, because nothing is preventing it from performing its ordinary function of public advocacy. Nor has EPIC suffered an informational injury: this Circuit has made clear that the primary purpose of a statute conferring an information injury must be the provision of information. The Privacy Act's main purpose is to balance privacy rights with the government's need to obtain and share information. Finally, no individual has sued, and neither organization has established associational standing through its members. Statements that its members are anxious or fearful of what might happen to their vote are nothing more than a generalized grievance based on speculation. On Plaintiffs' own facts, any alleged injury to a voter depends on a speculative chain of hypotheticals: that Defendants will send a future letter providing a state with evidence of

ineligible voters and requesting investigation; that a locality or state will comply (as opposed to declining to do so), that a court will order relief on behalf of Defendants, and that a member of the Plaintiff organizations' vote will not be counted.

On the merits, Plaintiffs have not demonstrated the requisite likelihood of success. To start, neither the DOJ demand letters nor the California suit represent final agency action under the Administrative Procedure Act (APA); the DOJ demand letters are not arbitrary or capricious on their face; and Plaintiffs' Privacy Claims fail because Plaintiffs identify no discrete final agency action that violates the Privacy Act – only a nebulous "Voter Data Transmission Policy," which they claim is unauthorized by statute. Despite states' traditional authority in managing elections, however, Congress expressly directed the Federal Government in 18 U.S.C. § 611 to ensure that noncitizens do not vote in federal elections.

Finally, the balance of equities and public interest tips decisively in favor of the government. The government's compelling interest in combating voter fraud significantly outweighs Plaintiffs' speculative and non-existent injuries. Further, Plaintiffs' proposed injunction is legally unsound, practically unworkable, violates fundamental prohibitions against universal relief, and fails to specify the conduct that would be restrained.

For those reasons, as further explained below, this Court should deny Plaintiffs' emergency application for a temporary restraining order and/or preliminary injunction.

## BACKGROUND

### A. Factual Background

On July 16, 2026, Secretary of Homeland Security Mullin issued a letter to the State of California indicating that a "[p]reliminary review" of California records revealed that there may be as many as 190,832 noncitizens registered to vote in California..Compl., Exhibit A, *United States v. California*, 2:26-cv-12025, July 16, 2026, Letter from DHS Secretary Mullin to California

Secretary of State Weber. The Secretary requested collaboration with California "to ensure the accuracy of [the] findings." *Id*. On July 23, 2026, California Secretary of State Shirley N. Weber declined to take the requested actions in Secretary Mullin's letter and requested additional information from DHS. *Id*., Compl., Exhibit B, July 23, 2026, Letter from Secretary Weber to Secretary Mullin.

On October 13, 2026, Acting Deputy Attorney General Trent McCotter sent letters to Secretary Weber and the Los Angeles County Clerk requesting that they confirm within 48 hours the eligibility of a list of over 20,000 individuals the Federal Government believes are highly likely noncitizens who were sent a vote-by-mail ballot to participate in the November 2026 federal election, and segregate the ballots until their citizenship was confirmed. *Id*., Compl.,Exhibit C, October 13, 2026, Letter from R. Trent McCotter to Dean C. Logan; October 13, 2026, Letter from R. Trent McCotter to Shirley N. Weber, ECF No. 34-7.

On October 15, 2026, Secretary Weber and Los Angeles County responded to the letters declining to take the requested actions and asserting that the request was unlawful. October 15, 2026, Letter from Shirley N. Weber to R. Trent McCotter, *United States of America v. California*, No. 2:26-cv-12025 (C.D. Cal.), ECF No. 22-2; *Id*., Compl., Exhibit D, October 15, 2026, Letter from Peter Bollinger to R. Trent McCotter.

### ***B. United States v. California***

On October 15, 2026, the Department of Justice brought suit against California and the election officials of the state and Los Angeles County requesting that the court "order California (1) to set aside vote-by-mail ballots from persons identified by the Federal Government likely to be noncitizens and (2) to independently—or in collaboration with the Federal Government—verify their citizenship status (beyond relying on unverified statements of citizenship necessary to registering) before tabulating their vote-by-mail ballot." Complaint ¶ 6, *United States of America*

*v. California*, No. 2:26-cv-12025 (C.D. Cal.), ECF No. 1. On October 19, the United States moved for an emergency TRO and order for why a preliminary injunction should not issue. *Id.*, ECF No. 22. The district court set a hearing for the following Tuesday, October 27. *Id.*, ECF No. 64. Because harm was ongoing and irreversible with highly likely non-citizen mail-in ballots being tabulated, the United States requested an expedited ruling on the emergency TRO by the following day, October 22. *Id.*, ECF No. 67. The district court did not rule on the TRO. The United States appealed shortly thereafter, interpreting the district court's failure to rule on the emergency TRO as a constructive denial under *AARP v. Trump*, 605 U.S. 91 (2025). *Id.*, ECF No. 74. The United States then moved for an injunction pending appeal in the Ninth Circuit on October 23. *United States v. California*, No. 26-7070 (9th Cir.), Dkt. 5.1. The Ninth Circuit held remote oral argument on the government's motion on Sunday afternoon, October 25. On October 26, 2026, the Ninth Circuit panel concluded that it lacked jurisdiction over the Government's appeal and denied as moot the United States' emergency motion for relief. *United States v. California,* No. 26-7070 (9th Cir. October 26, 2026) (per curiam), Dkt. 63.1.

### C. Procedural History

On October 15, 2026, Plaintiffs filed a Complaint challenging DHS's compilation of registered voters' sensitive personal information and its use of that information to identify voter fraud. *See* Compl. ¶ 3, ECF No. 1. The complaint sought, among other relief, to enjoin the "Voting Data Collection Policy," require Defendants to delete and disgorge any voter information collected and maintained under that policy, and prohibit further use of that information. *Id.*, Prayer for Relief.

On October 28, 2026, Plaintiffs filed their First Amended Complaint. ECF No. 13. The amended complaint sought to stay the Voter Data Policy and Voter Data Transmission Policy and require Defendants to delete and disgorge voter information collected, maintained, and used under those policies. It also sought to prohibit further use of that information—including internal use and

disclosure to DOJ—and to halt unsolicited transmission of voter information to states, localities, or others. *Id.*, Prayer for Relief.

At approximately 11 P.M. on October 29, 2026—two weeks after filing the original complaint, one day after filing an amended complaint, and less than a week from the midterm election—Plaintiffs moved for a temporary restraining order, stay under 5 U.S.C. 705, and/or preliminary injunction. *See* Plaintiffs' Motion for a Temporary Restraining Order, Stay Under 5 U.S.C. § 705, and/or Preliminary Injunction, at 1-2 ECF No. 15. The motion seeks to halt Defendants' transmission of data concerning registered voters whom Defendants characterize as "likely noncitizens" to states and localities for use in investigating those voters, segregating their ballots, or refusing to tabulate their ballots pending a determination of citizenship. *See id.* Plaintiffs contend they are likely to succeed on the merits. *Id.*

Specifically, Plaintiffs seek to enjoin Defendants from (1) further disclosing or transmitting voter data to states, localities, or others for use in investigating identified voters, segregate their ballots, refusing to tabulate their votes, or otherwise treating them differently in administering the 2026 election; and (2) directing, demanding, or requesting states or localities use voter data already disclosed or transmitted for those purposes. *Id.*; *see also* Plaintiffs' Proposed TRO, ECF No. 15-4.

### D. Legal Standard

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Hanson v. District of Columbia*, 120 F.4th 223, 231 (D.C. Cir. 2024) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)), *cert. denied*, 145 S. Ct. 2778 (2025); *see also, e.g., D.A.M. v. Barr*, 474 F. Supp. 3d 45, 55 (D.D.C. 2020) ("A TRO is an extraordinary remedy and should be granted sparingly." (citation omitted)).

A plaintiff seeking a preliminary injunction bears the burden of establishing "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Doe v. Blanche*, 172 F.4th 901, 911 (D.C. Cir.) (quoting *Winter*, 555 U.S. at 20), *remanded*, 2026 WL 1642068 (D.D.C. June 7, 2026). "The same standard applies to both temporary restraining orders and to preliminary injunctions." *D.A.M.*, 474 F. Supp. 3d at 55-56 (citation omitted).

*Winter* strongly indicates that all four preliminary injunction factors must be independently shown to obtain preliminary relief. *See* 555 U.S. at 20. Nonetheless, the D.C. Circuit has not yet expressly repudiated its preexisting "sliding scale" approach to the preliminary injunction factors, under which "a strong showing on one factor could make up for a weaker showing on another" in certain circumstances. *Clevinger v. Advoc. Holdings, Inc.*, 134 F.4th 1230, 1235–36 (D.C. Cir. 2025) (explaining it is "questionable that the sliding scale approach remains good law" after *Winter* (citation omitted)). Even under the sliding scale approach, however, a failure to show irreparable harm is fatal to a request for preliminary relief. *Id.* at 1236. At most, preliminary relief may issue under this approach where a plaintiff "raise[s] a serious legal question on the merits" and "the other three factors strongly favor issuing an injunction." *Glob. Health Council v. Trump*, 153 F.4th 1, 12 (D.C. Cir.) (quoting *Aamer v. Obama*, 742 F.3d 1023, 1043 (D.C. Cir. 2014)), *reh'g denied en banc*, 2025 WL 2709437 (D.C. Cir. Aug. 28, 2025).

In any event, whether the Court applies the questionable sliding scale approach or not, Plaintiffs bear the burden of persuasion on all four factors. *See N.Y. Times Co. v. Def. Health Agency*, Civ. A. No. 21-cv-566, 2021 WL 1614817, at *3 n.5 (D.D.C. Apr. 15, 2021); *Urb. Sustainability Dirs. Network v. U.S. Dep't of Agric.*, Civ. A. No. 25-1775, 2025 WL 2374528, at *11 (D.D.C. Aug. 14, 2025), *appeal filed*, No. 25-5370 (D.C. Cir. Oct. 17, 2025).

## ARGUMENT

### I. Plaintiffs Cannot Establish Standing.

A. Legal Standard for Standing

"In order to obtain a preliminary injunction, a party must show, among other things, 'a substantial likelihood of success on the merits.'" *Food & Water Watch, Inc. v. Vilsak*, 808 F.3d 905, 913 (D.C. Cir. 2015) (quoting *Mills v. District of Columbia*, 571 F.3d 1304, 1308 (D.C. Cir. 2009)). "In this context, the 'merits' on which plaintiff must show a likelihood of success encompass not only substantive theories but also establishment of jurisdiction." *Id.* (quoting *Obama v. Klayman*, 800 F.3d 559, 565 (D.C. Cir. 2015)). Because standing is an essential element of jurisdiction, "a party who seeks a preliminary injunction 'must show a substantial likelihood of standing.'" *Id.* (quoting *Klayman*, 800 F.3d at 568); *see also, e.g., D.A.M.*, 474 F. Supp. 3d at 56 ("[A] party who fails to show a substantial likelihood of standing is not entitled to a temporary restraining order." (citation omitted)).

The burden of "substantial likelihood of standing" at this stage is meaningfully heavier than the burden on a motion to dismiss. When a plaintiff moves for preliminary relief, "the plaintiff must make a 'clear showing' that she is 'likely' to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (quoting *Winter*, 555 U.S.at 22). Plaintiffs "cannot rest on 'mere allegations,' but must instead point to factual evidence." *Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)); *see Elec. Priv. Info. Ctr. v. U.S. Dep't of Com.*, 928 F.3d 95, 104 (D.C. Cir. 2019) ("*EPIC*") ("[S]tanding must be evaluated 'under the heightened standard for evaluating a motion for summary judgment' in 'determining whether or not to grant the motion for preliminary injunction.'" (quoting *Food & Water Watch*, 808 F.3d at 912)).

To establish standing, plaintiffs "must show (i) they have 'suffered a concrete and particularized injury in fact, (ii) that was caused by or is fairly traceable to the actions of the

defendant, and (iii) is capable of resolution and likely to be redressed by judicial decision.'" *Food & Water Watch*, 808 F.3d at 914 (quoting *Osborn v. Visa Inc.*, 797 F.3d 1057, 1063 (D.C. Cir. 2015)). An injury in fact must be "(1) concrete, (2) particularized, and (3) actual or imminent." *Id.* (quoting *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1292 (D.C. Cir. 2007)). "An actual or imminent injury is 'certainly impending and immediate – not remote, speculative, conjectural, or hypothetical.'" *Id.* (quoting *Public Citizen*, 489 F.3d at 1293). Importantly, "'plaintiffs must demonstrate standing for each claim that they press' against each defendant, 'and for each form of relief that they seek.'" *Murthy*, 603 U.S. at 61 (explaining that the lower court "erred by treating the defendants, plaintiffs, and platforms each as a unified whole" (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021))).

**i. <u>Plaintiffs lack a non-speculative injury-in-fact.</u>**

Plaintiffs lack a concrete and particularized injury-in-fact, and thus, this Court lacks jurisdiction. Plaintiffs primarily claim injury resulting from letters sent from the Federal Government to states, which they refer to as part of a Voter Data Transmission Policy, identifying suspected ineligible voters (*i.e.*, those voters who are not U.S. citizens, as federal law requires), and asking that any votes from those suspected ineligible voters be temporarily segregated so that the state and localities may ultimately determine if the suspected ineligible voters are in fact eligible. *See* Pls.' Mem. of Law in Supp. of Mot. for TRO at 9, ECF No. 15-1 ("Pls.' Mot.") 9; First Am. Compl. ¶¶ [], ECF No. 13 ("Compl."); Compl. ¶¶ [a-g] (Prayer for Relief).

These letters have no independent legal effect. States and localities have not complied with the obligations referenced in the letters and if they continue to not comply, Defendants would need a court order from an independent Article III judge to require those jurisdictions to segregate ballots. And even if the ballots are segregated, it will be states and localities that will have the

initial responsibility for determining whether any votes would be invalid under federal law. Plaintiffs have not shown that the letters themselves inflict the concrete, particularized injury necessary to support the sweeping prospective relief they seek. The letters do not themselves change any voter's registration status, withhold a ballot, or alter ballot tabulation. *See Trump v. California*, 609 U.S. 1032, 1037 (2026) (holding that the plaintiffs lacked standing to challenge President Trump's Executive Order directing the Attorney General to "prioritize" investigating and prosecuting violators of existing federal voting laws because the Executive Order "[did] nothing to them"); *Virginia v. Ferriero*, 525 F. Supp. 3d 36, 47 (D.D.C. 2021) (holding that the plaintiffs lacked standing to challenge the Archivist's refusal to publish a ratified amendment as part of the Constitution because the publication of the amendment is a formality with "no legal effect"), *aff'd on other grounds,* 60 F.4th 704 (D.C. Cir. 2023); *Boone v. Ill. Dep't of Corr.*, Nos. 23-2630 & 23-2727, 2024 WL 4750494, at *2 (7th Cir. Nov. 12, 2024) ("Because, as a matter of Illinois state law, [the statute at issue] has no independent legal effect, the statute could not have caused the plaintiffs an injury in fact that is capable of redress."), *cert. denied*, 145 S. Ct. 2819 (2025); *cf. Tex. Children's Hosp. v. Azar*, 315 F. Supp. 3d 322, 335-36 (D.D.C.) (concluding that the plaintiffs had standing, in part, because the government website FAQ that was at issue had independent legal effect), *appeal dismissed*, 2018 WL 7080504 (D.C. Cir. Dec. 28, 2018).

Thus, to the extent that Plaintiffs claim that the letters *themselves* injure them, they lack any injury. Indeed, Plaintiff LULAC primarily claims injury due to distrust and confusion or fear among voters concerning their vote, or staff concerns about criminal consequences for aiding a person to vote who might appear on the government list. These concerns are all allegedly based on a letter from the Federal Government to states and localities informing those jurisdictions about potential violations of the law. *See* Pls.' Mot. at 28-36; Decl. of Juan Proano ¶¶ 28-45, ECF No.

15-2 ("Proano Decl."). But this is speculation that cannot give rise to standing. LULAC and EPIC both allege that Defendants' alleged refusal to publish SORNs caused them injury because they cannot provide accurate information to their members about how their data is being used. But even if a SORN were relevant here, and it is not, a procedural violation cannot cause the sort of irreparable injury necessary for emergency injunctive relief. Specifically EPIC cannot ensure oversight of and educate the public on government activities that impact individual privacy, free expression and democratic values. *See* Pls.' Mot. at 37-38; Proano Decl. ¶¶ 28-45; Decl. of Alan Butler ¶¶ 9-14, ECF No.15-3 ("Butler Decl.").

Furthermore, any concrete and particularized injury to Plaintiffs in this case requires a "speculative chain of possibilities." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013). Even if Defendants send similar letters to new jurisdictions, those third-party jurisdictions would have to independently decide (or be compelled by a federal court) to take action based on those letters—*i.e.*, actually segregate votes—and the segregated votes would have to be those of eligible voters. After all, the letter itself does not segregate ballots (or effectuate any other action Plaintiffs want the Court to enjoin). But "[w]hen a plaintiff's asserted injury arises from the Government's regulation of a third party that is not before the court, it becomes 'substantially more difficult' to establish standing." *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 938 (D.C. Cir. 2004) (citation omitted). Yet Plaintiffs have not plausibly alleged—and they certainly haven't made a strong showing—that third parties will behave in this manner. Rather, these jurisdictions have contested these letters—as proceedings in the Ninth Circuit and Central District of California illustrate. Even there, because these letters are the subject of collateral litigation, a court would likely need to order the states to segregate the ballots, thus providing a double-layer of third-party interactions that breaks the chain of causation. This Court cannot enjoin sibling (or parent) federal

courts, *Sibley v. U.S. Supreme Ct.*, 786 F. Supp. 2d 338, 345 (D.D.C. 2011), and yet, that is ultimately the act that Plaintiffs complain about, since that seems to be the only act that will require third-party jurisdictions to enforce the letters. Plaintiffs attempt to establish Article III injury in three different ways: through (1) associational standing; (2) organizational standing; and (3) informational standing. Each fails.

**ii. <u>The Plaintiffs cannot establish associational standing.</u>**

"An organization can assert associational standing on behalf of its members if: '(1) at least one of their members has standing to sue in her or his own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires the participation of an individual member in the lawsuit.'" *EPIC*, 928 F.3d at 101 (quoting *Am. Library Ass'n v. FCC*, 401 F.3d 489, 492 (D.C. Cir. 2005)). Plaintiffs fail to establish that even one member of its organization has standing to sue because (1) there is no impending and immediate threat to any voter based on DOJ's requests to states, and (2) generalized discomfort is not sufficiently concrete to establish injury-in-fact.

Plaintiffs cannot establish that any of its unidentified members have standing because they do not allege that any member who is a voter is presently at risk of "hav[ing] their ballots undelivered or uncounted" pursuant to DOJ's challenged requests. No state has acted upon the lists that were provided to them by agreeing to, inter alia, segregate ballots from likely unlawful voters, and Defendants thus far have not succeed in compelling those states to act. Nor have Plaintiffs alleged that any naturalized citizen members are unable "to register to vote." Plaintiff LULAC alleges that its "Latino voters face particular risk when government agencies rely on incomplete or inaccurate records to determine citizenship status," Proano Decl. ¶¶ 31-32; Pls.' Mot. at 31, but the challenged letters do not have anything to do with voter registration and

amorphous "risk" that is dependent on a contingency of events fails the test for Article III standing. *See Clapper*, 568 U.S. at 414 (expressing "reluctance to endorse standing theories that rest on speculation about the decisions of independent actors"); *California v. Texas*, 593 U.S. 659, 675 (2021) (standing is "substantially more difficult to establish" where "a causal relation between injury and challenged action depends upon the decision of an independent third party" (citation omitted)).

Absent the issuance of a court order requiring a state to take action, members' alleged "fear . . . about how their votes will be treated" Pls.' Mot. at 31, is fatally speculative. For Plaintiffs' members to actually face an impediment to their ability to vote, they would, before the election on November 3, 2026: (1) need to in fact be named on DOJ's list as ineligible, (2) that listing would need to be incorrect, (3) the state would need to either reverse course and comply with its obligation to ensure unlawful votes are not countered or a state court would need to grant the government relief, (4) the state would then need to act to segregate the ballots of suspected ineligible voters including Plaintiffs' members (or a court would again need to compel the state to act), (5) and the state would need to fail to accurately confirm that Plaintiffs' members were actually eligible to vote. That is a classic example of "'highly attenuated chain of possibilities' predicated on 'guesswork as to how independent decisionmakers will exercise their judgment'" which cannot satisfy Article III standing. *Indus. Energy Consumers of Am. v. FERC*, 125 F.4th 1156, 1163 (D.C. Cir. 2025) (quoting *Clapper*, 568 U.S. at 413); *see also Clapper*, 568 U.S. at 414 n.5 ("Plaintiffs cannot rely on speculation about 'the unfettered choices made by independent actors not before the courts.'" (quoting *Lujan*, 504 U.S. at 562)). For all these reasons, Plaintiff's attempt to establish associational standing fails.

### iii. Plaintiffs Cannot Establish Organizational Standing

Organizations may "sue on their own behalf for injuries they have sustained[,]" but, like all litigants, they must "satisfy the usual standards for injury in fact, causation, and redressability." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 393-94 (2024) (citation omitted).

Specifically, Plaintiff LULAC alleges that Defendants' actions have irreparably harmed LULAC's core operations and mission by forcing it to "redirect resources to counteract the Policy's harms on LULAC's members." Pls.' Mot. at 31; Proano Decl. LULAC also alleges that it has had to "reassure" people who have expressed concern about their voter status, and has had to "to invest additional resources in training their staff and volunteers." Pls.' Mot. at 31-32; Proano Decl. ¶ 34. But none of these allegations establish organizational standing.

*First*, as explained, no action to effectuate the DOJ's request to states has occurred; nor can it reasonably be anticipated to occur absent judicial intervention. Thus, any expenditures premised on that possibility are unjustified, self-inflicted, and not fairly traceable to the challenged conduct of the Defendants. *See Ariz. All. for Retired Ams. v. Mayes*, 186 F.4th 622, 634 (9th Cir. 2026) (en banc) (holding that potential expenditures to mitigate the hypothetical impact of a challenged action "cannot support standing" when the alleged impact "lacks record support and is highly speculative." (quoting *All. for Hippocratic Med.*, 602 U.S. at 390)). It is no less fatal to Plaintiffs' alleged organizational standing than to individual or associational standing that there is no imminent threat that California or any other state will take the actions requested in Defendants' challenged letters.

*Second*, Plaintiffs cannot ground their organizational standing in expenditure allegations based on fears created by the independent (and unchallenged) law enforcement actions of the DOJ. But Plaintiffs' asserted expenditure/diversion of resources theory has been squarely rejected by

the Supreme Court. In *Alliance for Hippocratic Medicine*, four associations challenged actions by the Food and Drug Administration (FDA) relaxing "regulatory requirements for mifepristone, an abortion drug." 602 U.S. at 372–73, 376. Although the associations neither prescribed nor used mifepristone themselves, they asserted that they had standing to challenge FDA's actions because those actions "impaired" the associations' "ability to provide services and achieve their organizational missions." *Id.* at 394 (citation omitted). Thus, the associations asserted that their injuries went beyond "mere disagreement with FDA's policies" because they had "incurr[ed] costs to oppose FDA's actions." *Id.* For example, the associations had "conduct[ed] their own studies on mifepristone so that" they could "better inform their members and the public about mifepristone's risks." *Id.* And they had "expend[ed] considerable time, energy, and resources drafting citizen petitions to FDA, as well as engaging in public advocacy and public education." *Id.* (citation omitted). Those activities, the associations asserted, had required them to expend "considerable resources to the detriment of other spending priorities." *Id.* (citation omitted).

But the Supreme Court unanimously held that associations "cannot spend [their] way into standing[.]" *Id.* The generic setback to associations' missions without any actual "impediment to [their] advocacy businesses" does not support Article III standing. *Id.* at 395. To hold otherwise would allow virtually every organization to "manufacture its own standing" by "spend[ing] a single dollar" to counteract any governmental policy it wishes to challenge. *Id.* at 394–95. So too here.

Further, the additional activities Plaintiff LULAC alleges that it has been forced to undergo are activities that are entirely consistent with the mission of the organization, and consistent with activities it already undertakes. "[A]n organization may not establish standing simply by spending money 'opposing those policies' that it 'dislike[s].'" *Ctr. for Taxpayer Rts. v. IRS*, 190 F.4th 990,

1001 (D.C. Cir. 2026) (quoting *All. for Hippocratic Med.*, 602 U.S. at 395). It is only when "a government action 'directly affect[s] and interfere[s] with' an organization's 'core business activities,' and the organization 'diverted its resources' *to continue pursuing those activities*, [that] such concrete harm to the organization's activities supports standing to sue." *Id.* (emphasis added); *see also, e.g., Indep. Mkt. Monitor for PJM v. FERC*, 162 F.4th 1167, 1173-74 (D.C. Cir. 2025) (finding plaintiff might have demonstrated organizational standing had it alleged defendant's actions "depriv[ed] [it] of the information that it depends on to carry out its monitoring functions" and also showed "how it has used its resources to counteract the injury." (cleaned up)), *denying reh'g en banc*, 2026 WL 473621 (D.C. Cir. Feb. 18, 2026).

No such direct interference with LULAC's core business activities is at issue here. This case is nothing like *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). That case stands for the proposition that an organization has standing to challenge an agency action when the agency action *directly interferes* with the organization's existing programs or investments in a manner that satisfies Article III's requirements. *See All. for Hippocratic Med.*, 602 U.S. at 395 (describing *Havens* as a case in which the defendant's "actions directly affected and interfered with [the plaintiff's] core business activities"). As the Supreme Court has since recognized, however, *Havens* was an "unusual case" where the defendant's actions plainly caused an organization direct harm. *Id.* at 396. There, the defendant—who owned and operated apartment complexes—had provided the plaintiff (who operated a housing counseling service) with false information about apartment availability. *Id.* at 395 (describing *Havens*). "In other words, Havens's actions directly affected and interfered with [the plaintiff's] core business activities." *Id.*; *see also People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1104 (D.C. Cir. 2015) (Millet, J.). Plaintiffs here have not established any equivalent direct injury to their core mission.

### iv. Plaintiffs Cannot Establish Informational Standing

Plaintiffs allege that the Defendants violated their rights to participate in notice-and-comment proceedings, thereby creating informational standing. Pls.' Mot. at 21-23. Not so. "[T]he 'deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient' to confer Article III standing." *Am. First Legal Found. v. Greer*, 153 F.4th 1311, 1314 (D.C. Cir. 2025) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009)). In other words, even when a plaintiff alleges a violation of some procedural right, the plaintiff still "must show that the violation of a procedural right 'resulted in injury' to some 'concrete, particularized interest." *Id.* at 1315 (quoting *Ctr. for L. & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1157 (D.C. Cir. 2005)).

Plaintiffs' invocation of "informational" injuries in connection to allegations of procedural harm (such as SORNs and notice and comment ) is just a repackaging and fails for the same reasons. *See, e.g.*, Pls.' Mot. at 37-38. And to the extent Plaintiffs try to rely on an independent theory of informational standing, that effort fails, because the relevant provisions of the Privacy Act do not create any "informational" rights.

The D.C. Circuit has "recognized that a denial of access to information can, in certain circumstances, work an 'injury in fact' for standing purposes." *EPIC v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017) (citation omitted). But, "[t]o carry its burden of demonstrating a sufficiently concrete and particularized informational injury, the plaintiff must show that (1) it has been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." *Id.* (citation omitted).

Unlike FOIA, the Privacy Act "was not designed to vest a general right to information in the public." *EPIC*, 928 F.3d at 103 (discussing the E-Government Act); *see also, e.g.*, Compl. ¶ 33 (The Privacy Act's "raison d'etre" is 'to provide for protection against possible abuses of governmental power to affect an individual's privacy and confidential information.' *Williams v.*

*Dep't of Veterans Affs.*, 104 F.3d 670, 676 (4th Cir. 1997)."). "Rather, the statute was designed to protect individual privacy by focusing agency analysis and improving internal agency decision-making." *EPIC*, 928 F.3d at 103. "In this respect," the Privacy Act "is fundamentally different from statutes like the Freedom of Information Act (FOIA) where the harm Congress sought to prevent was a lack of information itself."[1] *Id.*

## II. Plaintiffs Have Not Demonstrated a Likelihood of Success on the Merits

### A. Plaintiffs Fail To Establish Final Agency Action Reviewable Under the APA.

Plaintiffs' APA claims fail at the threshold because they have not identified a final agency action subject to judicial review. Plaintiffs challenge only the "Voter Data Transmission Policy," which Plaintiffs loosely describe as a series of actions that culminate in letters to states asking those states to take corrective action. Pls' TRO Mot. at 16. Plaintiffs' motion complains about demand letters sent by DHS and DOJ to the State of California requesting the State take action to verify individuals the government reasonably believes are noncitizens registered to participate in the upcoming federal election. Pls.' TRO Mot. at 25. But an agency's "request for voluntary corrective action . . . do[es] not constitute final agency action." *Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731 (D.C. Cir. 2003); *Friends of the Everglades, Inc. v. Sec'y of the U.S. Dep't of Homeland Sec.*, 174 F.4th 822, 830–31 (11th Cir. 2026) (holding that "an agency request is not a final agency action").

The APA does not allow a court to "exercise judicial review over everything done by an administrative agency." *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004) (Roberts, J.) (cleaned up). The APA instead permits review of "final agency action for which there

---

[1] Even if the lack of a SORN an "informational" injury, "standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion*, 594 U.S. at 431. Thus, the appropriate remedy for a claimed failure to publish a SORN is straightforward: a court order requiring publication of a SORN.

is no other adequate remedy in a court." 5 U.S.C. § 704. For an "agency action" to be reviewable under the APA, it must be one of the "circumscribed, discrete" actions identified in the statutory definition of that term, *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004) ("*SUWA*")—*i.e.*, "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof[.]" 5 U.S.C. § 551(13); *see also id.* § 551(4), (6), (8), (10), (11) (defining "rule," "order," "license," "sanction," and "relief"). A plaintiff seeking judicial review under the APA must therefore challenge a "specific" agency action falling within one of these discrete categories, rather than attempt to challenge an "abstract" policy or decision divorced from a concrete action, *Biden v. Texas*, 597 U.S. 785, 809 (2022), or "at a high[] level of generality" an agency "operation" or "program," *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 894 (1990); *accord SUWA*, 542 U.S. at 64 (the APA's discrete-action "limitation . . . precludes . . . broad programmatic attack[s]").

Additionally, judicial review under the APA is available only to challenge an agency action that is "final." 5 U.S.C. § 704. Agency action is final if two conditions are satisfied. "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature." *U.S. Army Corp. of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016) (quoting *Bennet v. Spear*, 520 U.S. 154, 177-78 (1997)). "[S]econd, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* (quoting *Bennett*, 520 U.S. at 178).

None of the requirements for final agency action are present here. Plaintiffs do not identify any rule, order, or other enumerated action. Instead, they describe a Voter Data Transmission Policy that, by their own account, is part of a larger alleged policy that consists of several component policies, They ask the Court to review one component that they have assembled from "Defendants' public statements," apparently a demonstrative exhibit used in court.

First, the DHS and DOJ demand letters are nothing like the "circumscribed, discrete" actions identified in the statutory definition of "agency action" in the APA, *SUWA,* 542 U.S. at 62—*i.e.*, "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof[.]" 5 U.S.C. § 551(13); *see also id.* § 551(4), (6), (8), (10), (11) (defining "rule," "order," "license," "sanction," and "relief"). *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990), forecloses Plaintiffs position here. In *Lujan,* plaintiffs challenged numerous individual decisions undertaken pursuant to statutory directives. *Id.* at 875-77, 890. The Supreme Court held that the "program" was "not an 'agency action' within the meaning of § 702, much less a 'final agency action' within the meaning of § 704," because it did "not refer to a single BLM order or regulation, or even to a complete universe of particular BLM orders and regulations." *Id.* at 890.

The "Voter Data Transmission Policy" suffers from the same defect. It is a made-up, open-ended label for an evolving set of communications with different jurisdictions that Plaintiffs predict will grow. "[A]n on-going program or policy is not, in itself, a 'final agency action' under the APA," and a court's "jurisdiction does not extend to reviewing generalized complaints about agency behavior." *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.D.C 2006) (citation omitted). Here, Plaintiffs' "nebulous assertion of the existence of a 'policy'" cannot substitute for a discrete, reviewable action. *Rodriguez v. U.S. Dep't of Air Force*, 387 F. Supp. 3d 130, 135 (D.D.C. 2019) (quoting *Haase v. Sessions*, 835 F.2d 902, 911 (D.C. Cir. 1987), *appeal dismissed*, 2021 WL 1045489 (D.C. Cir. Feb. 18. 2021).

Second, the July 2026 letters do not conclusively resolve anything. They simply ask California and its counties to work together with the federal government to help protect against vote dilution and promote election integrity. *See United States v. California*, ECF No. 22-2; Ex. C. The lack of finality is evident on the face of the DOJ letters, which specifically states that further

action may be necessary if they refuse to cooperate with the federal government's request. *See United States v. California*, ECF No. 22-2 (stating that the United States will have no choice but to seek emergency relief if California does not implement the requested verification process). "[D]emand letters, although harsh in their terms and probably unsettling to their recipients," are not "final agency action from which they can seek judicial review." *Fanning v. United States*, 346 F.3d 386, 401 (3d Cir. 2003).

Third, an agency's request for corrective action does not determine rights or legal obligations. *Reliable Automatic Sprinkler Co.*, 324 F.3d at 731-32. "No legal consequences flow from [an] agency's" request for voluntary compliance, as there has been no compulsory order from DHS or DOJ that legally compels California or its counties to do anything. *Id.* at 732. Even when an agency notifies an opposing party of an upcoming lawsuit, and even when it files that lawsuit, it is non-reviewable, non-final agency action. For example, in *FTC v. Standard Oil Co. of California*, the Supreme Court held that even the filing of an administrative complaint does not constitute final agency action. *See* 449 U.S. 232, 242-43 (1980) (stating that the "issuance of the complaint had [no] such legal or practical effect, except to impose upon [a company] the burden of responding to the charges made against it"). Accordingly, there is no basis to conclude that the demand letters or the recent lawsuit filed in the Central District of California is final agency action subject to APA review.

Plaintiffs cannot overcome the lack of final agency action by vaguely alleging the existence of an alleged "Voter Data Transmission Policy." Pls.' Mot. at 1-2. Plaintiffs' motion contains no evidence that suggests this so-called policy even exists, much less that it is embodied in discrete agency actions capable of judicial review. Plaintiffs' "nebulous assertion of the existence of a 'policy'" does not establish final agency action subject to APA review. *Rodriguez*, 387 F. Supp.

3d at 135 (quoting *Haase*, 835 F.2d at 911). And to the extent Plaintiffs challenge a "generalized" policy or aggressive voter fraud enforcement under federal law, such a claim is not cognizable under the APA. A plaintiff cannot seek "wholesale improvement" of a federal agency's operations "by court decree." *Lujan*, 497 U.S. at 891. The federal government's efforts to improve the security and integrity of the Nation's elections are not "'agency action' within the meaning of § 702, much less a 'final agency action' within the meaning of § 704." *Id.* at 890.

**B. Plaintiffs cannot bring APA claims seeking injunctive relief predicated on Privacy Act violations.**

Plaintiffs' APA claims based on the Privacy Act fail at the outset because the APA does not grant a cause of action where there is "[an]other adequate remedy in a court." 5 U.S.C. § 704. This statutory provision "makes it clear that Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action." *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988). Accordingly, a plaintiff has adequate relief—and thus cannot rely on the cause of action in 5 U.S.C. § 704—"'where a statute affords an opportunity for *de novo* district-court review' of the agency action." *Garcia v. Vilsack*, 563 F.3d 519,522-23 (D.C. Cir. 2009) (quoting *El Rio Santa Cruz Neighborhood Health Ctr. v. HHS*, 396 F.3d 1265, 1270 (D.C. Cir. 2005)). Stated differently, where an agency action is subject to review in some manner under a separate statutory review scheme, then the general rule is that action must be reviewed within the confines of that scheme. The mode of review established by the statutory review scheme is presumed exclusive. This is true even where a statutory review scheme only provides for review of issues by certain parties; other parties are presumptively precluded from obtaining review of those issues under the APA. *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984) ("[W]hen a statute provides a detailed mechanism for judicial consideration of particular issues at the behest of particular persons, judicial review of those issues at the behest of other persons may be found

to be impliedly precluded."); *see also Dew v. United States*, 192 F.3d 366, 372 (2d Cir. 1999). It is also true even where the plaintiff may not succeed on the merits of her claim under the alternative statutory review procedure; the existence of that procedure alone suffices. *See Rimmer v. Holder*, 700 F.3d 246, 261-62 (6th Cir. 2012); *Jones v. HUD*, 2012 WL1940845, at *6 (E.D.N.Y. May 29, 2012) (reasoning that an alternative was adequate "whether ornot relief is ultimately granted").

Under these principles, Plaintiffs may not challenge purported violations of the Privacy Act under the APA, because the Privacy Act already provides an adequate alternative remedy for persons entitled to sue under that statute. The Privacy Act establishes "a comprehensive and detailed set of requirements" for federal agencies that maintain systems of records containing individuals' personal information, *FAA v. Cooper*, 566 U.S. 284, 287 (2012), and authorizes adversely affected individuals to bring suit for violations of those requirements, 5 U.S.C. § 552a(g)(1)(D). The Privacy Act applies only to individuals, not corporate or organizational entities. *Id.* §552a(g)(1)(D) (authorizing a cause of action for adversely affected "individuals"); *id.* § 552a(a)(2) (defining "individual" as "a citizen of the United States or an alien lawfully admitted for permanent residence."). So, at an absolute minimum, the organizational Plaintiffs are straightforwardly ineligible for any relief under the Privacy Act, and their claims should be dismissed on that basis.

**C. Defendants' Challenged Actions Are Not Contrary to Law**

Plaintiffs claim that "Voter Data Transmission Policy is contrary to law and exceeds Defendants' lawful authority." Pls. Mot. at 18. To the contrary, Defendants' actions are fully authorized by the statute.

The Elections Clause in Article I of the Constitution provides that "Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." U.S.

Const. art. I, § 4, cl. 1. Otherwise, "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof[.]" *Id.*

Acting under its plenary authority over immigration law, Congress passed 18 U.S.C. § 611(a)—the law undergirding the federal government's actions in California, Washington, and beyond. *See Arizona v. United States*, 567 U.S. 387, 394 (2012) (stating that the Federal Government "has broad, undoubted power over the subject of immigration and the status of aliens"); *see also Chavez-Perez v. Ashcroft*, 386 F.3d 1284, 1292 (9th Cir. 2004) ("[f]ederal authority in the areas of immigration and naturalization is plenary" (citation omitted).

Since at least 1996, Congress has made it "unlawful for any alien to vote in any election held solely or in part for the purpose of electing a candidate for the office of President, Vice President, Presidential elector, Member of the Senate, Member of the House of Representatives, Delegate from the District of Columbia, or Resident Commissioner[.]" 18 U.S.C. § 611(a). A noncitizen who violates the voting ban may be fined or imprisoned. *See id.*; *United States v. Knight*, 490 F.3d 1268, 1271 (11th Cir. 2007) (finding 18 U.S.C. § 611 to be a general intent crime where the government needs only to "prove that the defendant knowingly engaged in the conduct prohibited" (citation omitted)). And Congress has vested the Attorney General with broad authority "to detect and prosecute crimes against the United States." 28 U.S.C. § 533.

While Plaintiffs narrowly construe Section 611 as merely setting forth criminal punishments for non-citizens who vote illegally, Pls.' Mot. at 19, Section 611 is far broader. It regulates the conduct of noncitizens within the sphere of federal elections and allows for the maintenance of a republican form of government by ensuring only citizens can vote in federal elections. *See Smiley v. Holm*, 285 U.S. 355, 366–67 (1932) ("In exercising [its Elections Clause] power, the Congress may supplement the[] state regulations . . .. It may impose additional penalties

for the violation of the state laws."); *Burroughs v. United States*, 290 U.S. 534, 547 (1934) ("The power of Congress to protect the election of President and Vice President from corruption [is] clear[.]"); *Bluman v. FEC*, 800 F. Supp. 2d 281, 283 (D.D.C. 2011) (Kavanaugh, J.), *aff'd*, 565 U.S. 1104 (2012) (upholding federal statute banning certain aliens from engaging in election-related expenditures, on the ground that "[t]he Supreme Court has long held that the government (federal, state, and local) may exclude foreign citizens from activities that are part of democratic self-government in the United States").

Indeed, "any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government." *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952); *accord Arizona*, 567 U.S. at 395 (recognizing that it is "fundamental that foreign countries" confer with "one national sovereign" on immigration issues). That naturally includes authority over the statuses of noncitizens and "regulation of the conduct of an alien before naturalization." *Hines v. Davidowitz*, 312 U.S. 52, 66 (1941). Thus, "the regulation of aliens is so intimately blended and intertwined with responsibilities of the national government that where it acts, and the state also acts on the same subject, 'the act of congress, or the treaty, is supreme; and the law of the state, though enacted in the exercise of powers not controverted, must yield to it.'" *Id*. That is all true even if there are some unconstitutional applications of the law. *See United States v. Raines*, 362 U.S. 17 (1960). In this case, however, Section 611(a) constitutionally applies to situations where noncitizens are voting in a federal election. 18 U.S.C. § 611(a).

In sum, the challenged actions here are not contrary to the Constitution but rather supported by both the Constitution and statute. Pls.' Mot. at 29.

### B. Plaintiffs Cannot Establish Irreparable Harm

Plaintiffs' motion for preliminary relief must also be denied because they do not meet their burden to establish substantial likelihood of irreparable harm. "[A] 'movant's failure to show any irreparable harm is…grounds for refusing to issue a preliminary injunction, even if the other three factors…merit such relief.'" *Clevinger*, 134 F.4th at 1236 (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)); *see also, e.g., D.A.M.*, 474 F. Supp. 3d at 56 (The D.C. Circuit "has made clear…that an absence of irreparable injury is fatal to a plaintiff's motion" for preliminary relief.); *Taylor v. Trump*, 788 F. Supp. 3d 1, 7-8 (D.D.C. 2025) (cleaned up) ("It is clear that a failure to show a likelihood of irreparable harm is standing alone sufficient to defeat the motion" for emergency relief.).

The D.C. Circuit "has set a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297. For one, "the injury 'must be both certain and great; it must be actual and not theoretical.'" *Id.* (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). "The moving party must show the injury complained of is of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." *Id.* (citation modified). And of course, "the injury must be beyond remediation." *Id.* That means that even "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm." *Id.* at 297-98.

As discussed *supra*, Plaintiffs have failed to demonstrate that they have Article III standing to bring this motion. "The irreparable-harm standard requires a more significant showing than the injury-in-fact standard." *Air Transp. Ass'n of Am. v. Export-Import Bank of the U.S.*, 878 F. Supp. 2d 42, 60 (D.D.C. 2012), *rev'd sub nom. Delta Air Lines, Inc. v. Export-Import Bank of the U.S.,* 718 F.3d 974 (D.C. Cir. 2013). "Where plaintiff 'has failed to demonstrate an injury in fact sufficient to establish standing, he has also failed to demonstrate irreparable harm warranting a

preliminary injunction.'" *DSCC v. Trump*, 834 F. Supp. 3d 19, 40-41 (D.D.C. 2026) (quoting *Sibley v. Alexander*, 916 F. Supp. 2d 58, 63 (D.D.C. 2013)), *aff'd*, No. 26-5193, 2026 WL 2168617 (D.C. Cir. July 28, 2026). Here, Plaintiffs "'fail[] to carry their burden with respect to establishing that they have a substantial likelihood of standing,'" so "they have also failed to show that those injuries are 'certain enough and great enough to warrant preliminary injunctive relief.'" *Id.* at 41 (quoting *Doe v. Off. of Pers. Mgmt.*, No. 25-cv-234, 2025 WL 513268, at *4 (D.D.C. Feb. 17, 2025)).

Even if standing were not at issue, Plaintiffs' allegations do not establish the necessary threat of irreparable harm. There is no present possibility that California's state officials will act to interfere with Plaintiffs' voting rights based on Defendants' requests. *See DSCC*, 834 F. Supp. 3d at 41 (quoting *Wis. Gas. Co.*, 758 F.2d at 674) ("[G]iven …that no agency has yet acted pursuant to the Order in a way that could harm Plaintiffs, they have not suffered any harm at present, much less harm that is 'certain,' 'great,' and imminent."); *id.* at 31 (quoting *Clapper*, 568 U.S. at 409) ("[T]he Supreme Court has repeatedly said that 'allegations of *possible* future injury' are not sufficient to establish injury in fact."). The indisputable fact that California is not acting on DOJ's requests also breaks the necessary causal chain for the less specific harms alleged by Plaintiffs including interference with the administration of the 2026 election and discouragement of voting as well as interference with the electoral process and risks of distorting the fundamental right to the franchise. In the absence of any immediate threat of the allegedly irreparable harm, Plaintiffs fail to satisfy this prong of the preliminary injunction analysis. *Olu-Cole v. E.L. Haynes Pub. Charter Sch.*, 930 F.3d 519, 529 (D.C. Cir. 2019).

### C. The Balance of Equities Weighs Against Granting Plaintiffs' Request for Emergency Injunctive Relief

The balance of the equities and the public interest "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The government has a compelling interest in combating voter fraud. *See Anderson v. United States*, 417 U.S. 211, 227 (1974) ("Every voter in a federal primary election . . . has a right under the Constitution to have his vote fairly counted, without its being distorted by fraudulently cast votes."). "Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). "Voter fraud drives honest citizens out of the democratic process and breeds distrust of our government." *Id.* "Voters who fear their legitimate votes will be outweighed by fraudulent ones will feel disenfranchised." *Id.*; *see South Carolina v. United States*, 898 F. Supp. 2d 30, 43 (D.D.C. 2012) (three-judge panel) (Kavanaugh, J.) (stating that "there 'is no question about the legitimacy or importance' of the interest in deterring voter fraud and that there is 'independent significance' in enhancing public confidence in the electoral system") (quoting *Crawford v. Marion Cnty. Election Bd.,* 553 U.S. 181, 196–97 (2008)).

As the Supreme Court has explained, "'[t]he deposit of [fraudulent] ballots in the ballot boxes, no matter how small or great their number, dilutes the influence of honest votes in an election, and whether in greater or less degree is immaterial.'" *Anderson*, 417 U.S. at 227. Accordingly, the government is permitted to "take action to prevent election fraud" before it has occurred. *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 686 (2021).

Congress's enactment of 18 U.S.C. § 611 reflects an express mandate to protect those interests by authorizing the Executive Branch to enforce the prohibition on noncitizens voting in federal elections. A court deciding whether to issue an injunction is not free to disregard that legislative "order of priorities." *TVA* v. *Hill*, 437 U.S. 153, 194 (1978). "Courts of equity cannot,

in their discretion, reject the balance that Congress has struck in a statute." *United States* v. *Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 497 (2001).

Here, where Plaintiffs seek an injunction prohibiting the government from carrying out its responsibilities under a "statute[ ] enacted by representatives of [the] people," "it suffers a form of irreparable injury." *Trump* v. *CASA, Inc.*, 606 U.S. 831, 861 (2025) (citation omitted). The Supreme Court emphasized that point recently in staying two lower court injunctions that interfered with the federal government's ability to enhance election integrity. *See Trump v. California*, 609 U.S. at 1040-41 (holding that the government was "likely to suffer irreparable harm" from an injunction that, *inter alia*, prohibited DHS "from trying to compile Citizenship Lists" and "deal[t] 'a serious setback' to the Executive's 'goals'"); *DHS v. League of Women Voters*, 609 U.S. ---, No. 26A308, 2026 WL 2879700, at *2-3 (U.S. Sep. 25, 2026) (holding that the government was "likely to suffer irreparable harm" from an order that "set aside and vacated" improvements to the DHS system that verifies citizenship and immigration status of noncitizens).

The public interest and equities strongly tip in Defendants' favor and outweigh Plaintiffs' speculative and presently non-existent injuries.

## V. The Proposed Injunction Is Vague, Unworkable, and Violates the Separation of Powers.

In assessing whether to grant injunctive relief, the Court must consider "what is workable," as foundational principles of equity demand. *North Carolina v. Covington*, 581 U.S. 486, 488 (2017) (citation omitted). Plaintiffs' proposed injunction is vague, unworkable, and infringes on the separation of powers.

Rule 65(d)(1) requires that "[e]very order granting an injunction" must "state its terms specifically[,]" and "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1). As the Supreme Court

has explained, "the specificity provisions of Rule 65(d) are no mere technical requirements." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974). Instead, "[t]he Rule was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Id.* After all, "[s]ince an injunctive order prohibits conduct under threat of judicial punishment, basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed." *Id.; see, e.g.*, *Common Cause v. Nuclear Regul. Comm'n*, 674 F.2d 921, 926-27 (D.C. Cir. 1982).

Plaintiffs' proposed injunction violates the specificity requirements of Rule 65(d) by leaving Defendants guessing about what specific conduct would be enjoined. The offending "policy" they claim injures them is an artificially label umbrella for a variety of law enforcement steps that the Defendants are fully empowered to take. Are government officials restricted from making public statements about non-citizens voting in federal elections? May government officials communicate with state and local governments about potential voter fraud? Must the Department of Justice stop litigating voter fraud criminal cases? Does the injunction collaterally prohibit grand jury subpoenas for voter records? Those are just a few of the myriad questions that Plaintiffs' requested injunction leaves unanswered. Plaintiffs' proposed order does nothing to define a workable injunction. It simply purports to stop the investigation of voting fraud and enjoin "all who work in concert" with that effort. Such a proposed injunction violates Rule 65 and should be rejected.

## CONCLUSION

For the reasons explained above, the Court should deny Plaintiffs' motion for temporary restraining order and preliminary injunction.

Dated: October 31, 2026

BRETT A. SHUMATE
Assistant Attorney General

ELIZABETH J. SHAPIRO
Deputy Director, Federal Programs Branch

/s/ *William I. Friedman*__
WILLIAM I. FRIEDMAN
N.Y. Bar Reg. Number: 4039509
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
Telephone: (202) 532-5541
Email: william.friedman@usdoj.gov

*Counsel for Defendants*