**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

LEAGUE OF WOMEN VOTERS, et al.,

Plaintiffs,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY, et al.,

Defendants.

Civil Action No. 1:26-cv-3602

**PLAINTIFFS' REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER, STAY UNDER 5 U.S.C. § 705, AND/OR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................ 1

ARGUMENT ........................................................................ 1

I. Plaintiffs have standing and will be irreparably harmed absent preliminary relief. ............ 1

II. Plaintiffs are likely to succeed on the merits. ........................................ 4

A. The Voter Data Transmission Policy is final agency action reviewable under the APA. ........................................ 5

B. The Voter Data Transmission Policy is contrary to the Privacy Act. ...................... 8

C. Defendants' actions are not authorized by statute and are thus contrary to law. ........................................ 9

III. The balance of equities and public interest favor preliminary relief. ...................... 11

CONCLUSION ........................................................................ 12

## INTRODUCTION

Defendants focus almost entirely on standing and final agency action, and do not contest the merits of Plaintiffs' Privacy Act claims. Furthermore, at today's motion hearing, Defendants (1) admitted that some individuals that Defendants have accused of being noncitizens are, in fact, citizens, and (2) declined to commit, upon the Court's invitation, that they would *not* release more records of individual voter data to state or local officials around the country in connection with their election administration demands.[1] Defendants' representations confirm the urgent need for preliminary relief. The Court should grant Plaintiffs' motion.

## ARGUMENT

### I. Plaintiffs have standing and will be irreparably harmed absent preliminary relief.

Defendants' arguments on standing and irreparable harm rest on misunderstandings of both Plaintiffs' injuries and the law. They say Plaintiffs' injuries are speculative because jurisdictions may not comply with Defendants' demands. Defs.' Opp. 10. But Plaintiffs are suffering injury *now* based on Defendants' sharing voter lists and creating mass confusion, even if no jurisdiction goes along with the accompanying demands. *See* Pls.' Mem. 30–38; *see also* Decl. of Juan Proaño, ¶¶ 28-29, 33, 35, 37, Dkt. No. 15-2 ("Proaño Decl."); Decl. of Gustavo Gutierrez Gomez, ¶¶ 9–10, Dkt. No. 27-1 ("Gutierrez Gomez Decl."). Moreover, some jurisdictions *are* investigating the voters the government has listed, *see* Hannah Poukish & Stephanie Zappelli, *SLO County DA Investigating Voter Registrations of 63 Suspected Noncitizens*, San Luis Obispo Tribune (Oct. 30, 2026), https://perma.cc/Q9PM-THJF, a development that will exacerbate the injuries suffered by Plaintiff LULAC. *See, e.g.*, Proaño Decl. ¶¶ 41–42. These injuries will continue during the post-election canvassing, tabulation, and certification period, too—a point Defendants do not contest.

[1] Plaintiffs have requested a rush transcript. Characterizations of Defendants' counsel's statements to the Court are based on Plaintiffs' counsel's notes.

*See, e.g.*, *id.* ¶¶ 43–45; Julia Ainsley et al., *DOJ Weighs Election Litigation Against More States*, NBC News (Oct. 21, 2026), https://perma.cc/7CBD-PK8V (reporting based on a DOJ source that DOJ is considering additional action "against more states in the lead-up to — or possibly after — the Nov. 3 midterm elections as part of its efforts to compel states to comb through voter rolls for noncitizens trying to vote in federal elections").

Defendants also claim that Plaintiffs lack standing because Defendants' policy has "no independent legal effect." Defs.' Opp. 8. This is wrong, *see* Pls.' Mem. 17, but it is also irrelevant. Standing looks at "*de facto* causality"—not any legal effects test—and Plaintiffs can establish it by "showing that third parties will likely react in predictable ways" to the challenged actions. *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019) (citation omitted). Here, Plaintiffs' three theories of harm are straightforward, documented, and unrefuted on the facts.

***Organizational activity injury***. LULAC's theory of harm is the exact same theory that the D.C. Circuit has twice endorsed: Where "new obstacles . . . make it more difficult for" a voter registration organization "to accomplish [its] primary mission of registering voters," the organization has suffered an "injury for purposes both of standing and irreparable harm." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016); *see also Ctr. for Taxpayer Rts. v. IRS*, 190 F.4th 990, 1010–11 (D.C. Cir. 2026). Because the Voter Data Transmission Policy has directly impeded LULAC's voter registration efforts, its injury is unlike that in *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), a case where an organization attempted to "establish standing simply by spending money" in opposition to a policy it disliked. *Ctr. for Taxpayer Rts.*, 190 F.4th at 1001; *see also Common Cause v. U.S. Dep't of Just.*, No. 26-cv-1352 (SLS), 2026 WL 3033772, at *10 (D.D.C. Oct. 9, 2026) (recognizing that plaintiff organization was

harmed where the government's policy of maintaining voter lists "chill[ed] potential voters from registering" and so "imped[ed] the organization's voter-registration programming").

***Voting injury***. As Gustavo Gutierrez Gomez, a LULAC member, explains, he is "afraid," "confused," and "scared" due to the Voter Data Transmission Policy, Gutierrez Gomez Decl. ¶ 10, and other LULAC members *across the country* are too, *id.* ¶¶ 9, 11–13; *see also* Proaño Decl. ¶¶ 28–30. Where federal action "chills [an organization's members'] election-related activities," the organization has suffered an injury-in-fact sufficient to give rise to standing. *Cal. Nurses Ass'n v. Mullin*, No. 26-7139, 2026 WL 3268397, at *4 (9th Cir. Oct. 30, 2026) (per curiam) (citing *Ariz. All. for Retired Ams. v. Mayes*, 186 F.4th 622, 635–36 (9th Cir. 2026) (en banc); *Mi Familia Vota v. Fontes*, 129 F.4th 691, 708–09 (9th Cir. 2025)); *see also Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014) (finding standing based on an impairment of the right to vote even where plaintiffs "were ultimately not prevented from voting"). Defendants' theory appears to be that Plaintiffs must wait until they are actually prohibited from voting to bring suit. Defs.' Opp. 11–12. But that would very likely be too late, and Defendants cite no authority for such a remarkable proposition. *See Newby*, 838 F.3d at 8–9 ("As a preliminary injunction requires only a likelihood of irreparable injury, Damocles's sword does not have to actually fall on all appellants before the court will issue an injunction." (internal citation omitted)).

***Informational injury***. As Judge Sooknanan recently held, the "failure to provide . . . relevant disclosures" about voter data is, "[w]ithout question," the type of harm "that the Privacy Act . . . [was] intended to prevent." *Common Cause*, 2026 WL 3033772, at *12. Defendants resist this conclusion. Defs.' Opp. 16–17. But they do not grapple with Judge Sooknanan's analysis of both the text of the Privacy Act—which grants rights to "interested persons," including organizations, 5 U.S.C. §§ 552a(e)(11), 551(2)—and its legislative history. And a System of Records Notice

would have necessarily contained information about how individual voters could access their records in the system and request corrections of inaccurate information. *See id.* § 552a(e)(4)(G), (H). Plaintiffs could have used that information to advise their members and other voters how to exercise their rights. Because Defendants do not dispute that Plaintiffs LULAC and EPIC have been unlawfully deprived of time-sensitive information, these informational injuries, too, suffice to establish standing.

***Irreparable harm.*** Defendants' irreparable harm arguments simply repeat the same mistaken arguments they make about why Plaintiffs lack standing. *See* Defs.' Opp. 25–26. For the same reasons those arguments fail to establish a lack of standing, they also fail to refute Plaintiffs' showing of irreparable harm. Further, the fact that certain orders have issued in other cases does not eliminate the irreparable harm. First, Plaintiffs are not aware of (and Defendants have not identified) any order by any federal court prohibiting Defendants from *transmitting voter data* to non-federal recipients. Second, even if there were such an order, "courts routinely grant follow-on injunctions against the Government, even in instances when an earlier nationwide injunction has already provided plaintiffs in the later action with their desired relief." *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1, 60 (D.D.C. 2020) (collecting cases).

## II. Plaintiffs are likely to succeed on the merits.

Defendants fall woefully short of rebutting Plaintiffs' likelihood of success on the merits, and they fail altogether to respond to the merits of Plaintiffs' claims that the Voter Data Transmission Policy violates the Privacy Act's procedural and substantive safeguards. Plaintiffs' unaddressed arguments should be deemed conceded for purposes of this motion. *See Texas v. United States*, 798 F.3d 1108, 1110 (D.C. Cir. 2015) ("[Local Rule 7(b)] is understood to mean that if a party files an opposition to a motion and therein addresses only some of the movant's arguments, the court may treat the unaddressed arguments as conceded." (cleaned up)); *Media Matters for*

*Am. v. FTC*, 805 F. Supp. 3d 105, 138 (D.D.C. 2025) (noting "this concession rule applies with particular force when a plaintiff 'need only demonstrate a likelihood of success on the merits' instead of 'an absolute certainty of success'"). And the handful of merits arguments Defendants *do* raise are foreclosed by precedent.

### A. The Voter Data Transmission Policy is final agency action reviewable under the APA.

Controlling D.C. Circuit precedent establishes that the Voter Data Transmission Policy is final agency action reviewable under the APA. *See* Pls.' Mem. 16–17 (citing cases). That is because an agency "policy" allowing the "disclos[ure] [of] confidential information without notice is surely a 'consummation of the agency's decisionmaking process,' and 'one by which [individuals'] rights [and the agency's] obligations have been determined.'" *Venetian Casino Resort v. EEOC*, 530 F.3d 925, 931 (D.C. Cir. 2008); *see also Ctr. for Taxpayer Rts.*, 190 F.4th at 1006 (holding that "IRS's formal Data-Exchange Procedure, as written and implemented, constitutes the consummation of the agency's decision making on how it will share—and has shared—confidential taxpayer information with ICE").

Defendants have no response to these decisions—and indeed fail even to acknowledge them. *See* Defs.' Opp. 17–21. They instead assert a grab-bag of arguments that mischaracterize Plaintiffs' claims and the governing law. *See id.* All are unavailing.

To start, each of Defendants' arguments focuses solely on Defendants' *demand letters* to various jurisdictions; they do not address Defendants' accompanying *disclosures* of protected voter information to state and local election officials. *See* Pls.' Mem. 8–10 (describing Defendants' transmission of "thumb drive[s]" and "lists" of alleged noncitizen voter registrants to various jurisdictions, along with their demand letters). As noted, however, binding precedent dictates that a policy of disclosing such information is final agency action. That point—which Defendants do not

address, and thus concede, *see Texas*, 798 F.3d at 1110—is dispositive on the question of final agency action.

Even setting aside this dispositive concession, Defendants' arguments fail. Defendants are wrong that the Voter Data Transmission Policy is too "nebulous" and not sufficiently "discrete." Defs.' Opp. 19. In *Common Cause*, Judge Sooknanan correctly rejected an identical argument that an agency policy was "unreviewable under the APA because it is made up of multiple constituent actions." 2026 WL 3033772, at *20. As the court explained, the Supreme Court in *National Wildlife Federation* "distinguished an unreviewable challenge to an agency's entire program of land regulation from an agency's reviewable choice to 'apply[] some particular measure across the board.'" *Id.* (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890 n.2 (1990)). And following *National Wildlife Federation*, "courts have reviewed agencies' decisions to adopt categorical policies under the APA." *Common Cause*, 2026 WL 3033772, at *20 (citing cases). Moreover, "an agency's decision to adopt a policy, even if unwritten, can be challenged under the APA." *Id.*; *see also Ctr. for Taxpayer Rts.*, 190 F.4th at 1003 (data disclosure policy was final agency action even though it was not "formally noticed or published").

Here, as in *Common Cause*, the record "leaves no doubt about the contours of the policy being challenged." 2026 WL 3033772, at *20. The Voter Data Transmission Policy is outlined in a detailed flow chart posted online by the First Assistant U.S. Attorney for the Central District of California, as well as in sworn declarations filed in federal court by DHS officials. *See* Pls.' Mem. 1, 7–8.[2] In DOJ's words, the policy is a "multi-agency, multi-step verification process" designed to "ensure only U.S. citizens vote" that culminates in a "*final* list" of alleged "likely noncitizen

[2] At today's motion hearing, counsel for Defendants relied on the First Assistant U.S. Attorney's flow chart when asked by the Court to describe how Defendants are analyzing voter data, seemingly confirming the chart's factual accuracy and general applicability.

voters" being "delivered to State and County officials." *Id.* at 1 (emphasis added). Thus, as in *Center for Taxpayer Rights*, Defendants' "policy is laid out in a final, written document" that "prescribes the steps of the process that [agency] officials will follow to implement" it, Defendants have "already used" the process in multiple jurisdictions and are poised to deploy it in others, and they have "published [an] . . . illustrated flowchart[]" to "explain" its steps. 190 F.4th at 1002. The policy is clear as day and, by all accounts, it is final.

Defendants wrongly argue that their policy "do[es] not conclusively resolve anything" and "simply ask[s] [state and local officials] to work together with the federal government." Defs.' Opp. 19–20. Those statements defy reality. The undisputed facts show that DOJ has used the lists and demand letters to put state and local election administrators on notice of purported noncitizens on their voter rolls, overtly threatened criminal prosecution of officials who refuse to comply with their demands, and even subpoenaed those officials. *See* Nicole Sganga & Sarah N. Lynch, *California Election Officials Face Grand Jury Subpoenas as DOJ Expands Voting Investigation*, CBS News (Oct. 29, 2026), https://perma.cc/65PX-PWS3. Plus, Defendants promptly sued one non-complying state (California) and have subjected thousands of voters to the intolerable risk that their ballots will be "sequestered" and, in turn, not counted. *See* Pls.' Mem. 9–11.

Indeed, the whole legal premise of Defendants' actions is that, by putting state and local officials on "notice of specific individuals who are likely to be noncitizens," the lists *do* create a legal obligation. Mot. in Support of TRO at 20, *United States v. California*, No. 26-cv-12025 (C.D. Cal. Oct. 19, 2026), Dkt. No. 22-2. Specifically, they obligate the recipients to take steps to prevent the listed individuals' votes from counting. *Id.* If the recipients do not, according to the government, those officials are "knowingly facilitat[ing]" violations of 18 U.S.C. § 611(a). *Id.*

These are real and appreciable consequences. Defendants are exerting the full weight of the federal government to coerce election officials to bend to their will. Their demand letters are nothing like the comparatively benign letters in the case cited by Defendants, *see* Defs.' Opp. 20, in which an agency sought reimbursement for certain Medicare payments and advised recipients of their administrative review rights. *See Fanning v. United States*, 346 F.3d 386, 401 (3d Cir. 2003). Defendants' Voter Data Transmission Policy is final agency action.

### B. The Voter Data Transmission Policy is contrary to the Privacy Act.

***The APA authorizes review of Defendants' Privacy Act violations.*** As Defendants' counsel candidly admitted at today's motion hearing, courts have consistently rejected Defendants' argument (Defs.' Opp. 21–22) that the Privacy Act precludes Plaintiffs' claims for vacatur and injunctive relief under the APA. *See* Pls.' Mem. 21 n.5 (citing cases). "[C]ourts in this District have precluded APA suits for Privacy Act violations only when they duplicate existing procedures for review of agency action." *Common Cause*, 2026 WL 3033772, at *27 (citing cases) (cleaned up). "But the Privacy Act does not provide relief for violations of its procedural requirements," it does not provide prospective "remedies to enforce its statutory limitations on disclosure," and it does not provide *any* remedy for organizations, like Plaintiffs LULAC and EPIC, that are harmed by violations of its provisions. *Id.* at *27–28. "Thus, rather than suggesting a bar on APA review, the absence of equitable relief for these claims in the Privacy Act's judicial review provisions is easily explained by the availability of such relief under the APA." *Id.* at *27 (cleaned up); *see Doe v. Chao*, 540 U.S. 614, 619 n.1 (2004) ("The Privacy Act says nothing about standards of proof governing equitable relief that may be open to victims of adverse determinations or effects, although it may be that this inattention is explained by the general provisions for equitable relief

within the [APA].”). “Indeed, the D.C. Circuit has permitted vacatur relief under the APA to enforce the Privacy Act’s disclosure provisions,” as have “numerous district courts.” *Common Cause*, 2026 WL 3033772, at *27 (citing *Doe v. Stephens*, 851 F.2d 1457, 1465–67 (D.C. Cir. 1988); *League of Women Voters v. DHS*, 835 F. Supp. 3d 79, 121 (D.D.C. 2026) (citing cases), *stayed on other grounds*, *DHS v. League of Women Voters*, 2026 WL 2879700, at *2–3 (U.S. Sep. 25, 2026) (per curiam)).

***Defendants have forfeited any argument on the merits of Plaintiffs’ Privacy Act-based APA claims.*** As noted, Defendants do not address the merits of Plaintiffs’ Privacy Act-based APA claims. *Compare* Pls.’ Mem. 21–28, *with* Defs.’ Opp. 17–24. For purposes of the present motion, then, these arguments should be deemed forfeited. *See Texas*, 798 F.3d at 1110; *Media Matters for Am.*, 805 F. Supp. 3d at 138.

### C. Defendants’ actions are not authorized by statute and are thus contrary to law.

Defendants rely exclusively on 18 U.S.C. § 611—which Defendants acknowledge Congress passed pursuant to its “plenary authority over immigration law” (as opposed to the Elections Clause, *see* U.S. Const. art. I, § 4, cl. 1)—as authority for their Voter Data Transmission Policy. This criminal statute bars noncitizens from voting in federal elections. Defs.’ Opp. 24. It does not, however, give the federal government or any federal agency authority over election administration. *See* Pls.’ Mem. 19–20.

“[W]henever [Congress] has assumed to regulate [ ] elections it has done so by positive and clear statutes.” *United States v. Gradwell*, 243 U.S. 476, 485 (1917); *accord Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 9 (2013) (when Congress enacts a law under the Elections Clause, that law spans only “so far as it is exercised, and no farther”). Thus, “[i]n enacting voting legislation like HAVA, NVRA, and the VRA, Congress has expressly delegated its Elections

Clause power only in limited instances. Otherwise, while Congress has set certain time, place, and manner restrictions pursuant to the Elections Clause, it has left further regulation to States, not federal agencies." *League of Women Voters of Mass. v. Trump,* No. 1:26-CV-11549-IT, 2026 WL 2620871, at *13 (D. Mass. Sept. 4, 2026).

Here, while DOJ of course may lawfully *prosecute* violations of Section 611, *see* 28 U.S.C. § 547*,* Defendants have no authority to conscript election administrators into a witch hunt for purportedly forthcoming violations of that criminal statute. Section 611 does not confer any power over election administration to federal agencies, and it certainly does not provide Defendants with a basis for transmitting unreliable data concerning registered voters to state and local entities or superintending these entities' election procedures by forcing them to sequester or throw out ballots. Order Denying TRO, *United States v. California*, No. 26-cv-12025, Dkt. No. 149 at 15 (C.D. Cal. Oct. 28, 2026) ("Section 611 is a federal misdemeanor statute that sets forth criminal punishments for non-citizens who vote illegally . . . . It includes no language addressing the State administration of federal elections. And it includes no mechanism for the United States Department of Justice to intervene in an ongoing election to require a State and its officials to segregate and stop counting ballots."); *see also United States v. California*, No. 26-7070, 2026 WL 3212945, at *10–13 (9th Cir. Oct. 26, 2026) (Bennett, J., concurring) ("On its face, the statute's plain text governs only an individual's conduct—it simply does not prescribe the processes a state must (or must not) use when handling ballots from allegedly unqualified voters."); *cf. Georgia v. Meadows*, 88 F.4th 1331, 1347 (11th Cir. 2023) (recognizing that the federal Executive has no authority to "interfere[] with state election procedures based solely on [its] own initiative"). Likewise, trying to force *states* to change election policy enacted under the Elections Clause also falls well outside the bounds of

*DHS* conducting *civil* immigration enforcement, just as it severely intrudes on states' constitutional mandate to administer federal elections.

Simply put, "[a]llowing the United States to misuse § 611 to prescribe how [states] must process ballots would 'override the plain and manifest dictates of the Constitution itself.'" *United States v. California*, No. 26-7231, 2026 WL 3268272, at *13 (9th Cir. Oct. 30, 2026) (per curiam) (quoting *Ex parte Siebold*, 100 U.S. 371, 392 (1880)). The same is true regarding Defendants' conveyance of voter information. Accordingly, Defendants should not be permitted to invoke the statute as authority for their Voter Data Transmission Policy.

**III. The balance of equities and public interest favor preliminary relief.**

As Plaintiffs' opening brief explained, the Voter Data Transmission Policy has injected eleventh-hour chaos into the midterm elections and, absent relief, will disenfranchise lawful voters. Pls.' Mem. 38–42; *see also Newby,* 838 F.3d at 12 ("[T]he public interest . . . favors permitting as many qualified voters to vote as possible." (citation omitted)). Defendants ignore these catastrophic consequences. Defs.' Opp. 27–28. Instead, they simply assert that preventing voter fraud is an important government interest. *Id.* But Defendants have not shown that the Voter Data Transmission Policy does *anything* to combat voter fraud. As Plaintiffs explained, and Defendants have not contested, instances of noncitizens voting are almost unheard of, *see* Pls.' Mem. 40, and there is *no* reason to think Defendants are accurately identifying those rare instances, *see* Pls.' Mem. 40–42 & nn. 15, 17. Indeed, at the hearing, counsel for the government conceded that she could not disagree with the Court that the government has made mistakes in identifying noncitizen voters in the past. Just earlier today, after Chief Judge Boasberg ordered the government to provide the list of 20,000 California voters to the plaintiffs in *Trujillo v. U.S. Department of Homeland Security*, the plaintiffs' experts found that there were *hundreds* of listed individuals who were "highly likely matches" to U.S. citizens belonging to the organizational plaintiff there, CHIRLA. Decl. of

Dr. Matt Barreto & Michael Rios ¶ 10, *Trujillo v. U.S. Dep't of Homeland Sec.*, No. 1:26-cv-03072 (D.D.C. Oct. 31, 2026), Dkt. No. 43-1. The number of listed U.S. citizens not belonging to CHIRLA is undoubtedly much greater.

Defendants also claim that 18 U.S.C. § 611 somehow reflects a congressional endorsement of their actions. Defs.' Opp. 27–28. But Section 611 says nothing about the Executive Branch distributing slapdash lists of supposedly unlawful voters or demanding that states and localities refuse to count the votes of the identified individuals. *See supra* Section II.C.

Finally, the government asserts that it always suffers an irreparable harm when a court enjoins one of its policies. Defs.' Opp. 28. But this is Plaintiffs' motion, not the government's application for a stay pending appeal. At this stage, the government's irreparable harm is not at issue. Defendants' citations to generic statements from unrelated cases fail to undercut Plaintiffs' case-specific arguments for why the Voter Data Transmission Policy is contrary to the public interest and immediate relief is required.

In accordance with the Court's direction at today's hearing, Plaintiffs attach a revised proposed order for the Court's consideration.

## CONCLUSION

For the foregoing reasons, the Court should grant the motion and issue a temporary restraining order, a stay under 5 U.S.C. § 705, and/or a preliminary injunction.

Dated: October 31, 2026

Respectfully submitted,

/s/ *Louis R. Katz*
Louis R. Katz (D.C. Bar No. 90003861)
Briana M. Clark (D.C. Bar No. 1735505)
J.P. Cooney (D.C. Bar No. 494026)
Ronald A. Fein (D.C. Bar No. 90026641)
Brian D. Netter (D.C. Bar No. 979362)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
Phone: (202) 448-9090
Fax: (202) 796-4426
lkatz@democracyforward.org
bclark@democracyforward.org
jpcooney@democracyforward.org
rfein@democracyforward.org
bnetter@democracyforward.org

John B. Hill (D.C. Bar No. 90044825)
Reuven Dashevsky (D.C. Bar No. 90046789)*
Haley Y. Florsheim (D.C. Bar No. 90041575)*
Nikhel S. Sus (D.C. Bar No. 1017937)
Citizens for Responsibility
and Ethics in Washington
P.O. Box 14596
Washington, DC 20044
(202) 408-5565
jhill@citizensforethics.org
rdashevsky@citizensforethics.org
hflorsheim@citizensforethics.org
nsus@citizensforethics.org

* Admitted *pro hac vice*

*Counsel for Plaintiffs*