**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **LEAGUE OF WOMEN VOTERS**, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>**U.S. DEPARTMENT OF HOMELAND SECURITY**, *et al.*,<br><br>*Defendants*. | Civil Action No. 26-cv-3602 (TSC) |

## MEMORANDUM OPINION

Federal law places restrictions on how the government may collect, use, store, and disseminate individuals' personal records. The Department of Homeland Security ("DHS") and the Department of Justice ("DOJ") have collected millions of voting records—including those of U.S. citizens—in an alleged effort to investigate noncitizen voting. After compiling and analyzing this data, the government is now transmitting selected portions to states and localities responsible for election administration, claiming the individuals are not eligible to vote. They are also requesting that the state electoral officials take action to address the purported risk of noncitizen voting. Election day is tomorrow, and in many states voting is already underway.

Plaintiffs, nonprofit organizations whose missions involve voter registration and privacy, sued on October 15, 2026, claiming that the Administration's use of voters' data in this way violates several federal laws and the Constitution. On October 29, 2026, two of the plaintiffs, LULAC and EPIC, moved for a preliminary injunction and a stay of agency action under 5 U.S.C. § 705. They assert they are likely to succeed on Counts I–III of their Amended Complaint challenging the Administration's transmission of this data. For the following reasons, the court

will grant the motion, enter a preliminary injunction, and stay the "Voter Data Transmission Policy" pursuant to 5 U.S.C § 705.

## I. BACKGROUND

### A. Legal and Factual Background

#### 1. Privacy Act

This case involves the Privacy Act of 1974, which establishes "safeguards for an individual against an invasion of personal privacy by requiring Federal agencies" to "collect, maintain, use, or disseminate any record of identifiable personal information" in specific ways. Privacy Act of 1974 § 2(b)(4), Pub. L. No. 93-579, 88 Stat. 1896, 1896 (1974), codified at 5 U.S.C. § 552a note.

One of those safeguards is procedural. When an agency "establish[es] or revis[es]" any "system of records"—i.e., "a group of any records" from which an individual's information may be retrieved—the agency must "publish in the Federal Register . . . a notice of the existence and character of the system of records." *Id.* § 552a(a)(5), (e)(4). The Act specifies that these notices, called systems of record notices or SORNs, "shall include" nine categories of information. *Id.* § 552a(e)(4). For instance, a SORN must include "each routine use of the records contained in the system, including the categories of users and the purpose of such use[.]" *Id.* § 552a(e)(4)(D). The Act also requires notice and "an opportunity for interested persons to submit written data, views, or arguments to the agency" at least 30 days prior to "any new use or intended use of the information in the system[.]" *Id.* § 552a(e)(11). This requirement goes to a central purpose of the Act: to "permit an individual to determine what records pertaining to him are collected, maintained, used, or disseminated by [federal] agencies." 88 Stat. at 1896.

The Act strictly "limits when federal agencies may disclose government records, whether within or outside the federal government." *Common Cause v. U.S. Dep't of Just.*, No. CV 26-1352, 2026 WL 3033772, at *3 (D.D.C. Oct. 9, 2026). Relevant here, it allows disclosure for a

"routine use," i.e., "a purpose which is compatible with the purpose for which it was collected[.]" 5 U.S.C. § 552a(7). It also permits disclosure to another governmental jurisdiction for "civil or criminal law enforcement activity if the activity is authorized by law," but only "if the head of the agency or instrumentality has made a written request to the agency which maintains the record specifying the particular portion desired." 5 U.S.C. § 552a(b)(7). And it limits collection and disclosure of records relating to First Amendment activity, *id.* § 552a(e)(7), and mandates that the agency take "reasonable efforts" to ensure records are accurate prior to disclosure. *Id.* § 552a(e)(6).

**2. Factual Background**

The relevant portion of Plaintiffs' allegations are as follows. Plaintiffs contend that, as part of the Trump Administration's long-running campaign to combat what it views as the threat of noncitizens voting in U.S. elections, DOJ and DHS have embarked on an unauthorized project to amass a national database of voter registration information for use in sweeping election integrity actions. *See* Am. Compl. ¶¶ 1–2. Plaintiffs term this initiative the "Voter Data Policy." *Id.* ¶ 2. They claim that under it, Defendants "collect, maintain, augment, and use available" statewide voter registration lists "to support the agencies' efforts to identify purportedly unlawful voters and coerce states to not count such individuals' votes." *Id.* ¶ 92.

Plaintiffs allege that under this Policy, Defendants have acquired lists of tens of millions of voters from at least 47 states, containing sensitive personal information, including social security numbers, dates of birth, voting history, political-party affiliation, and more. *Id.* ¶¶ 63, 73, 104, 144. Plaintiffs claim that through a multi-agency, multi-step review process, Defendants "enhance" voter records by pairing them with commercially-acquired third-party data; compare them to information in Federal databases to identify potential matches for noncitizens based on, *inter alia*, State Department, Social Security Administration, and U.S. Citizenship and

Immigration Service data; and generate lists of individuals they contend are noncitizens who are registered to vote. *Id.* ¶¶ 93–123. Defendants' programmatic collection of voter information has been the subject of litigation and produced declarations and materials confirming the general contours of this policy. *Id.* ¶¶ 114–123 nn. 49–61 (referring to declarations, materials produced in litigation, and public statements). *See also Common Cause*, 2026 WL 3033772, at *4–7 (providing an overview of similar litigation). Plaintiffs allege that the resulting lists are compromised by unreliable data sources and plagued with inaccuracy. *See* Am. Compl. ¶ 140 ("DHS is incapable of accurately identifying instances of voter fraud based on [statewide voter registration lists] . . . and regularly produce[s] false positives that incorrectly suggest that U.S. citizens have voted illegally."), *id.* ¶¶ 141–154. *See also United States v. California*, No. 2:26-CV-12025, 2026 WL 3252428, at *3 (C.D. Cal. Oct. 28, 2026) (observing that after DHS claimed 15,903 non-citizens were registered to vote in Nevada, a manual review by the state determined that "every single individual was a United States citizen").

Relevant here, Plaintiffs allege that the "final component action" of the Voter Data Policy is what they term the "Voter Data Transmission Policy." Am. Compl. ¶¶ 102, 123. At this step, Defendants allegedly transmit the collected data records of individuals who they claim are noncitizens to state and local election administrators. *Id.* ¶¶ 101, 123. Along with the individuals' records, Defendants also send demands to the officials to investigate the eligibility of individuals on the list, and Plaintiffs further allege that Defendants ask electoral administrators to refuse to issue ballots to individuals on the list, and segregate or refuse to tabulate their ballots. *Id.* ¶ 101. Plaintiffs claim Defendants have publicly threatened election officials who do not comply with criminal legal action. *See, e.g.*, *id.* ¶¶ 137–138.

To illustrate how the Voter Data Transmission Policy works, Plaintiffs point to recent legal action in California. *Id.* ¶¶ 129–136; *see also California*, 2026 WL 3252428, at *2. On October 13, 2026, the Department of Justice hand-delivered Los Angeles County a "thumb drive contain[ing] the sensitive and personal identifiable information of over 20,000 individuals" it claimed were likely noncitizens unlawfully sent a vote-by-mail ballot, along with a letter instructing the County to review the list within 48 hours and "segregate" and withhold unsent ballots from the listed individuals. *California*, 2026 WL 3252428, at *2 (internal quotations omitted). When the County declined to do so, the DOJ sued the state of California and Los Angeles County and requested injunctive relief to force them to comply. *Id.* The County eventually determined the lists appeared to contain inaccuracies. *Id.* (observing that of the 20,000 records, only 7,035 "had addresses in Los Angeles County"). The court denied DOJ's motion for injunctive relief, *California*, 2026 WL 3252428, at *15, and the Court of Appeals for the Ninth Circuit denied DOJ's emergency motion for an injunction pending appeal. No. 26-7231, 2026 WL 3268272, at *1 (9th Cir. Oct. 30, 2026). Today, the DOJ filed an emergency application for an injunction pending appeal to the Supreme Court, which the Court denied. *See United States v. California*, No. 26A624 (U.S. Nov. 2, 2026) (denying application).

Plaintiffs claim Defendants are expanding the Voter Data Transmission Policy to other jurisdictions. On October 23, 2026, Defendants "sent letters to every county in California requiring them to set aside the votes of alleged non-citizens" or "'risk significant federal scrutiny' if they failed to comply." *California*, 2026 WL 3252428, at* 4. And on October 26, 2026, DOJ transmitted voter data to Washington state asking them to investigate and segregate ballots of identified voters. Pls.' Mem. in Support of Preliminary Injunction ("Pls.' Mem."), ECF No. 15-1 at 8 (citing Letter for Hon. Steve Hobbs, Washington Sec. of State, from Charles Neil Floyd,

Acting United States Attorney, and Pete Serrano, First Assistant United States Attorney, at 2 (Oct. 26, 2026) ("DOJ Letter to Washington"), available at https://perma.cc/K3WYET8G). The letter stated that DOJ "anticipate[s] imminently receiving a second list of individuals believed to be noncitizens . . . which [it] will transmit ahead of" the election that occurs tomorrow, November 3, 2026. *Id.* (citing DOJ Letter to Washington at 2). Plaintiffs contend that public reporting indicates the Administration plans to imminently transmit additional voter data information to new jurisdictions. Am. Compl. ¶ 139; Pls.' Mem. at 11. They also observe that internal DHS documents regarding the data collection efforts also identified "[p]riority states includ[ing] Texas, Pennsylvania, California, New Jersey, Minnesota, Michigan, Arizona, Florida, Georgia, and Ohio." Am. Compl. ¶ 108 (quoting documents).

**3. Procedural Background**

Plaintiffs, three nonprofit organizations, filed a Complaint on October 15, 2026, *see* ECF No. 1, and an Amended Complaint on October 28, 2026. ECF No. 13. Plaintiffs' Complaint asserts the defendants' Voter Data Policy (1) is not authorized by law and in excess of its statutory authority; (2) violates the Privacy Act, including that Act's substantive requirements on the collection, storage, and use of citizens' personal data as well as its notice-and-comment requirements; (3) violates the Paperwork Reduction Act, 44 U.S.C. § 3501, which also prescribes procedures before collecting information; (4) is arbitrary and capricious; and (5) violates separation of powers, federalism principles, and various constitutional provisions. Am. Compl. ¶¶ 188–265.

On October 29, 2026, Plaintiffs LULAC and EPIC moved for a Temporary Restraining Order, a preliminary injunction, and a stay of agency action under 5 U.S.C. § 705.[1] In support of their motion, Plaintiffs submitted declarations from Juan Proaño, LULAC's CEO, Gustavo Gutierrez Gomez, a LULAC member in Washington state, and Alan Butler, EPIC's President and Executive Director. *See* ECF Nos. 15-2, 15-3, 27-1. Plaintiffs seek a preliminary injunction only on the basis of Counts I-III of the Amended Complaint, which challenge the "Voter Data Transmission Policy." Pls.' Mem. at, at 4 n.2.

Plaintiffs claim (1) transmission of the voter data is in excess of statutory authority and contrary to law under the Administrative Procedure Act ("APA") because no statute authorizes it; (2) Defendants' bulk transmission of the records violates the Privacy Act's prohibition on disclosure of records without an applicable exception; and (3) that Defendants did not follow the Privacy Act's requirements that it publish a SORN governing the intended use of the collected records. Pls.' Mem. at 21–27. Plaintiffs seek an order enjoining or staying Defendants from "further disclosing, transmitting, or releasing data purporting to constitute lists of individual potential or actual non-citizen voters or registered voters" to election officials. *See* Proposed Order Granting Pls.' Mot., ECF 28-1, at 2.

## II. LEGAL STANDARDS

### A. Preliminary Injunction

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Hanson v. District of Columbia*, 120 F.4th 223, 231 (D.C. Cir. 2024) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22

[1] Plaintiffs noted that League of Women Voters is not moving for preliminary relief at this time. Pls. Mot. for Temporary Restraining Order, ECF No. 15 at 1 n.1.

(2008)). To make this showing, the movant must establish "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20 (citations omitted); *see also Clevinger v. Advoc. Holdings, Inc.*, 134 F.4th 1230, 1233 (D.C. Cir. 2025). Where, as here, "the Government is the opposing party," the last two factors—the balance of the equities and the public interest—"merge" because the Government's interest *is* the public interest. *Ctr. for Taxpayer Rts. v. IRS*, 190 F.4th 990, 1011 (D.C. Cir. Sept. 8, 2026) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

### B. Stay of Agency Action

Section 705 of the APA authorizes district courts to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings" on "such conditions as may be required and to the extent necessary to prevent irreparable injury." *See* 5 U.S.C. § 705. The standard for obtaining a Section 705 stay is the same as that for obtaining a preliminary injunction. *See Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985) (citing *Wash. Metro. Area Transit Auth. v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977)). But the two remedies differ in nature, "with an injunction commanding a party and a stay suspending the agency action itself." *Coal. for Indep. Tech. Rsch. v. Rubio*, 836 F. Supp. 3d 215, 232 (D.D.C. 2026) (citing *Nken*, 556 U.S. at 428–29)).

## III. ANALYSIS

The Court finds that all four preliminary injunction and stay factors favor Plaintiffs.[2]

[2] While the D.C. Circuit has expressed skepticism after the Supreme Court's decision in *Winter* as to whether a movant must satisfy each preliminary injunction and stay factor independently, or whether the factors may be evaluated on a sliding scale, *compare Clevinger*, 134 F.4th at

**A. Likelihood of Success on the Merits**

**1. Standing**

To establish standing, which is an irreducible constitutional minimum for jurisdiction, a plaintiff must show that it has suffered 1) an "injury in fact" that is concrete, particularized, and actual or imminent, 2) that the "injury was likely caused by the defendant", and 3) that the "injury would likely be redressed by judicial relief." *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 111–12 (2025) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)). Where, as here, the plaintiff seeks "prospective relief such as an injunction, the plaintiff must establish a sufficient likelihood of future injury." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013)). When seeking a preliminary injunction, a party must show a "substantial likelihood" of standing. *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 375 (D.C. Cir. 2017). Both Plaintiffs have made this showing.

**a. Organizational standing**

"Like an individual, an organization can establish standing by showing an actual or threatened injury in fact that is fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by a favorable court decision." *Ctr. for Biological Diversity v. Dep't of the Interior ("CBD")*, 144 F.4th 296, 314 (D.C. Cir. 2025) (cleaned up). This injury must be "'more than simply a setback to the organization's abstract social interests.'" *Am. Anti-Vivisection Soc'y v. USDA*, 946 F.3d 615, 618 (D.C. Cir. 2020) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). An organization must show (1) "an injury to its organizational interests," and

1235 (citing *Winter*, 555 U.S. at 20–22) *with Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291–92 (D.C. Cir. 2009), the court finds that all four factors favor Plaintiffs here.

(2) that it has "used its resources to counteract that harm." *Indep. Mkt. Monitor for PJM v. FERC ("PJM")*, 162 F.4th 1167, 1172 (D.C. Cir. 2025) (quoting *People for the Ethical Treatment of Animals v. U.S. Dep't of Agriculture ("PETA")*, 797 F.3d 1087, 1094 (D.C. Cir. 2015)).

While an impaired ability to conduct "issue advocacy" is not sufficient, an organization is injured when an action "directly affect[s] and interfere[s] with [its] core business activities." *CBD*, 144 F.4th at 315 (quoting *All. for Hippocratic Med.*, 602 U.S. at 395–96) (recognizing injuries to "non-advocacy operations"). This includes actions that shift to the organization "the burden to 'investigate and respond to complaints'" or require the organization to produce public education materials. *Id.* (quoting *PETA*, 797 F.3d at 1095. Moreover, for organizations that engage in voter registration work, "new obstacles [that] unquestionably make it more difficult for the [organizations] to accomplish their primary mission of registering voters[] provide injury for purposes . . . of standing," because as voting registration deadlines pass, "there can be no do over and no redress." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016).

LULAC contends Defendants' transmission of voter data to states and localities is "harm[ing] LULAC's core operations and mission and will continue to do so through election certification" and is "imposing drastic new obstacles that are making it more difficult . . . to accomplish its missions," namely by "causing LULAC to redirect resources to counteract the Policy's harms on LULAC's members." Pls.' Mem. at 29. These claims meet both prongs.

First, LULAC has established that the Voter Data Transmission Policy will directly affect and interfere with its core business activities, including voter registration and get-out-the-vote programming. *Cf. Newby,* 838 F.3d at 1; *Common Cause*, 2026 WL 3033772, at *10 (finding first prong satisfied when plaintiff established policy "will disrupt its existing voter education and

protection efforts.”). LULAC’s CEO declares that the “core mission of the organization” is “to educate and encourage its members and constituents to register to vote and vote in the upcoming election.” Decl. of Juan Proaño, (“Proaño Decl.”), ECF No. 15-2 ¶ 17. LULAC’s work includes voter registration drives, get-out-the-vote or “GOTV” programs, and distribution of information on how to register to vote, check registration status, vote by mail-in-ballot, and find polling places. *Id.* ¶¶ 4, 14, 16. It also operates a National Election Protection center that monitors election-related developments. *Id.* ¶ 44.

LULAC asserts that these core activities have been harmed by prior voter data transmissions and will be harmed by subsequent transmissions. LULAC alleges because its members have “registered to vote and voted in the past, their sensitive personal information is contained in the files that” Defendants maintain. Am. Compl. ¶ 168. Its CEO attests that the data transmissions have created “palpable fear among” LULAC members, many of whom are naturalized citizens, who do not know how their votes will be treated or how to remedy or cure ballots that are improperly segregated. *Id.* ¶¶ 29, 31–23. None of these fears are speculative, LULAC contends, because “LULAC has many members across the country who are naturalized and derived U.S. citizens.” Proaño Decl. ¶ 18. Courts have recognized that naturalized citizens face a demonstrable risk of inaccurate identification in government records. *League of Women Voters v. U.S. Dep’t of Homeland Sec.*, 835 F. Supp. 3d 79, 101 (D.D.C. 2026) (“[A] naturalized citizen who applied for a Social Security card or otherwise interacted with SSA prior to naturalization may be incorrectly identified as a non-citizen in SSA records.”); *Common Cause*, 2026 WL 3033772, at *33 (“The record reflects that [a USCIS database’s] ability to verify citizenship—and particularly the citizenship of acquired or naturalized citizens—is limited.”). And the Latino voters who are LULAC members “face particular risks . . . [as] [c]ommon names,

inconsistent identifying information, and records that fail to reflect naturalization can lead to mistaken identifications." Proaño Decl. ¶ 33.

LULAC also submits a declaration from a Washington state member, who attests he is a "naturalized citizen." Decl. of Gustavo Gutierrez Gomez ("Gutierrez Decl."), ECF No. 27-1 ¶¶ 5. He states that the highly publicized transmission of voter data has caused "fear, confusion, and chaos" to him and other LULAC members; that he is "afraid his name may" erroneously "appear on one of the government's lists," and that he is "very confused, and do[esn't] know what to do if" his name appears on a list." *Id.* ¶ 9–11. He is scared that his vote "will not count." *Id.* ¶ 10. The transmissions have directly impacted LULAC's leadership: LULAC's councils, staff, and volunteers responsible for its voter registration and GOTV efforts are now "concerned about the repercussions of" conducting their core mission of "help[ing] other people register or vote" and are worried that "they could be accused of a crime." Proaño Decl. ¶ 30. Similarly, the data transmissions have chilled the activity of LULAC "council leaders in Washington," who have recently "expressed concern that participating in GOTV efforts could unintentionally make them accomplices to a crime in the federal government's eyes." *Id.* ¶ 30. LULAC contends these disruptive and chilling effects will continue if more voter data is transmitted to states and localities, and will continue after election day until the elections are certified. Pls.' Mem. at 32.

Under controlling D.C. Circuit precedent, "a voter education and mobilization organization suffers irreparable harm when [government policies] hinder[] its ability to register voters in the run-up to an election[]." *Ctr. for Taxpayer Rts.*, 190 F.4th at 1010–11. LULAC's declarations establish, *inter alia*, that this has occurred. In sum, LULAC's declarations indicate that the government's policy has created "new obstacles . . . [that] make it more difficult for" LULAC to "accomplish [its] primary mission of registering voters." *Newby*, 838 F.3d at 9. LULAC has

further established that further transmission of voter data will harm its "core business activities," *All. for Hippocratic Med.*, 602 U.S. at 395, and "perceptibly impair[] the organization's ability to provide services." *Turlock Irrigation Dist. v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015) (internal quotations omitted).

Second, LULAC has established it will "use[] its resources to counteract that harm." *PJM*, 162 F.4th at 1172. LULAC has "been forced, and will continue to be forced, to spend time and money to counteract these effects," including "field[ing] concerns from voters who are confused or worried" and are unsure whether they will be targeted or if they are "still eligible to vote." Proaño Decl. ¶ 33. It has been "forced to pivot away from registration and GOTV efforts towards . . . ameliorating voters' fears that they may be targeted by the federal government or that their votes may not be counted." *Id.* ¶ 37; *cf. id.* ¶ 36 ("In the past week alone, LULAC staff have spent dozens of staff hours responding to concerns about the federal government's actions, [including] preparing additional voter education materials."). LULAC's CEO declared that this strain will be even greater if the government "expands its efforts to disclose . . . voter data to additional states beyond California and Washington." *Id.* ¶ 39. Further disclosures, LULAC states, would force it to "drain the resources and staff time of LULAC's leadership," and compel it to make emergency updates to its educational materials. *Id.* ¶ 42.

Defendants' arguments against LULAC's organizational standing are unavailing. Defendants contend that Plaintiffs' injury is speculative, as "[s]tates and localities have not complied with the obligations referenced in the letters." Defs.' Opp'n, ECF No. 24 at 8. But Plaintiffs direct the court to a report that at least one California county has indicated it is investigating based on data transmitted under the Transmission Policy. Pls.' Reply at 1 (quoting Hannah Poukish & Stephanie Zappelli, *SLO County DA Investigating Voter Registrations of 63*

*Suspected Noncitizens*, San Luis Obispo Tribune (Oct. 30, 2026), https://perma.cc/Q9PM-THJF). Defendants also claim the letters and transmission of voter data has "no independent legal effect" and that "no action to effectuate the DOJ's request[s] to states has occurred." Defs.' Opp'n at 8, 13. But an injury "may be premised 'on the predictable effect of Government action on the decisions of third parties.'" *Ctr. for Taxpayer Rts.*, 190 F.4th at 1001 (quoting *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019). It is entirely predictable that jurisdictions that receive future transmissions of future data, along with letters referencing federal criminal penalties and the threat of investigation might—as at least it appears one jurisdiction is doing—investigate. *Cf. Newby*, 838 F.3d at 8 (finding likelihood of future injury, even though it was unclear whether jurisdictions were "currently" implementing policies that would burden voter registration, but it was *likely* that "similar obstacles . . . will spring up").

More importantly, although Defendants contend LULAC's injuries depend on a "speculative chain of possibilities" that third-party recipients of voter data *may* act to investigate voters, Defs.' Opp'n at 10 (citing *Clapper*, 568 U.S. at 410), this misses the point: Plaintiffs' contended harm is Defendants' highly publicized "transmission of lists of voter data" itself, which has "sowed distrust and confusion and made it more difficult for LULAC to encourage voter confidence and inform voters about the use of voter data and voter security." Proaño Decl. ¶ 28. And while "an organization may not establish standing simply by spending money 'opposing those policies'" it dislikes, *Ctr. For Taxpayer Rts.*, 190 F.4th at 1001 (quoting *All. for Hippocratic Med.*, 602 U.S. at 395), LULAC is doing something different: It is responding to impediments to its core voter registration and education campaigns, including spending resources to support staff, volunteers, and councils. Finally, Defendants do not materially contest that a favorable ruling from this court blocking further transmissions of voter data will redress LULAC's injuries.

For all these reasons, LULAC has established a substantial likelihood of future injury if transmissions of voter data continue.

**b. Associational standing**

LULAC also establishes associational standing. Associational standing allows an organization to sue on behalf of its members, provided (1) at least one member would have standing in his own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires an individual member's participation in the suit. *See Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002) (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342–43 (1977)). Of course, the member or members must establish a concrete, particularized, and actual or imminent injury in fact, causation, and redressability. *See, e.g.*, *Diamond Alt. Energy, LLC*, 606 U.S. at 111–12.

Plaintiffs contend that "Defendants are irreparably harming LULAC's members by causing voter confusion" and fear. Pls.' Mem. at 33. Voter confusion is a cognizable injury in fact. Voting is "a process 'of the most fundamental significance under our constitutional structure.'" *Bost*, *v. Illinois State Bd. of Elections*, 607 U.S. 71, 77 (2026) (quoting *Ill. Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979)). Thus, "[t]here is no doubt that the right to vote is a legally protected interest cognizable under Article III of the Constitution." *League of Women Voters*, 835 F. Supp. 3d at 113 (alteration in original) (internal quotations omitted). "Even an increased risk of disenfranchisement can make an injury sufficiently imminent for standing purposes." *Id.* (quoting *Richardson v. Trump*, 496 F. Supp. 3d 165, 179 (D.D.C. 2020) (internal quotations omitted). Accordingly, government actions that are "likely to confuse the public" about voting requirements are a cognizable harm, especially where "[c]onfusion will create a disincentive for citizens who would otherwise attempt" to participate in the election. *Newby*, 838

F.3d at 13. *Cf. DSCC v. Trump*, No. 26-CV-01114, 2026 WL 2681471, at *6 (D.D.C. Sept. 13, 2026) (finding member's "confusion and uncertainty about whether [she] will be able to vote by mail in the upcoming elections" supported harm to organization) (alteration in original). And conduct that "chills citizens' election-related activities" and causes the "fear [of] being wrongly targeted" injures an individual's "legally protected interest in participating in the election." *Cal. Nurses Ass'n v. Mullin.*, No. 26-7139, 2026 WL 3268397, at *3–4 (9th Cir. Oct. 30, 2026) (finding fear and chill to voting activities caused by DHS investigation of naturalized citizens supported standing).

LULAC's declarations demonstrate these harms have occurred and will likely occur when the government transmits additional voter data. The Government's disclosures of data have left LULAC members "concerned and confused about how their vote will be treated due to the federal government's policies." Proaño Decl. ¶ 29; *see also id.* ¶ 33 ("LULAC has had to increasingly field concerns from voters who are confused or worried . . . some of whom are wondering whether their personal information could be used to target them or whether they are still eligible to vote"), ¶ 37 ("We have been forced to pivot away from registration and GOTV efforts toward . . . ameliorating voters' fears"), ¶ 43 (LULAC is "serv[ing] as a sounding board for our councils and members to clear up misinformation, answer questions, and reassure people who are worried about their registration status"), ¶ 44 ("We have also had to create and publish additional messaging to address the increased confusion"). And LULAC member Gustavo Gutierrez Gomez attested to the "fear, confusion, and chaos" the transmissions of voter data have caused to him as a naturalized citizen with a Latino last name—the type of individual at high risk of inaccurate identification in Defendants' systems. Gutierrez Decl. ¶ 9. *See also id.* ¶ 10 ("I am afraid that my

name may appear on one of the government's lists. I am also very confused. I do not know if my name is on the list, and I don't know what to do if it does appear on there.")

Based on LULAC's declarations, its members are likely to suffer an imminent injury in fact from the confusion, fear, and chilling caused by further transmission of voter data. Defendants contend that any impediment to vote is speculative and not causally linked, as election administrators would have to choose to act on the data transmitted to them. Defs.' Opp'n at 12. But this outcome is not speculative, as the government has brought legal action against jurisdictions to *compel* them to investigate the data it has transmitted—an effort that courts have found would "provoke catastrophic change, upending the administration of the election" and would "likely cause 'voter confusion and consequent incentive to remain away from the polls.'" *California*, 2026 WL 3252428, at *15 (quoting *Purcell v. Gonzalez*, 549 U.S. 1, 5 (2006) (denying government's request for a TRO to compel California and Los Angeles County to investigate voters based on data it transmitted). And as with LULAC's organizational standing, Defendants miss the point: the fear and confusion caused by the government's publicized efforts to share this data with election administrators is itself an injury, as "[c]onfusion will create a disincentive for citizens who would otherwise attempt" to participate in the election. *Newby*, 838 F.3d at 13. These imminent harms undoubtably are germane to LULAC's mission as a voter registration and education organization.

Accordingly, LULAC has established a sufficient likelihood of associational standing on behalf of the voting-related injuries to its members.

**c. Informational standing**

Finally, the court finds LULAC has established a sufficient likelihood of informational standing. LULAC asserts that "Defendants' refusal to publish SORNs in violation of the Privacy

Act's transparency requirements" is an irreparable injury. Pls.' Mem. at 35. "To prove an informational injury, a plaintiff must show that (1) it has been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." *Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 77 F.4th 679, 685 (D.C. Cir. 2023) (quoting *Elec. Priv. Info. Ctr.*, 878 F.3d at 378). For the first prong, the court need not conclude that a plaintiff's reading is correct. *See Common Cause*, 2026 WL 3033772, at *12.

The first element is straightforwardly satisfied, as LULAC contends that it has been deprived of information contained in the SORN that it believes must be published under the Privacy Act before Defendants collected, maintained, and disseminated voters' data. Pls.' Mem. at 21–23, 36 (describing a SORN as "statutorily guaranteed"). The second element is also met, as LULAC claims that without the information in a SORN, it "cannot provide accurate information to its members about how their data is being used by the federal government and clear up their confusion." Proaño Decl. ¶ 47 ("As a result, LULAC was not aware of this policy, [and] does not know how federal agencies are using its members' data."). LULAC argues that in the time-sensitive context of an election, the lack of a SORN means the organization and its members "cannot fully understand how voters' personal data is being aggregated, repurposed, and pooled across the government . . . or protect themselves against any attendant consequences to their personal lives, careers, or participation in elections." Pls.' Mem. at 36. *Cf. Drs. for Am. v. Off. Of Personnel Mgmt.*, 766 F. Supp. 3d 39, 54 (D.D.C. 2025) (recognizing "time-sensitive" informational injuries). This court has recognized similar informational injuries as cognizable. *See Common Cause*, 2026 WL 3033772, at *12 (finding defendants' failure to publish a SORN

"deprived [plaintiff] of necessary information about" a similar initiative to collect state voter registration list data and "impair[ed] its ability to conduct its voter education and other activities").

Defendants counter by citing a case involving a different statute, in which the court held that the E-Government Act was "not designed to vest a general right to information." Defs.' Opp'n at 16 (quoting *EPIC*, 878 F.3d at 378). But unlike the E-Government Act, the Privacy Act expressly provides for publication in the Federal Register of a SORN—a "notice of the existence and character of the system of records," 5. U.S.C. § 552a(a)(5), (e)(4). This notice provision is central to the Act's purpose "to prevent unauthorized uses of Americans' personal information by . . . informing the public of covered collections of information before they take place." *Common Cause*, 2026 WL 3033772, at *12. "Without question," LULAC's informational harms "are of the type that the Privacy Act . . . [was] intended to prevent." *Id.*

EPIC also claims standing on the basis of informational injuries. It contends it "routinely monitors, analyzes, and educates the public about the collection, use, retention, and transfer of personal information by federal agencies." Decl. of Alan Butler ("Butler Decl."), ECF No. 15-3 ¶ 4. This includes relying on SORNs and other public notices on "hundreds of occasions" to support that work. *Id.* ¶ 10. EPIC claims that Defendants' failure to publish a SORN have prevented EPIC from "ensuring oversight of and educating the public on government activities that impact individual privacy, free expression, and democratic values." Pls. Mem. at 38. Because EPIC claims Defendants' "failure to provide the relevant disclosures deprived it of necessary information" about the Voter Data Transmission Policy "impair[s] its ability to conduct" education activities, and these "harms are of the type that the Privacy Act were intended to prevent," EPIC also likely has informational standing. *Common Cause*, 2026 WL 3033772, at *12.

**2. Final Agency Action**

Defendants argue that even if Plaintiffs have standing, they do not identify a "final agency action" subject to APA review. Defs.' Opp'n at 17. *See also* 5 U.S.C. § 704. They claim Plaintiffs challenge only a loose "series of actions that culminate in letters to states asking" them to take action, Defs.' Opp'n at 17, and contend that Plaintiffs challenge only individual enforcement actions. An agency action is "final" under the APA if (1) it "mark[s] the consummation of the agency's decisionmaking process" and is not "merely tentative or interlocutory," and (2) "rights or obligations have been determined" by it or "legal consequences will flow" from it. *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016)

Plaintiffs are likely to succeed on their claim that Defendants' adoption of a policy to transmit—and the actual transmission of—voter data meets the first prong. "Adopting a policy of permitting employees to disclose confidential information without notice is surely a 'consummation of the agency's decisionmaking process.'" *Venetian Casino Resort, L.L.C. v. E.E.O.C.*, 530 F.3d 925, 931 (D.C. Cir. 2008). Plaintiffs' Amended Complaint refers to public declarations made by DOJ officials in related litigation, letters sent from DOJ to states and localities, Am. Compl. ¶¶ 96–144, as well as a public document posted on the social media site X by a DOJ official detailing a "multi-agency, multi-step verification process" by which DOJ and DHS collect data, augment, and analyze it. Am. Compl. ¶ 96; Pls.' Mem. at 1. The process ends with a "*final* list delivered to state & county . . . [a]fter all reviews." Am. Compl. ¶ 96; Pls.' Mem. at 1 (emphasis added).

Defendants argue this document is merely press material, but in *Center for Taxpayer Rights* the D.C. Circuit found final agency action based on "multiple illustrated flowcharts . . . that . . . explain the [p]rocedure" for a disclosure process. 190 F.4th at 1002. Moreover, "[a]n agency's decision to *adopt* a policy, even if unwritten, can be challenged under

the APA." *Common Cause*, 2026 WL 3033772, at *20. Defendants' course of action indicates that they have "not only finalized the process but ha[ve] also used it to make disclosures," by transmitting voter data to states. *Ctr. for Taxpayer Rts.*, 190 F.4th at 1003. Even if the "details of [Defendants'] disclosure policy are still unclear," on this record it appears they have "'a policy of disclosing confidential information'" to states and localities "in a manner that . . . has not previously been disclosed." *Id.* at 999 (internal quotations omitted) (affirming finding of final agency action where plaintiffs alleged IRS "unlawfully adopted a new policy governing disclosure of [tax] return information to ICE").

Even if, as Defendants contend, the challenged policy contains a series of actions, Plaintiffs challenge the "final step" as described by the DOJ's own flowchart and materials: transmission to recipients. Am. Compl. ¶¶ 96; Pls.' Mem. at 1. Defendants themselves concede that this "series of actions . . . *culminates*" in transmission of voter data to states and localities. Defs.' Opp'n at 17. Moreover, that this policy may not be "formally noticed or published . . . is not a prerequisite for final agency action." *Ctr. for Taxpayer Rts.*, 190 F.4th at 1003. And courts in this district have agreed that the actual act of transmitting records outside of the agency is "final" for APA purposes. *See League of United Latin Am. Citizens ("LULAC") v. Exec. Off. of the President*, 818 F. Supp. 3d 34, 112 (D.D.C. 2026) ("Sharing sensitive records with others *outside* the agency is 'final' because it clearly represents the 'consummation' of the agency's decision-making process."), *aff'd*, No. 25-5476, 2026 WL 1991571 (D.C. Cir. July 2, 2026).

Second, Plaintiffs have established that "legal consequences will flow" from Defendants' adoption of the policy and transmission of voter data under it. As an initial matter, the D.C. Circuit has held "[a]dopting a policy of permitting employees to disclose confidential information without notice is surely . . . one by which . . . rights [and the agency's] obligations have been determined."

*Venetian Casino*, 530 F.3d at 931. Accordingly, courts in this district regularly find that "nonconsensual sharing of individuals' confidential information *itself* creates legal consequences, without any need for further action." *Common Cause*, 2026 WL 3033772, at *21 (emphasis in original); *see also LULAC*, 818 F. Supp. 3d at 112. Here, Plaintiffs allege a similar policy of nonconsensual disclosure of sensitive information outside an agency.

Finally, as Plaintiffs point out, Defendants have themselves contended that legal consequences flow from the transmission of the data. In litigation to compel California to investigate a list of voters transmitted by DOJ and DHS, Defendants argued that the government's provision of the information puts the recipients on notice of possible noncitizen voting, such that the failure to investigate means recipients are "facilitating violations of the statute"—a condition which could impose legal liability. *See* Defs.' Mem. in Support of TRO, *United States v. California*, No. 26-cv-12025 (C.D. Cal. Oct. 19, 2026), Dkt. No. 22-2 at 21. *Cf. Common Cause*, 2026 WL 3033772, at *21 (similar DOJ demand letters to states that "resulted in settlement agreements, memoranda of understanding, and enforcement litigation" indicated finality). In sum, Defendants appear to have "implement[ed] a policy choice, putting it into motion in a way that leads to concrete results and prescribes consequences." *Ctr. for Taxpayer Rts.*, 190 F.4th at 1004. Thus, at this stage, Plaintiffs have sufficiently established a likelihood that Defendants' adoption of the Voter Data Transmission Policy and disclosure of data under it constitutes final agency action reviewable under the APA.

**3. Merits**

**i. Excess of Statutory Authority**

The APA requires courts to "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]" 5 U.S.C. §§ 706(2)(A), (C). This is because "[a]n agency . . . literally has no power to act . . . unless and until

Congress authorizes it to do so by statute." *FEC v. Cruz*, 596 U.S. 289, 301 (2022) (internal quotations omitted). Plaintiffs claim that no statute authorizes Defendants' Voter Data Transmission Policy. Defendants point to only one: 18 U.S.C. § 611, which criminally penalizes noncitizen voting. *See* 18 U.S.C. § 611. Defendants also make a passing reference to the Elections Clause of the Constitution which provides that Congress may "make or alter such Regulations" that states have prescribed as to the time, place, and manner of holding elections. Const. art. I § 4, cl. 1.

Plaintiffs have established that they will likely succeed on the merits of their claim that no statute authorizes the Voter Data Transmission Policy. The plain text of 18 U.S.C. § 611 provides: "It shall be unlawful for any [noncitizen] to vote in any [federal] election," and provides for punishment of violations by a fine or imprisonment. *See* 18 U.S.C. § 611. The statute contains no language authorizing the broad program of bulk transmission of sensitive voter data for the purposes of intervening in state election procedures. *See Cruz*, 596 U.S. at 301. *See also United States v. California*, No. 26-7070, 2026 WL 3212945, at *10–13 (9th Cir. Oct. 26, 2026) (Bennett, J., concurring) ("On its face, [18 U.S.C. § 611's] plain text governs only an individual's conduct—it simply does not prescribe the processes a state must (or must not) use when handling ballots from allegedly unqualified voters.") Defendants ask this court to read the statute's authorization of criminal prosecution and imposition of post facto *criminal* penalties to authorize a broad authority to carry out a pre-emptive program of data transmission. But such a reading would run afoul of the requirement that courts construe penal statutes strictly, *see, e.g.*, *U.S. v. Boston & M.R.R.*, 380 U.S. 157, 160 (1965), and against the longstanding proposition that Congress does not "delegate a decision of such . . . political significance to an agency in so cryptic a fashion." *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000).

Moreover, although Defendants broadly assert that 18 U.S.C. § 611 "allows for the maintenance of a republican form of government," and imply it should be viewed as connected with the Elections Clause, they contradictorily assert that 18 U.S.C. § 611 was passed under Congress's "plenary authority over *immigration* law." Defs.' Opp'n at 23 (emphasis added). Other courts to consider the plain text of the statute agree that it does not authorize broad intervention in state election procedures. *See California*, 2026 WL 3268272, at *4. Defendants point to no other statute which they claim authorizes their dissemination of voter data, and courts have rejected arguments that other federal statutes authorize similarly wide-ranging policies of voter data collection and use. *See, e.g.*, *Common Cause,* 2026 WL 3033772, at *1, 22-26 (program of demanding state voter lists, comparing them to inaccurate databases, and disseminating to states was not authorized by any statute).

Accordingly, the court finds it likely that Plaintiffs will succeed on the merits of their argument that the Voter Data Transmission Policy is unauthorized by any statute and is thus in excess of statutory authority and contrary to law. *See* 5 U.S.C. §§ 706(2)(A), (C).

**ii. Privacy Act**

Plaintiffs are also likely to succeed on the merits of their claims that the Voter Data Transmission Policy violates the Privacy Act. They contend Defendants violated the Privacy Act's procedural safeguards requiring agencies to post a SORN in the Federal Register whenever an agency "'establish[es] or revis[es]' any 'system of records.'" *Common Cause*, 2026 WL 3033772, at *3 (quoting 5 U.S.C. § 552a(a)(5), (e)(4) (alteration in original)). *See* also Pls.' Mem. at 21–23. They also claim the bulk transmission of voter data violates the Act's "general prohibition on disclosure without consent or an applicable exception." Pls. Mem. at 23.

Defendants do not meaningfully respond to the merits of Plaintiffs' substantive Privacy Act claims. Instead, they claim that the APA does not grant a cause of action under the Privacy

Act because there is another "adequate remedy in a court." 5 U.S.C. § 704. They contend that because the Privacy Act already provides a remedy for adversely affected *individuals* to sue under § 552a(g)(1)(D), the Act precludes any organizational claims for procedural violations. Defs.' Opp'n at 22. But as Defendants conceded at oral argument, courts in this district "ha[ve] considered and rejected this argument." *Common Cause*, 2026 WL 3033772, at *27 (quoting *League of Women Voters*, 835 F. Supp. 3d at 120); *see also* Oct. 31, 2026 Hr'g Tr. 53:13–24, ECF No. 29. "[T]he Privacy Act does not provide relief for violations of its procedural requirements or provide remedies to enforce its statutory limitations on disclosure." *Id.* at *27 (citations omitted). These are the precise harms that Plaintiffs here seek to vindicate. "Indeed, the D.C. Circuit has permitted vacatur relief under the APA to enforce the Privacy Act's disclosure provisions." *Id.* (citing *Doe v. Stephens*, 851 F.2d 1457, 1465–67 (D.C. Cir. 1988)). And in any event, the Privacy Act "cannot serve as an adequate remedy" for LULAC and EPIC, "organizations with no private right of action under the Act." *Id.* at *28 (citing 5 U.S.C. § 552a(g)(1)). Therefore the APA's adequate remedy does not apply and Plaintiffs can bring their Privacy Act claims.

Although Defendants' failure to address the substantive Privacy Act claims means their arguments are arguably waived, *see Texas v. United States*, 798 F.3d 1108, 1110 (D.C. Cir. 2015), even without that waiver, the court finds that Plaintiffs are likely to succeed on the merits of those claims.

Plaintiffs allege—and Defendants do not credibly contest—that by amassing millions of voter data records and enhancing them with additional third-party and other federal data, Defendants "have established and maintained new or revised systems of records." Am. Compl. ¶ 220. *Cf. Common Cause*, 2026 WL 3033772, at *28 (finding DOJ's related collection of state voter registration lists was stored as part of a "system of records"). And they claim that Defendants

have not "published any new or revised SORNs" that cover collection or transmission of this data, Compl. ¶ 221, and Defendants have identified none.[3] Defendants do not contend that a SORN has been published or otherwise applies to its data collection. This constitutes a violation of the Privacy Act's procedural requirements. As another court in this district has observed, "it is flatly inconsistent with the text, structure, and purpose of the Privacy Act for an agency to initiate a major new data-sharing program affecting the sensitive data of millions of Americans" without publishing a SORN that covers the intended routine uses of the information. *LULAC*, 818 F. Supp. 3d at 115–16. Consequently, Plaintiffs are likely to succeed on their claims that Defendants' amassing and transmitting of voter data without the publication of a SORN violates the Privacy Act. *See Common Cause*, 2026 WL 3033772, at *29.

Plaintiffs also show a likelihood of success on their claims that bulk disclosure of voter records is prohibited by the Privacy Act. Disclosure of records under the Act is only permitted under a limited set of exceptions. *See Chichakli v. Tillerson*, 882 F.3d 229, 233 (D.C. Cir. 2018) ("An agency violates the Act when it discloses information . . . and the disclosure is not pursuant to a valid exception.") (internal quotations omitted). Records may be disclosed pursuant to a "routine use," which is a "use of [a] record for a purpose which is compatible with the purpose for which it was collected." 5 U.S.C. § 552a(a)(7). But new routine uses must be announced in a SORN. *See id.* § 552a(e)(4)(D); *Chichakli*, 882 F.3d at 233. Defendants' failure to identify a

[3] This fact renders Defendants' argument even weaker than in *Common Cause*, where defendants contended that a 23-year old SORN for a database containing information on "[s]ubjects of investigations [and] victims" applied to the DOJ's broad collection of state voter registration list data because all individuals on the lists were either subjects or victims of voter fraud investigations. *Common Cause*, 2026 WL 3033772, at *28–29 (alterations in original). The court found that claim "defies belief . . . . [I]t is nonsensical to say that every American registered to vote is the subject of a DOJ voter fraud investigation simply because they registered to vote . . . . It is clear as day that the 2003 SORN does not cover the [collection of state voter registration lists]." *Id.* at *28.

SORN covering transmission of data to states and localities for election administration forecloses reliance on the routine use exception. And without a SORN, it appears no other exception justifies Defendants' bulk transmission of voter records. Defendants are unlikely to be able to rely on the law enforcement exception, which permits disclosure based on a request from the "head of the agency or instrumentality . . . specifying the particular portion desired." 5 U.S.C. § 552a(b)(7). Defendants have not identified any such request. And the law enforcement exception "was intended to 'requir[e] that the agency rule on each request on a case-by-case basis,'" not disclose records in bulk. *Common Cause*, 2026 WL 3033772, at *32 (alteration in original) (quoting S. Rep. No. 93-1183 at 73 (1974)). Plaintiffs' proffered evidence indicates that Defendants have disclosed and intend to continue to disclose voter data in bulk. *See, e.g., California*, 2026 WL 3252428, at *2 (explaining DOJ transmitted information of "over 20,000 individuals"); Pls.' Mem. at 11. Consequently, the law enforcement exception is inapplicable, and Plaintiffs are likely to succeed on their claim that the Voter Data Transmission Policy violates the Act's prohibitions on disclosure without any applicable exception.[4]

**B. Irreparable Harm**

"The party seeking a preliminary injunction must make two showings to demonstrate irreparable harm. First, the harm must be 'certain and great,' 'actual and not theoretical,' and so 'imminen[t] that there is a clear and present need for equitable relief to prevent irreparable harm.'" *Newby*, 838 F.3d at 7–8 (alteration in original) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)). Second, it must be "'beyond remediation' at a later date." *Ctr. for Taxpayer Rts.*, 190 F.4th at 1011 (quoting *Newby*, 838 F.3d at 7–8).

[4] Because Plaintiffs have shown a likelihood of success on some of their improper disclosure claims, the court need not address their remaining claims.

The election is tomorrow. As noted above, the imminent transmission of voter data has already and will continue to "unquestionably make it more difficult for [LULAC] to accomplish [its] primary mission of registering voters," and this "provide[s] injury for purposes . . . of irreparable harm." *Newby*, 838 F.3d at 9. "And that harm is irreparable because after the deadlines for the November election pass, 'there can be no do over and no redress.'" *Id.* (quoting *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014)). *See also Ctr. for Taxpayer Rts.*, 190 F.4th at 1010–11. Plaintiffs allege that Defendants intend to continue sharing lists of voter data with states and localities, and proffered supporting evidence. *See* Pls.' Mem. at 11 (quoting letter from DOJ to Washington Secretary of State explaining DOJ "anticipate[s] imminently receiving a second list of individuals believed to be noncitizens who are registered to vote from DHS, which [DOJ] will transmit ahead of the" election). Plaintiffs contend that these demands are likely to lead to further fear, confusion, and injury similar to the type that LULAC and its members are already experiencing. *Cf. Newby*, 838 F.3d at 9 (finding likely future irreparable injury where "based on the [prior] experience of [a plaintiff], it seems almost certain that similar obstacles to [voter registration] will spring up" if challenged policy continued). "As a preliminary injunction requires only a likelihood of irreparable injury, Damocles's sword does not have to actually fall . . . before the court will issue an injunction." *Id.* (citing *Winter*, 555 U.S. at 22).

Plaintiffs' informational injuries also will cause irreparable harm, because they "relate[] directly to the conduct of impending elections." *Citizens for Resp. & Ethics in Washington ("CREW") v. U.S. Dep't of Just.*, 826 F. Supp. 3d 73, 89 (D.D.C. 2026). "This is because 'stale information is of little value,' especially in the time-sensitive context of an election cycle." *Id.* LULAC claims that without the required information from a SORN, it "cannot provide accurate

information to its members about how their data is being used by the federal government and clear up their confusion." Proaño Decl. ¶ 47. "The irreparable injury resulting from any delay will become particularly acute after upcoming elections pass, as they will" tomorrow. *CREW*, 826 F. Supp. 3d at 89.

**C. Balance of the Equities and the Public Interest**

The balance of the equities and the public interest, which merge in a case against the government, favor Plaintiffs. *See Nken*, 556 U.S. at 435. The public has a "strong interest in exercising the fundamental political right to vote," *Purcell*, 549 U.S. at 4 (internal quotation marks omitted), a right that is one "of the most fundamental significance under our constitutional structure," *Ill. State Bd. of Elections*, 440 U.S. at 184. The public interest favors a preliminary injunction because, absent one, there is substantial risk of "[c]onfusion [that] will create a disincentive for citizens who would otherwise" vote, register to vote, or participate in election-related activities, as LULAC's declarations establish. *Newby*, 838 F.3d at 12–13. Moreover, the public interest and the balance of the equities weigh heavily in favor of protecting the privacy and voting rights of the millions of Americans whose voter data Defendants have already collected.

On the other side of the ledger, the public "indisputably has a compelling interest in preserving the integrity of [the] election process." *Purcell*, 549 U.S. at 4. But the government does "not point to any record evidence that there will be significant fraud in the upcoming elections in the event the [c]ourt enters preliminary injunctive relief." *DSCC*, 2026 WL 2681471, at *10. Moreover, to the extent the government contends its demand letters and transmission of voter data have "no independent legal effect" and jurisdictions are free to ignore its requests, this undercuts any claim that an injunction imposes harm on the government's efforts to combat purported fraud. Defs.' Opp'n at 8. And because there is "generally no public interest in the perpetuation of unlawful agency action," the court's finding that Defendants' disclosure of sensitive voter data is

likely unlawful counsels in favor of an injunction. *Newby*, 838 F.3d at 12. Further, the *Purcell* principle does not counsel against injunctive relief—and in fact counsels in favor of it, as the purpose of the principle is to "preserve the States' existing electoral status quo," and reduce confusion. *DSCC*, 2026 WL 2681471, at *11 (emphasis omitted). Here, where the effect of further voter data transmissions and demands from the government may "cause widespread confusion among voters and election officials, divert election administration resources, and usher in electoral chaos," the *Purcell* principle counsels for retaining the states' status quo and enjoining further voter data transmissions. *California*, 2026 WL 3212945, at *16 (Sanchez, J., concurring) (internal quotations omitted).

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for a Preliminary Injunction and Stay of Agency Action is GRANTED. ECF No. 15. An order will accompany this opinion.

It is **SO ORDERED**.

Date: November 2, 2026

Tanya S. Chutkan
TANYA S. CHUTKAN
United States District Judge